# EXHIBIT 3

NYSCEF

Niagara County Supreme Court

**Document List**

**Index #  E165792/2018**    Created on:09/14/2018 12:56 PM

Case Caption:   **A M H et al - v. - PURDUE PHARMA, LP et al**

Judge Name:   **Frank Caruso**

| Doc# | Document Type/Information | Status | Date Received | Filed By |
|------|---------------------------|--------|---------------|----------|
| 1 | SUMMONS + COMPLAINT | Processed | 08/23/2018 | Creadore, D. |
| 2 | AFFIRMATION/AFFIDAVIT OF SERVICE | Processed | 09/05/2018 | Creadore, D. |
| 3 | AFFIRMATION/AFFIDAVIT OF SERVICE | Processed | 09/05/2018 | Creadore, D. |
| 4 | RJI -RE: OTHER<br>ADMISSION PRO HAC VICE | Processed | 09/10/2018 | Creadore, D. |
| 5 | NOTICE OF MOTION | Pending | 09/10/2018 | Creadore, D. |
| 6 | AFFIRMATION | Processed | 09/10/2018 | Creadore, D. |
| 7 | AFFIDAVIT | Processed | 09/10/2018 | Creadore, D. |
| 8 | EXHIBIT(S)<br>LA cert of good standing | Processed | 09/10/2018 | Creadore, D. |
| 9 | AFFIDAVIT | Processed | 09/10/2018 | Creadore, D. |
| 10 | EXHIBIT(S)<br>LA Certificate of Good Standing | Processed | 09/10/2018 | Creadore, D. |
| 11 | AFFIDAVIT | Processed | 09/10/2018 | Creadore, D. |
| 12 | EXHIBIT(S)<br>various certificates of good standing | Processed | 09/10/2018 | Creadore, D. |
| 13 | EXHIBIT(S)<br>PHV- record of no proceedings | Processed | 09/10/2018 | Creadore, D. |
| 14 | EXHIBIT(S)<br>Law School Ltr. | Processed | 09/10/2018 | Creadore, D. |
| 15 | AFFIDAVIT<br>WV Certificate of Good Standing attached | Processed | 09/10/2018 | Creadore, D. |
| 16 | AFFIDAVIT | Processed | 09/10/2018 | Creadore, D. |
| 17 | EXHIBIT(S)<br>certificate of good standing | Processed | 09/10/2018 | Creadore, D. |
| 18 | ORDER ( PROPOSED ) | Processed | 09/10/2018 | Creadore, D. |
| 19 | NOTICE OF MOTION (AMENDED)<br>change of motion return date | Pending | 09/12/2018 | Creadore, D. |
| 20 | AFFIRMATION/AFFIDAVIT OF SERVICE | Processed | 09/12/2018 | Creadore, D. |
| 21 | AFFIRMATION/AFFIDAVIT OF SERVICE | Processed | 09/12/2018 | Creadore, D. |

**SUPREME COURT FOR THE STATE OF NEW YORK**
**NIAGARA COUNTY**

-------------------------------------------------------------------------X

| | |
|---|---|
| **A.M.H., INDIVIDUALLY AND** | INDEX NO.: |
| **IN HER CAPACITY AS LEGAL CUSTODIAN** | |
| **OF BABY C.E., ON BEHALF OF THEMSELVES** | Plaintiffs designate |
| **AND ALL OTHERS SIMILARLY SITUATED,** | Niagara County as the place |
| | of trial. The basis of venue is |
| **Plaintiffs,** | Plaintiffs' residence. |

**v.**

CLASS ACTION COMPLAINT
*JURY TRIAL DEMANDED*

**PURDUE PHARMA L.P.;**
**PURDUE PHARMA, INC.;**
**THE PURDUE FREDERICK COMPANY, INC.;**
**MCKESSON CORPORATION;**                    **SUMMONS**
**CARDINAL HEALTH, INC.;**
**AMERISOURCEBERGEN CORPORATION;**            **ECF FILED**
**TEVA PHARMACEUTICAL INDUSTRIES, LTD.;**
**TEVA PHARMACEUTICALS USA, INC.;**
**CEPHALON, INC.;**
**JOHNSON & JOHNSON;**
**JANSSEN PHARMACEUTICALS, INC.;**
**ORTHO-MCNEIL-JANSSEN**
**PHARMACEUTICALS, INC. n/k/a**
**JANSSEN PHARMACEUTICALS, INC.;**
**JANSSEN PHARMACEUTICA INC. n/k/a**
**JANSSEN PHARMACEUTICALS, INC.;**
**INSYS THERAPEUTICS, INC.;**
**ENDO HEALTH SOLUTIONS INC.;**
**ENDO PHARMACEUTICALS, INC.;**
**ALLERGAN PLC f/k/a ACTAVIS PLC;**
**WATSON PHARMACEUTICALS, INC.**
**n/k/a ACTAVIS, INC.;**
**WATSON LABORATORIES, INC.;**
**ACTAVIS LLC; and**
**ACTAVIS PHARMA, INC. f/k/a**
**WATSON PHARMA, INC.,**

**Defendants.**

-----------------------------------------------------------X

To the above named Defendants:

**YOU ARE HEREBY SUMMONED** to answer the complaint in this

action and to serve a copy of your answer, or, if the complaint is not served with this

summons, to serve a notice of appearance, on the plaintiffs' attorneys within twenty (20)

days after the service of this summons, exclusive of the day of service (or within thirty

(30) days after the service is complete if this summons is not personally delivered to you

within the State of New York); and in case of your failure to appear or answer, judgment

will be taken against you by default for the relief demanded in the complaint.

Dated:  New York, New York
          August 22, 2018

_____/s/ Donald Creadore_____
THE CREADORE LAW FIRM, P.C.
Attorneys for Plaintiffs
450 Seventh Avenue – Suite 1408
New York, New York 10123
(212) 355-7200

SERVICE LIST ATTACHED:

## OPIOID DEFENDANT SERVICE INFORMATION
### (New York)

**Please Serve:**

**ACTAVIS PHARMA, INC. f/k/a WATSON PHARMA, INC.**
Through their Registered Agent for Service of Process
Corporate Creations Network, Inc.
15 N. Mill St.
Nyack, NY 10960

**AMERISOURCEBERGEN CORPORATION**
Through their Registered Agent for Service of Process
C T Corporation System
111 Eighth Ave.
New York, NY 10011

**CARDINAL HEALTH, INC**
Through their Registered Agent for Service of Process
C T Corporation System
111 Eighth Ave.
New York, NY 10011

**CEPHALON, INC.**
Through their Registered Agent for Service of Process
Corporate Creations Network, Inc.
600 W. Main St.
Nyack, NY 10960

**ENDO PHARMACEUTICALS, INC.**
Through their Registered Agent for Service of Process
C T Corporation System
111 Eighth Ave.
New York, NY 10011

**JOHNSON & JOHNSON**
Through their Registered Agent for Service of Process
C T Corporation System
111 8th Ave.
New York, NY 10011

**MCKESSON CORPORATION**
Through their Registered Agent for Service of Process
Corporation Service Company
80 State Street
Albany, NY 12207-2543

4828-5992-5104, v. 1

**ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. n/k/a JANSSEN
PHARMACEUTICALS, INC.**
Through their Registered Agent for Service of Process
Corporation Service Company
80 State Street
Albany, NY 12207-2543

**PURDUE PHARMA, INC.**
Through their Registered Agent for Service of Process
Corporation Service Company
80 State Street
Albany, NY 12207-2543

**PURDUE PHARMA, L.P.**
Through their Registered Agent for Service of Process
Corporation Service Company
80 State Street
Albany, NY 12207-2543

**TEVA PHARMACEUTICALS USA, INC.**
Through their Registered Agent for Service of Process
Corporate Creations Network, Inc.
15 North Mill Street
Nyack, New York, 10960

**THE PURDUE FREDERICK COMPANY, INC**
Through their Registered Agent for Service of Process
Corporation Service Company
80 State Street
Albany, NY  12207

**Please provide Long Arm Citation for the
following defendants:**

**ACTAVIS, LLC**
*Via Long Arm at their principal place of business*
400 Interpace Parkway
Morris Corporate Center III
Parsippany, JN  07054

**ALLERGAN PLC f/k/a ACTAVIS, PLC.**
*Via Long Arm at their principal place of business*
400 Interpace Parkway
Parsippany, NJ 07054

4828-5992-5104, v. 1

**ENDO HEALTH SOLUTIONS, INC.**
*Via Long Arm at their principal place of business*
C.T. Corporation System, 111 Eighth Avenue,
New York, NY 10011

**INSYS**
*Via Long Arm at their principal place of business*
1333 S Spectrum Blvd #100
Chandler, AZ 85286

**JANSSEN PHARMACEUTICALS INC.**
*Via Long Arm at their principal place of business*
C.T. Corporation System
600 North 2nd Street, Suite 401
Harrisburg, PA 17101

**JANSSEN PHARMACEUTICA INC. n/ka JANSSEN PHARMACEUTICALS, INC.**
*Via Long Arm at their principal place of business*
C.T. Corporation System
600 North 2nd Street, Suite 401
Harrisburg, PA 17101

**TEVA PHARMACEUTICAL INDUSTRIES, LTD**
*Via Long Arm at their principal place of business*
1090 Horsham Road North
Wales, PA 19454

**WATSON LABORATORIES, INC.**
*Via Long Arm at their principal place of business*
1090 Horsham Road
N. Wales, PA 19454-1505

4828-5992-5104, v. 1

**SUPREME COURT FOR THE STATE OF NEW YORK**
**NIAGARA COUNTY**
------------------------------------------------------------------------X

A.M.H., INDIVIDUALLY AND IN
HER CAPACITY AS LEGAL CUSTODIAN
OF BABY C.E., ON BEHALF OF THEMSELVES
AND ALL OTHERS SIMILARLY SITUATED,

       **Plaintiffs,**

v.

                                     **INDEX NO.:**

                                     **CLASS ACTION COMPLAINT**

PURDUE PHARMA L.P.;                         **JURY TRIAL DEMANDED**
PURDUE PHARMA, INC.;
THE PURDUE FREDERICK COMPANY, INC.;     **ECF -FILED**
MCKESSON CORPORATION;
CARDINAL HEALTH, INC.;
AMERISOURCEBERGEN CORPORATION;
TEVA PHARMACEUTICAL INDUSTRIES, LTD.;
TEVA PHARMACEUTICALS USA, INC.;
CEPHALON, INC.;
JOHNSON & JOHNSON;
JANSSEN PHARMACEUTICALS, INC.;
ORTHO-MCNEIL-JANSSEN
PHARMACEUTICALS, INC. n/k/a
JANSSEN PHARMACEUTICALS, INC.;
JANSSEN PHARMACEUTICA INC. n/k/a
JANSSEN PHARMACEUTICALS, INC.;
ENDO HEALTH SOLUTIONS INC.;
ENDO PHARMACEUTICALS, INC.;
ALLERGAN PLC f/k/a ACTAVIS PLC;
WATSON PHARMACEUTICALS, INC.
n/k/a ACTAVIS, INC.;
WATSON LABORATORIES, INC.;
ACTAVIS LLC; and
ACTAVIS PHARMA, INC. f/k/a
WATSON PHARMA, INC.,

       **Defendants.**
------------------------------------------------------------------------X

1

4852-5120-1392, v. 1

## CLASS ACTION COMPLAINT

**NOW COME** Plaintiffs and Putative Class Representative A.M.H., individually, and as sole custodian of Baby C.E. pursuant to court order, and on behalf of all other similarly situated individuals born addicted to opioids (NAS Babies), hereby filing their Complaint against the Defendants for damages, equitable, statutory, and injunctive relief. In support thereof, through the undersigned counsel, Plaintiffs state as follows:

## INTRODUCTION

1.     Like thousands of children born every year, Baby C.E. was born addicted to opioids. Prenatal exposure to opioids caused Baby C.E. to experience severe withdrawal symptoms and lasting if not permanent developmental, physical, medical, occupational, and psychological impacts. Baby C.E. was born thirteen month ago. The first days of Baby C.E.'s life was spent in excruciating pain as doctors weaned the infant from opioid addiction. Baby C.E. will require years of treatment and counseling to deal with the effects of prenatal exposure. Baby C.E. and his mother are victims of the opioid crisis that has ravaged New York State (sometimes "New York"), causing incomprehensible suffering to those born addicted to opioids, like Baby C.E., and untold expense to those forced to deal with the aftermath, like A.M.H.

2.     At birth, Baby C.E. was diagnosed with Neonatal Abstinence Syndrome ("NAS"), a condition suffered by babies of mothers addicted to opioids. Baby C.E. was forced to endure a painful start to his life; crying excessively, arching his back, refusing to feed, involuntary eye-twitching and subjected to violent tremors and uncontrollable shaking for example. NAS is a clinical diagnosis, and "a consequence of the abrupt discontinuation of chronic fetal exposure to substances that were used or abused by the mother during pregnancy."[1] Baby C.E. spent his first

---

[1] Prabhakar Kocherlakota, *Neonatal Abstinence Syndrome,* 134(2) Pediatrics 547, 547-48 (2014), *available at* http://pediatrics.aappublications.org/content/pediatrics/134/2/e547.full.pdf.

2

five days in isolation writhing in agony as he went through detoxification; and he was discharged only after spending the first two weeks of his future in the hospital.

3.    Baby C.E.'s mother was prescribed opioids before pregnancy, became addicted, and later turned to heroin.

4.    Upon information and belief, C.E.'s mother consumed opioids manufactured and distributed by all named defendants including:

    a.   Purdue's products Oxycontin, Dilaudid, and MS Contin;

    b.   Cephalon's products Actiq and Fentora;

    c.   Janssen's product Duragesic;

    d.   Endo's products Perodan, Percoset, Opana, Opana ER, Oxycodone, Hydrocodone (Vicodin and Lortab), Oxymorphone, and Hydromorphone; and

    e.   Activis' product Norco and Kadian.

5.    Baby C.E.'s experience is part of an opioid epidemic sweeping through the United States, including New York, causing thousands of infants great suffering and continuing developmental physical, medical, occupational, and psychological issues.  This epidemic is reportedly the largest health care crisis in U.S. history.  Plaintiffs bring this class action to eliminate the hazard to public health and safety caused by the opioid epidemic and to abate the nuisance caused by Defendants' false, negligent and unfair marketing and/or unlawful diversion of prescription opioids.  Plaintiffs further seek equitable relief in the form of medical monitoring, in order to provide this class of infants with monitoring of developmental issues confronting them as they mature, in addition to equitable relief in the form of funding for services and treatment.

6.    The incidence of NAS has been increasing in the United States. The Substance

3

Abuse Mental Health Services Administration reported that 1.1% of pregnant women abused opioids (0.9% used opioid pain relievers and 0.2% used heroin) in 2011.[2]

7.       In recent years, there has been a dramatic rise in the proportion of infants who have been exposed to opioids. Opioid use among women who gave birth increased in the United States from 1.19 to 5.63 per 1,000 hospital births per year between 2000 and 2009. Concurrently the incidence of neonatal abstinence syndrome (NAS) among newborns during the same period (from 1.20 per 1,000 hospital births per year in 2000 to 3.39 per 1,000 hospital births per year in 2009).[3]

8.       According to New York State Department of Health statistics, the incidence of neonatal abstinence syndrome in New York State among newborns rose from 1.9 per 1,000 hospital births per year in 2005 to 5.2 per 1,000 hospital births in 2014. Excluding New York City, that rate rises to 8.5 per 1000 births.[4]

9.       In a study from Florida, the number of newborns who had NAS and were admitted to the neonatal intensive care unit, NICU, increased by 10-fold from 2005 to 2011. Increases in the incidence of NAS have been reported uniformly across community hospitals, teaching hospitals, and children's hospitals.[5]

10.       The incidence of NAS in babies being delivered by opioid-dependent women is between 70 and 95 percent. Research also suggests that newborns with NAS (most commonly associated of opioid misuse during pregnancy) are more likely to have low birthweight and/or respiratory complications than all other hospital births. When untreated, heroin and other opioid

---

[2] *Id.*
[3] Patrick, S. W., Schumacher, R. E., Benneyworth, B. D., Krans, E. E., McAllister, J. M., & Davis, M. M. (2012). Neonatal abstinence syndrome and associated health care expenditures: United States, 2000–2009. *Journal of the American Medical Association, 307*(18), 1934–1940.
[4] https://www.health.ny.gov/statistics/opioid/data/h14_999.htm
[5] Prabhakar Kocherlakota, *Neonatal Abstinence Syndrome,* 134(2) Pediatrics 547, 547-48 (2014), *available at* http://pediatrics.aappublications.org/content/pediatrics/134/2/e547.full.pdf.

4

misuse during pregnancy is also associated with increased risk of placental abruption, preterm labor, maternal obstetric complications, and fetal death.[6]

11.     The NAS epidemic and its consequences could have been, and should have been, prevented by the Defendants who manufacture prescription opioids (Manufacturing Defendants) and distribute them nationwide (Distribution Defendants).   These Defendants, in concert, have profited greatly by flooding New York State with prescription opioids.

12.     The drug distribution industry, including the Distribution Defendants, are obligated and duty bound to serve as a "check" in the drug delivery system, by securing and monitoring opioids at every step of the stream of commerce, protecting them from theft and misuse and, also, refusing to fulfill suspicious or unusual orders by downstream pharmacies, doctors, clinics, or patients, and reporting suspicious or unusual conduct.  Defendants knowingly and willfully failed to discharge their duty and, instead, Defendants consciously ignored known or knowable problems, obvious warning signs, and the disturbing data in their supply chains.

13.     Defendants through their actions and omissions intentionally and negligently created conditions in which vast amounts of opioids have flowed freely from drug manufacturers to, for instance, innocent patients who became addicted, to opioid abusers, and even to illicit drug dealers - with distributors regularly fulfilling suspicious orders from pharmacies and clinics, who were economically incentivized to ignore "red flags" at the point of sale and before dispensing the pills.

14.     Defendants' wrongful conduct has allowed billions of opioid pills to be diverted

---

[6] Winklbaur, B., Kopf, N., Ebner, N., Jung, E., Thau, K., & Fischer, G. (2008). *Treating pregnant women dependent on opioids is not the same as treating pregnancy and opioid dependence.* Addiction, 103(9), 1429–1440; *see also* American College of Obstetricians and Gynecologists. (2012; reaffirmed in 2014). Opioid abuse, dependence, and addiction in pregnancy (Committee Opinion No. 524). Retrieved from http://www.acog.org/-/media/Committee-Opinions/Committee-on-Health-Care-for-Underserved-Women/co524.pdf?dmc=1&ts=20150928T1302076021; *see also* Kaltenbach, K., Berghella, V., & Finnegan, L. (1998). Opioid dependence during pregnancy: Effects and management. Obstetrics Gynecology Clinics of North America, 25(1), 139–151.

4852-5120-1392, v. 1

from legitimate channels of distribution into the illicit black market in quantities that have fueled the opioid epidemic in New York. This is characterized as "opioid diversion." Acting against their common law and statutory duties, Defendants have created an environment in which opioid diversion is rampant. As a result, unknowing patients and unauthorized opioid users have ready access to illicit sources of diverted opioids.

15. For years, Defendants and their agents have had the ability to substantially reduce the consequences of opioid diversion, including stemming the dramatic increase in the number of infants born with NAS. All the Defendants in this action share responsibility for perpetuating the epidemic that has led to the exponential increase in the number of infants afflicted with NAS.

16. Defendants have foreseeably caused damages to Plaintiffs, Baby C.E. and Class Members including, for example, the costs of neo-natal medical care, therapeutic care, prescription drug purchases, and other treatments for NAS afflicted newborns, to be followed by counseling and rehabilitation services after birth. Plaintiffs bring this civil action for injunctive relief, compensatory damages, statutory damages, and any other relief allowed by law against the Defendant opioid drug manufacturers and distributors, who, by their actions and omissions, knowingly or negligently have distributed and dispensed prescription opioid drugs in a manner that foreseeably injured, and continues to injure, Plaintiff Baby C.E. and the Class.

## PARTIES

### A.    Plaintiffs

17. Plaintiff A.M.H. is a citizen and resident of the State of New York, Niagara County. Plaintiff A.M.H. is the sole legal custodian of plaintiff Baby C.E.

18. Plaintiff C. E., an infant, is a citizen and resident of the State of New York, Niagara County.

6

4852-5120-1392, v. 1

19.     Baby C.E. and Putative Class members (sometimes, "Class") are individuals residing and domiciled in New York State have suffered Neonatal Abstinence Syndrome (NAS) because of exposure to opioids in utero. This drug exposure provides Baby C.E. the right to sue, through his guardian, for damages under products liability, nuisance, negligence, and gross negligence.

20.     Baby C.E. and Putative Class Members directly and foreseeably sustained all damages alleged herein. Categories of past and continuing sustained damages include, for instance: (1) costs for providing treatment to infants born with opioid-related medical conditions like NAS; (2) costs for testing, monitoring and treatment for diseases, latent and otherwise, associated with NAS; (3) costs for providing ongoing medical monitoring care into a Court-administered fund, additional therapeutic and prescription drug purchases, and other treatments; (4) costs for providing treatment, counseling and rehabilitation services; and (5) costs associated with providing care for children whose parents suffer from opioid-related disability or incapacitation, including costs of foster care services and costs incurred by individuals possessing sole legal custody over an infant born with NAS.

21.     Baby C.E. and the Putative Class Members have suffered and continue to directly suffer these damages. Plaintiffs and Putative Class Representatives also seek the means to abate the epidemic Defendants' wrongful and/or unlawful conduct has created.

**B.     Defendants**

22.     McKesson Corporation ("McKesson") has its principal place of business in San Francisco, California and is incorporated under the laws of Delaware. During all relevant times, McKesson has distributed substantial amounts of prescription opioids into New York State and to providers and retailers in the State of New York.

4852-5120-1392, v. 1

23.    Cardinal Health, Inc. ("Cardinal") has its principal place of business in Ohio and is incorporated under the laws of Ohio.  During all relevant times, Cardinal has distributed substantial amounts of prescription opioids into New York State and to providers and retailers in the State of New York.

24.    AmerisourceBergen Corporation has its principal place of business in Pennsylvania and is incorporated under the laws of Delaware. During all relevant times, AmerisourceBergen has distributed substantial amounts of prescription opioids into New York State and to providers and retailers in the State of New York.

25.    McKesson, Cardinal, and AmerisourceBergen are collectively referred to hereinafter as "Distributor Defendants."

26.    Purdue Pharma L.P. is a limited partnership organized under the laws of Delaware with its principal place of business in Connecticut; Purdue Pharma, Inc. is a New York corporation with its principal place of business in Connecticut; and The Purdue Frederick Company is a Delaware corporation with its principal place of business in Connecticut (these three corporate entities are sometimes referred to collectively as "Purdue" or the "Purdue Entities").

27.    Upon information and belief, at all times relevant, the Purdue Entities acted in concert with one another and, each entity acted as the agents and/or principals of the other entities, and in unison, in relation to the conduct described herein.  Upon information and belief, at all times relevant the Purdue Entities are united in interest.

28.    Purdue manufactures, promotes, sells, and distributes opioids such as OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, and Targiniq ER in the U.S. and New York. OxyContin is Purdue's best-selling opioid.   Since 2009, Purdue's annual sales of

8

4852-5120-1392, v. 1

OxyContin have fluctuated between $2.47 billion and $2.99 billion, up four-fold from its 2006 sales of $800 million. OxyContin constitutes roughly 30% of the entire market for analgesic drugs (painkillers).

29.    Cephalon, Inc. ("Cephalon") is a Delaware corporation with its principal place of business in Frazer, Pennsylvania. Cephalon manufactures, promotes, sells, and distributes opioids such as Actiq and Fentora in the United States and in New York. Actiq and Fentora have been approved by the FDA only for the "management of breakthrough cancer pain in patients 16 years of age and older who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain." In 2008, Cephalon pled guilty to a criminal violation of the Federal Food, Drug and Cosmetic Act for its misleading promotion of Actiq and two other drugs and agreed to pay $425 million.

30.    Teva Pharmaceutical Industries, Ltd. ("Teva Ltd.") is an Israeli corporation with its principal place of business in Petah Tikva, Israel. Teva Pharmaceuticals USA, Inc. ("Teva USA"), a wholly-owned subsidiary of Teva Ltd., is a Delaware corporation with its principal place of business in Pennsylvania. Teva USA acquired Cephalon in October 2011.

31.    Teva Ltd., Teva USA, and Cephalon collaborate to market and sell Cephalon products in the U.S. Teva Ltd. conducts all sales and marketing activities for Cephalon in the U.S. through Teva USA. Teva Ltd. and Teva USA publicize Actiq and Fentora as Teva products. Teva USA sells all former Cephalon branded products through its "specialty medicines" division. The FDA-approved prescribing information and medication guide, which is distributed with Cephalon opioids marketed and sold in New York, discloses that the guide was submitted by Teva USA, and directs physicians to contact Teva USA to report adverse events. Teva Ltd. has directed Cephalon to disclose that it is a wholly-owned subsidiary of Teva

9

Ltd. on prescription savings cards distributed in New York, indicating Teva Ltd. would be responsible for covering certain co-pay costs. All of Cephalon's promotional websites, including those for Actiq and Fentora, prominently display Teva Ltd.'s logo. Teva Ltd.'s financial reports list Cephalon's and Teva USA's sales as its own. Through interrelated operations like these, Teva Ltd. operates in New York and the rest of the U.S. through its subsidiaries Cephalon and Teva USA. The U.S. is the largest of Teva Ltd.'s global markets, representing 53% of its global revenue in 2015, and, were it not for the existence of Teva USA and Cephalon, Inc., Teva Ltd. would conduct those companies' business in New York itself. Upon information and belief, Teva Ltd. directs the business practices of Cephalon and Teva USA, and their profits inure to the benefit of Teva Ltd. as controlling shareholder. (Teva Ltd., Teva USA, and Cephalon, Inc. are hereinafter collectively referred to as "Cephalon.")

32.    Janssen Pharmaceuticals, Inc. is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey, and it is a wholly-owned subsidiary of Johnson & Johnson (J&J), a New Jersey corporation with its principal place of business in New Brunswick, New Jersey. Ortho-McNeil-Janssen Pharmaceuticals, Inc., now known as Janssen Pharmaceuticals, Inc., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey. Janssen Pharmaceuticals Inc., now known as Janssen Pharmaceuticals, Inc., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey. J&J is the only company that owns more than 10% of Janssen Pharmaceuticals' stock, and corresponds with the FDA regarding Janssen's products. Upon information and belief, J&J controls the sale and development of Janssen Pharmaceuticals' drugs and Janssen's profits inure to J&J's benefit. (Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., Janssen Pharmaceutical, Inc., and J&J are sometimes are collectively referred to as "Janssen.").

10

33.     Janssen manufactures, promotes, sells, and distributes drugs in the U.S. and New York, including the opioid Duragesic. Before 2009, Duragesic accounted for at least $1 billion in annual sales.  Until January 2015, Janssen developed, marketed, and sold the opioids Nucynta and Nucynta ER. Together, Nucynta and Nucynta ER accounted for $172 million in sales in 2014.

34.     Endo Health Solutions Inc. is a Delaware corporation with its principal place of business in Malvern, Pennsylvania.  Endo Pharmaceuticals Inc., a wholly-owned subsidiary of Endo Health Solutions Inc., is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. (Endo Health Solutions Inc. and Endo Pharmaceuticals Inc. hereinafter are collectively referred to as "Endo.") Endo develops, markets, and sells prescription drugs, including the opioids Opana/Opana ER, Percodan, Percocet, and Zydone, in the U.S. and New York. Opioids made up roughly $403 million of Endo's overall revenues of $3 billion in 2012. Opana ER yielded $1.15 billion in revenue from 2010 and 2013, and it accounted for 10% of Endo's total revenue in 2012. Endo also manufactures and sells generic opioids such as oxycodone, oxymorphone, hydromorphone, and hydrocodone products in the U.S. and New York, by itself and through its subsidiary, Qualitest Pharmaceuticals, Inc.

35.     Allergan PLC is a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland.  Actavis PLC acquired Allergan PLC in March 2015, and the combined company changed its name to Allergan PLC in January 2013.  Before that, Watson Pharmaceuticals, Inc. acquired Actavis, Inc. in October 2012, and the combined company changed its name to Actavis, Inc. as of January 2013, later to Actavis PLC in October 2013.  Watson Laboratories, Inc. is a Nevada corporation with its principal place of business in Corona, California, as well as a wholly-owned subsidiary of Allergan PLC (f/k/a Actavis, Inc.

11

f/k/a Watson Pharmaceuticals, Inc.). Actavis Pharma, Inc. (f/k/a Actavis, Inc.) is a Delaware

corporation with its principal place of business in New Jersey, and it was formerly known as

Watson Pharma, Inc. Actavis LLC is a Delaware limited liability company with its principal

place of business in Parsippany, New Jersey. Each of these business entities is owned by

Allergan PLC, which uses them to market and sell its drugs in New York. Upon information and

belief, Allergan PLC exercises control over and derives financial benefit from the marketing,

sales, and profits of Allergan/Actavis products. (Allergan PLC, Actavis PLC, Actavis, Inc.,

Actavis LLC, Actavis Pharma, Inc., Watson Pharmaceuticals, Inc., Watson Pharma, Inc., and

Watson Laboratories, Inc. are sometimes hereinafter referred to collectively as "Actavis.")

Actavis manufactures, promotes, sells, and distributes opioids, including the branded drugs

Kadian and Norco, a generic version of Kadian, and generic versions of Duragesic and Opana, in

New York. Actavis acquired the rights to Kadian from King Pharmaceuticals, Inc. on December

30, 2008, and began marketing Kadian in 2009.

36.    Purdue, Cephalon, Janssen, Endo, and Actavis are sometimes referred to

collectively as the "Pharmaceutical Defendants."

37.    Insys Therapeutics, Inc. ("Insys") is a Delaware corporation with its principal

place of business in Chandler, Arizona. Insys develops, markets, and sells prescription drugs,

including Subsys, a sublingal spray of fentanyl, in, upon information and belief, Plaintiffs'

counties and nationally.

## JURISDICTION AND VENUE

38.    Jurisdiction is proper in this Court pursuant to Civil Practice Law and Rules

302(a).

39.    This Court has personal jurisdiction over Defendants because each has committed

12

torts, in part or in whole, within the State of New York, as alleged herein. Moreover, Defendants have substantial contacts and business dealings directly within New York by virtue of their willful and knowing and deliberate marketing, promoting, distributing, dispensing, and selling of prescription opioids in the State of New York to, for instance, New York residents, citizens and business, for-profit and not-for-profit alike; by entering into contracts relating to the subject matter of this action in the State of New York; by Defendants delivering, distributing, dispensing, and selling opioids in New York with the intent and the expectation that those products would be distributed to or purchased by New York residents, citizens, and business entities. All causes of action herein relate to Defendants' wrongful actions, conduct, and omissions committed against Plaintiffs and the Class, and the consequences and damages related to said wrongful actions, conduct, and omissions.

40. Venue is proper in this Court pursuant to N.Y. C.P.L.R. 503 in that the Plaintiffs reside in Niagara County.

## BACKGROUND FACTS

41. Opioid means "opium – like" and the term includes all drugs derived in whole or in part from the opium poppy.

42. The United States Food and Drug Administration's website describes this class of drugs as follows: "Prescription opioids are powerful pain-reducing medications that include prescription oxycodone, hydrocodone, and morphine, among others, and have both benefits as well as potentially serious risks. These medications can help manage pain when prescribed for the right condition and when used properly. But when misused or abused, they can cause serious harm, including addiction, overdose, and death."

43. Prescription opioids with the highest potential for addiction are categorized under

4852-5120-1392, v. 1

Schedule II of the Controlled Substances Act ("CSA"). They include non-synthetic derivatives of the opium poppy (such as codeine and morphine, which are also called "opiates"), partially synthetic derivatives (such as hydrocodone and oxycodone), or fully synthetic derivatives (such as fentanyl and methadone).

44.    Before the epidemic of Defendants' prescription opioids, the generally accepted standard of medical practice was that opioids should only be used short-term for acute pain, pain relating to recovery from surgery, and for cancer or palliative (end-of-life) care. Due to a lack of evidence that opioids improved patients' ability to overcome pain and function, coupled with evidence of greater pain complaints as patients developed tolerance to opioids over time and the serious risk of addiction and other side effects, the use of opioids for chronic pain was discouraged or prohibited. As a result, doctors generally did not prescribe opioids for chronic pain.

## PHARMACEUTICAL DEFENDANTS' WRONGFUL CONDUCT

45.    To establish and exploit the lucrative market of chronic pain patients, each Pharmaceutical Defendant developed a well-funded, sophisticated, and negligent marketing and/or distribution scheme targeted at consumers and physicians. These Defendants used direct marketing, as well as veiled advertising by seemingly independent third parties, to spread misrepresentations about the risks and benefits of long-term opioid use – statements that created the "new" market for prescription opioids, upended the standard medical practice, and benefited other Defendants and opioid manufacturers. These statements were unsupported by and, in many instances, contrary to the prevailing scientific evidence. These statements were also contrary to pronouncements by and guidance from the FDA and CDC based upon that evidence. These Defendants also targeted susceptible prescribers and vulnerable patient populations,

14

including those situated in New York State.

46.    The Pharmaceutical Defendants spread their false and negligent statements by marketing their branded opioids directly to doctors and patients in New York. Defendants also deployed seemingly unbiased and independent third parties that they controlled to spread their false and negligent statements about the risks and benefits of opioids for the treatment of chronic pain throughout geographic areas and patient demographics of New York.

47.    The Pharmaceutical Defendants' direct and branded ads negligently portrayed the benefits of opioids for chronic pain. For example, Endo distributed and made available on its website www.opana.com, a pamphlet promoting Opana ER with photographs depicting patients with physically demanding jobs, misleadingly implying that the drug would provide long-term pain-relief and functional improvement. In another example, Purdue ran a series of ads, called "Pain Vignettes," for OxyContin that featured chronic pain patients and recommended OxyContin for each. One such ad described a "54-year-old writer with osteoarthritis of the hands" and implied that OxyContin would help the writer work more effectively. Despite the fact that both Endo and Purdue agreed, in 2015-16, to cease disseminating these particularly misleading representations in New York, they each flaunted their obligations by continuing to disseminate them in New York.

48.    The Pharmaceutical Defendants also promoted the use of opioids for chronic pain through "detailers" – sophisticated and specially trained sales representatives who visited individual doctors and medical staff, and fomented small-group speaker programs. In 2014, for instance, these Defendants spent almost $200 million on "detailing" branded opioids to doctors.

49.    The FDA has cited at least one of the named Defendants for negligent promotions by its detailers and for negligent direct-to-physician marketing. In 2010, an FDA-mandated

15

"Dear Doctor" letter required Actavis to inform doctors that "Actavis sales representatives distributed . . . promotional materials that . . . omitted and minimized serious risks associated with [Kadian]," including the risk of "[m]isuse, [a]buse, and [d]iversion of [o]pioids" and, specifically, the risk that "[o]pioid[s] have the potential for being abused and are sought by drug abusers and people with addiction disorders and are subject to criminal diversion."

50.     The Pharmaceutical Defendants invited doctors to participate, in return for payment and other remuneration, in speakers' bureaus and programs that were also being funded by these Defendants. These speaker programs were consciously designed to provide incentives for doctors to prescribe opioids, as well as offering them recognition and compensation for being selected as speakers. Doctors acting as speakers give the false impression that they are providing unbiased and medically accurate presentations when, in fact, they are presenting a script prepared by these Defendants. Upon information and belief, these presentations conveyed misleading information, omitted material information, and failed to correct Defendants' prior misrepresentations about the risks and benefits of opioids.

51.     The Pharmaceutical Defendants' detailing to doctors was highly effective in advancing the national proliferation of prescription opioids. Defendants used sophisticated data mining and intelligence to track and understand the rates of initial prescribing and renewal by individual doctors, allowing specific and individual targeting, customizing, and monitoring of their marketing and distribution efforts.

52.     The Pharmaceutical Defendants have deployed unified and uniform marketing plans and strategies from state to state, including New York, in their efforts to ensure that their marketing messages remained consistent and effective across all their marketing platforms.

53.     The Pharmaceutical Defendants negligently marketed opioids in New York

4852-5120-1392, v. 1

through unbranded advertising that promoted opioid use generally while at the same time remaining silent as to a specific opioid. This advertising was ostensibly created and disseminated by independent third parties but it was being funded, directed, coordinated, edited, and distributed, in whole or in part, by these Defendants and their public relations firms and agents.

54. The Pharmaceutical Defendants used putative third-party, unbranded advertising to avoid regulatory scrutiny, since such advertising is not submitted to, or reviewed by, the FDA. These Defendants used third-party, unbranded advertising to create the false appearance that the negligent messages came from an independent and objective source.

55. The Pharmaceutical Defendants' negligent unbranded marketing also contradicted the branded materials they had submitted to the FDA.

56. The Pharmaceutical Defendants marketed opioids through a small circle of doctors who were vetted, selected, funded, and promoted by these Defendants, largely if not solely based upon their public support of prescription opioids to treat chronic pain. These doctors became known as "key opinion leaders" or "KOLs." These Defendants paid KOLs to serve in a number of doctor-facing and public-facing capacities, all designed to promote a pro-opioid message and to promote the opioid industry pipeline, from manufacturer to distributor to retailer.

57. These Defendants entered into and/or benefitted from arrangements with seemingly unbiased and independent organizations or groups that generated treatment guidelines, unbranded materials, and programs promoting chronic opioid therapy including, for example, the American Pain Society ("APS"), the American Geriatrics Society ("AGS"), the Federation of State Medical Boards ("FSMB"), the American Chronic Pain Association ("ACPA"), the

17

FILED: NIAGARA COUNTY CLERK 08/23/2018 11:40 AM
NYSCEF DOC. NO. 1    Case 1:18-cv-01018-EAW    Document 1-3    Filed 09/14/18    Page 25 of 150

INDEX NO. E165792/2018
RECEIVED NYSCEF: 08/23/2018

American Society of Pain Education ("ASPE"), the National Pain Foundation ("NPF"), the Healthcare Distribution Alliance ("HDA"); the Pain Care Forum ("PCF"), and the Pain & Policy Studies Group ("PPSG").

58. The Pharmaceutical Defendants collaborated, through the organizations and groups, to spread negligent and misleading messages and representations about the risks and benefits of long-term opioid therapy.

59. To convince doctors and patients in New York that opioids can and should be used to treat chronic pain, these Defendants embarked on a promotional campaign to persuade these groups that long-term opioid use is both safe and helpful. Knowing that they could do so only by conveying negligent misrepresentations to those doctors and patients about the risks and benefits of long-term opioid use, these Defendants made numerous claims that either were not supported by, or were contrary to, the scientific evidence and/or available data.

60. To convince doctors and patients that opioids are safe, the Pharmaceutical Defendants, negligently, trivialized and failed to disclose the risks of long-term opioid use, particularly the risk of addiction, by propounding a series of misrepresentations that have since been conclusively debunked by the FDA and CDC. These misrepresentations – described below – reinforced one another to create the dangerously misleading impression that: (a) starting patients on opioids was low-risk because most patients would not become addicted, and those who were at greatest risk of addiction could be readily identified and managed; (b) patients who displayed signs of addiction probably were not addicted and, in any event, could easily be weaned from the drugs; (c) the use of higher opioid doses, which many patients need to sustain pain relief as they develop tolerance to the drugs, do not pose special risks; and (d) abuse-deterrent opioids both prevent abuse and overdose and are inherently less addictive. Defendants

18

have not only failed to correct these misrepresentations, they continue to make them today.

61.     The Pharmaceutical Defendants are responsible for negligently claiming that the risk of opioid addiction is low; that addiction is unlikely to develop when opioids are prescribed as opposed to obtained illicitly; and for failure to disclose the greater risk of addiction with prolonged use of opioids.  Some examples of these negligent misrepresentations by opioid manufacturers are: (a) Actavis employed a patient education brochure that negligently claimed opioid addiction is "less likely if you have never had an addiction problem;"; (b) Cephalon and Purdue each sponsored APF's Treatment Options: *A Guide for People Living with Pain*, negligently claiming that addiction is rare and limited to extreme cases of unauthorized doses; (c) Endo sponsored a website, Painknowledge.com, which negligently claimed that "[p]eople who take opioids as prescribed usually do not become addicted;" (d)  Endo distributed a pamphlet bearing the Endo logo and entitled *Living with Someone with Chronic Pain*, which stated that: "most people do not develop an addiction problem"; (e) Janssen distributed a patient education guide, entitled *Finding Relief: Pain Management for Older Adults*, describing as "myth" the claim that opioids are addictive; (f) a Janssen website negligently claimed that concerns about opioid addiction are "overestimated"; (g) Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management* – that negligently claims that  pain is undertreated due to "misconceptions about opioid addiction."

62.     As noted in the 2016 CDC Guideline ("CDC Guideline") endorsed by the FDA, there is "extensive evidence" of the "possible harms of opioids (including opioid use disorder [an alternative term for opioid addiction])."  The Guideline points out that "[o]pioid pain medication use presents serious risks, including . . . opioid use disorder" and that "continuing opioid therapy for three (3) months substantially increases risk for opioid use disorder."

19

63. The FDA further exposed the falsity of the Pharmaceutical Defendants' claims about the low risk of addiction when it announced changes to the labels for certain opioids, in 2013, and again, in 2016. In each announcement, the FDA found that "most opioid drugs have 'high potential for abuse", and that opioids "are associated with a substantial risk of misuse, abuse, NOWS [neonatal opioid withdrawal syndrome], addiction, overdose, and death." According to the FDA, because of the "known serious risks" associated with long-term opioid use, including "risks of addiction, abuse, and misuse, even at recommended doses, and because of the greater risks of overdose and death," opioids should be used only "in patients for whom alternative treatment options" like non-opioid drugs have failed. The FDA further acknowledged that the risk is not limited to patients who seek drugs illicitly; addiction "can occur in patients appropriately prescribed [opioids]."

64. In a 2016 settlement agreement with Endo, the State of New York found that opioid "use disorders appear to be highly prevalent in chronic pain patients treated with opioids, with up to 40% of chronic pain patients treated in specialty and primary care outpatient centers meeting the clinical criteria for an opioid use disorder."; Endo had claimed on its www.opana.com website that "[m]ost healthcare providers who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted," but the State of New York found no evidence for that statement. Consistent with this finding, Endo agreed not to "make statements that . . . opioids generally are non-addictive" or "that most patients who take opioids do not become addicted" in New York. This agreement, however, did not extend to New York.

65. The Pharmaceutical Defendants negligently instructed doctors and patients that the signs of addiction are actually signs of undertreated pain and should be treated by prescribing

20

more opioids. Defendants called this phenomenon "pseudo-addiction" – a term used by Dr. David Haddox, who went to work for Purdue, and Dr. Russell Portenoy, a KOL for Cephalon, Endo, Janssen, and Purdue. Defendants negligently claimed that pseudo-addiction was substantiated by scientific evidence. Some examples of these negligent claims are: (a) Cephalon and Purdue sponsored Responsible Opioid Prescribing, which taught that behaviors such as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding, are all signs of pseudo-addiction, rather than true addiction; (b) Janssen sponsored, funded, and edited the Let's Talk Pain website, which in 2009 stated: "pseudo-addiction . . . refers to patient behaviors that may occur when pain is under-treated;" (c) Endo sponsored a National Initiative on Pain Control (NIPC) CME program titled Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia, which promoted pseudo-addiction by teaching that a patient's aberrant behavior was the result of untreated pain; (d) Purdue sponsored a CME program entitled Path of the Patient, Managing Chronic Pain in Younger Adults at Risk for Abuse in which a narrator notes that because of pseudo-addiction, a doctor should not assume the patient is addicted.

66.     The 2016 CDC Guideline rejects the concept of pseudo-addiction, explaining that "[p]atients who do not experience clinically meaningful pain relief early in treatment . . . are unlikely to experience pain relief with longer- term use," and that physicians should reassess "pain and function within 1 month" in order to decide whether to "minimize risks of long-term opioid use by discontinuing opioids" because the patient is "not receiving a clear benefit."

67.     The Pharmaceutical Defendants negligently instructed doctors and patients that addiction risk screening tools, patient agreements, urine drug screens, and similar strategies were very effective to identify and safely prescribe opioids to even those patients predisposed to

4852-5120-1392, v. 1

addiction. These misrepresentations were reckless because Pharmaceutical Defendants directed

them to general practitioners and family doctors who lack the time and expertise to closely

manage higher-risk patients on opioids. Pharmaceutical Defendants' misrepresentations were

intended to make doctors more comfortable, falsely, in prescribing opioids. Some examples of

these negligent claims are: (a) an Endo supplement in the Journal of Family Practice emphasized

the effectiveness of screening tools to avoid addictions; (b) Purdue's webinar, Managing

Patient's Opioid Use: Balancing the Need and Risk, claimed that screening tools, urine tests, and

patient agreements prevent "overuse of prescriptions" and "overdose deaths;" (c) Purdue

represented in scientific conferences that "bad apple" patients – and not opioids – were the

source of the addiction crisis when, in actuality, the "bad apples" were the Defendants.

68.     The CDC Guideline exposes the falsity of these misrepresentations, noting that

there are no studies assessing the effectiveness of risk mitigation strategies – such as screening

tools, patient contracts, urine drug testing, or pill counts widely believed by doctors to detect and

deter abuse – "for improving outcomes related to overdose, addiction, abuse, or misuse." The

CDC Guideline emphasizes that available risk screening tools "show insufficient accuracy for

classification of patients as at low or high risk for [opioid] abuse or misuse", and counsels that

doctors "should not overestimate the ability of these tools to rule out risks from long-term opioid

therapy."

69.     To downplay the risks and impact of addiction and to make doctors feel more

comfortable starting patients on opioids, Pharmaceutical Defendants negligently claimed that

opioid dependence can easily be solved by tapering, that opioid withdrawal was not difficult, and

that there were no problems in stopping opioids after long-term use.

70.     A CME sponsored by Endo, entitled Persistent Pain in the Older Adult, claimed

that withdrawal symptoms could be avoided by tapering a patient's opioid dose by up to 20% for a few days. Purdue sponsored APF's A Policymaker's Guide to Understanding Pain & Its Management, that claimed "[s]ymptoms of physical dependence can often be ameliorated by gradually decreasing the dose of medication during discontinuation," without mentioning any known or foreseeable issues.

71. Pharmaceutical Defendants negligently minimized the significant symptoms of opioid withdrawal – which, as explained in the CDC Guideline, include drug cravings, anxiety, insomnia, abdominal pain, vomiting, diarrhea, sweating, tremor, tachycardia (rapid heartbeat), spontaneous abortion and premature labor in pregnant women, and the unmasking of anxiety, depression, and addiction – and grossly understated the difficulty of tapering, particularly after long-term opioid use. Defendants failed to warn New York physicians, potential mothers and pregnant women of the dangers of using their product outside of these areas. The CDC Guideline recognizes that the duration of opioid use and the dosage of opioids prescribed should be "limit[ed]" to "minimize the need to taper opioids to prevent distressing or unpleasant withdrawal symptoms," because "physical dependence on opioids is an expected physiologic response in patients exposed to opioids for more than a few days." The CDC Guideline further states that "tapering opioids can be especially challenging after years on high dosages because of physical and psychological dependence", and it highlights the difficulties, including the need to carefully identify "a taper slow enough to minimize symptoms and signs of opioid withdrawal" and to "pause[] and restart[]" tapers depending on the patient's response. The CDC Guideline also acknowledges the lack of any "high-quality studies comparing the effectiveness of different tapering protocols for use when opioid dosage is reduced, or opioids are discontinued."

72. The Pharmaceutical Defendants negligently claimed that doctors and patients

23

INDEX NO. E165792/2018
RECEIVED NYSCEF: 08/23/2018

could increase opioid dosages indefinitely without added risk of addiction and other health consequences and failed to disclose the greater risks to patients at higher dosages. The ability to escalate dosages was critical to Defendants' efforts to market opioids for long-term use to treat chronic pain because, absent this misrepresentation, doctors would have abandoned treatment when patients built up tolerance and lower dosages did not provide pain relief. For example: (a) an Actavis patient brochure stated - "Over time, your body may become tolerant of your current dose. You may require a dose adjustment to get the right amount of pain relief. This is not addiction;" (b) Cephalon and Purdue sponsored APF's Treatment Options: A Guide for People Living with Pain, claiming that some patients need larger doses of opioids, with "no ceiling dose" for appropriate treatment of severe, chronic pain; (c) an Endo website, painknowledge.com, claimed that opioid dosages may be increased until "you are on the right dose of medication for your pain;" (d) an Endo pamphlet Understanding Your Pain: Taking Oral Opioid Analgesics, stated "The dose can be increased. . . . You won't 'run out' of pain relief;" (e) a Janssen patient education guide Finding Relief: Pain Management for Older Adults listed dosage limitations as "disadvantages" of other pain medicines yet omitted any discussion of risks of increased opioid dosages; (f) Purdue's In the Face of Pain website promotes the notion that if a patient's doctor does not prescribe what, in the patient's view, is a sufficient dosage of opioids, he or she should find another doctor who will; (g) Purdue's A Policymaker's Guide to Understanding Pain & Its Management stated that dosage escalations are "sometimes necessary," even unlimited ones, but did not disclose the risks from high opioid dosages; (h) a Purdue CME entitled Overview of Management Options taught that NSAIDs and other drugs, but not opioids, were unsafe at high dosages; (i) Purdue presented a 2015 paper at the College on the Problems of Drug Dependence challenging the correlation between opioid dosage and overdose.

24

73.    These and other representations conflict with the scientific evidence, as confirmed by the FDA and CDC. As the CDC Guideline explains, the "[b]enefits of high-dose opioids for chronic pain are not established" while the "risks for serious harms related to opioid therapy increase at higher opioid dosage." More specifically, the CDC Guideline explains that "there is now an established body of scientific evidence showing that overdose risk is increased at higher opioid dosages." The CDC Guideline states that "there is an increased risk for opioid use disorder, respiratory depression, and death at higher dosages." That is why the CDC advises doctors to "avoid increasing dosages" above 90 morphine milligram equivalents per day.

74.    The CDC Guideline reinforces earlier findings announced by the FDA. In 2013, the FDA acknowledged "that the available data do suggest a relationship between increasing opioid dose and risk of certain adverse events." Similarly, the FDA noted that studies "appear to credibly suggest a positive association between high-dose opioid use and the risk of overdose and/or overdose mortality."

75.    Pharmaceutical Defendants' marketing of the so-called abuse-deterrent properties of some of their opioids created false impressions that these opioids can curb addiction and abuse. Indeed, in a 2014 survey of 1,000 primary care physicians, nearly half reported that they believed abuse-deterrent formulations are inherently less addictive.

76.    Pharmaceutical Defendants have made misleading claims about the ability of their so-called abuse-deterrent opioid formulations to deter abuse. For example, Endo's advertisements for the 2012 reformulation of Opana ER negligently claimed that it was designed to be crush resistant, in a way that suggested it was more difficult to abuse. The FDA warned, in a 2013 letter, that there was no evidence Endo's design "would provide a reduction in oral, intranasal or intravenous abuse." Moreover, Endo's own studies, which it failed to disclose,

25

Case 1:18-cv-01018-EAW   Document 1-3   Filed 09/14/18   Page 33 of 150

showed that Opana ER could still be ground and chewed.

77.     In a 2016 settlement with the State of New York, Endo agreed not to make statements in New York that Opana ER was "designed to be or is crush resistant."  New York found those statements to be both false and negligent because there was no difference in the ability to extract the narcotic from Opana ER.  Similarly, the CDC Guideline states that "[n]o studies" support the notion that "abuse-deterrent technologies [are] a risk mitigation strategy for deterring or preventing abuse," noting that the technologies – even when they work – "do not prevent opioid abuse through oral intake, the most common route of opioid abuse, and can still be abused by non-oral routes."

78.     These numerous, longstanding misrepresentations minimizing the risks of long-term opioid use persuaded doctors and patients to discount or ignore the true risks. Pharmaceutical Defendants also had to persuade them that there was a significant upside to long-term opioid use.  But as the CDC Guideline makes clear, there is "insufficient evidence to determine the long-term benefits of opioid therapy for chronic pain."  In fact, the CDC found that "[n]o evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least 1 year later (with most placebo-controlled randomized trials ≤ 6 weeks in duration)" and that other treatments were more or equally beneficial and less harmful than long-term opioid use.  The FDA, too, has recognized the lack of evidence to support long-term opioid use.  In 2013, the FDA stated that it was "not aware of adequate and well-controlled studies of opioids use longer than 12 weeks."  Despite this, Defendants negligently and misleadingly touted the benefits of long-term opioid use and negligently and misleadingly suggested that these benefits were supported by scientific evidence. Not only have Defendants failed to correct these false and negligent claims, they continue to

26

2-5120-1392, v. 1

FILED: NIAGARA COUNTY CLERK 08/23/2018 11:40 AM
NYSCEF DOC. NO. 1     Case 1:18-cv-01018-EAW    Document 1-3    Filed 09/14/18    Page 34 of 150

INDEX NO. E165792/2018
RECEIVED NYSCEF: 08/23/2018

make them today.

79.     For example, the Pharmaceutical Defendants negligently claimed that long-term opioid use improved patients' function and quality of life, including the following misrepresentations: (a) an Actavis advertisement claimed that the use of Kadian to treat chronic pain would allow patients to return to work, relieve "stress on your body and your mental health," and help patients enjoy their lives; (b) an Endo advertisement that claimed that the use of Opana ER for chronic pain would allow patients to perform demanding tasks, portraying seemingly healthy, unimpaired persons; (c) a Janssen patient education guide Finding Relief: Pain Management for Older Adults stated as "a fact" that "opioids may make it easier for people to live normally" such as sleeping peacefully, working, recreation, sex, walking, and climbing stairs; (d) Purdue advertisements of OxyContin entitled "Pain vignettes" implied that OxyContin improves patients' function; (e) Responsible Opioid Prescribing, by Cephalon, Endo and Purdue, taught that relief of pain by opioids, by itself, improved patients' function; (f) Cephalon and Purdue sponsored APF's Treatment Options: A Guide for People Living with Pain counseling patients that opioids "give [pain patients] a quality of life we deserve;" (g) Endo's NIPC website painknowledge.com claimed   that with opioids, "your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse;" (h) Endo CMEs titled Persistent Pain in the Older Patient claimed that chronic opioid therapy had been "shown to reduce pain and improve depressive symptoms and cognitive functioning;" (i) Janssen sponsored, funded, and edited a website, Let's Talk Pain, in 2009, which featured an interview edited by Janssen claiming that opioids allowed a patient to "continue to function;" (j) Purdue's A Policymaker's Guide to Understanding Pain & Its Management claimed that "multiple clinical studies" had

27

shown opioids as effective in improving daily function, psychological health, and health-related quality of life for chronic pain patients; (k) Purdue's, Cephalon's, Endo's, and Janssen's sales representatives have conveyed and continue to convey the message that opioids will improve patient function.

80.     These claims find no support in the scientific literature. The CDC Guideline concluded that "there is no good evidence that opioids improve pain or function with long-term use, and . . . complete relief of pain is unlikely" (emphasis added). The CDC Guideline reinforced this conclusion:

- "No evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least 1 year later . . ."

- "Although opioids can reduce pain during short-term use, the clinical evidence review found insufficient evidence to determine whether pain relief is sustained and whether function or quality of life improves with long-term opioid therapy."

- "[E]vidence is limited or insufficient for improved pain or function with long-term use of opioids for several chronic pain conditions for which opioids are commonly prescribed, such as low back pain, headache, and fibromyalgia."

81.     The CDC also noted that the risks of addiction and death "can cause distress and inability to fulfill major role obligations." As a matter of common sense (and medical evidence), drugs that can kill patients or commit them to a life of addiction or recovery do not improve their function and quality of life.

82.     The CDC Guideline was not the first time a federal agency repudiated the Pharmaceutical Defendants' claim that opioids improved function and quality of life. In 2010, the FDA warned Actavis that "[w]e are not aware of substantial evidence or substantial clinical experience demonstrating that the magnitude of the effect of the drug [Kadian] has in alleviating pain, taken together with any drug-related side effects patients may experience . . . results in any overall positive impact on a patient's work, physical and mental functioning, daily activities, or

enjoyment of life." In 2008, the FDA sent a warning letter to an opioid manufacturer, making it clear "that [the claim that] patients who are treated with the drug experience an improvement in their overall function, social function, and ability to perform daily activities . . . has not been demonstrated by substantial evidence or substantial clinical experience."

83.     The Pharmaceutical Defendants also negligently and misleadingly emphasized or exaggerated the risks of competing products like NSAIDs, so that doctors and patients would look to opioids first for the treatment of chronic pain. Once again, these misrepresentations by Defendants contravene pronouncements by and guidance from the FDA and CDC based on the scientific evidence. Indeed, the FDA changed the labels for ER/LA opioids in 2013 and IR opioids in 2016 to state that opioids should only be used as a last resort "in patients for which alternative treatment options" like non-opioid drugs "are inadequate." The CDC Guideline states that NSAIDs, not opioids, should be the first-line treatment for chronic pain, particularly arthritis and lower back pain.

84.     In addition, Purdue misleadingly promoted OxyContin as being unique among opioids in providing 12 continuous hours of pain relief with one dose. In fact, OxyContin does not last for 12 hours – a fact that Purdue has known at all relevant times. According to Purdue's own research, OxyContin wears off in under six hours in one quarter of patients and in under 10 hours in more than half. This is because OxyContin tablets release approximately 40% of their active medicine immediately, after which release tapers. This triggers a powerful initial response but provides little or no pain relief at the end of the dosing period, when less medicine is released. This phenomenon is known as "end of dose" failure, and the FDA found in 2008 that a "substantial number" of chronic pain patients taking OxyContin experience it. This not only renders Purdue's promise of 12 hours of relief false and negligent, it also makes OxyContin more

dangerous because the declining pain relief patients experience toward the end of each dosing period drives them to take more OxyContin before the next dosing period begins, quickly increasing the amount of drug they are taking and spurring growing dependence.

85.    Purdue's competitors were aware of this problem.  For example, Endo ran advertisements for Opana ER referring to "real" 12-hour dosing.  Nevertheless, Purdue negligently promoted OxyContin as if it were effective for a full 12 hours.  Indeed, Purdue's sales representatives continue to tell doctors that OxyContin lasts a full 12 hours.

86.    Cephalon negligently marketed its opioids Actiq and Fentora for chronic pain even though the FDA has expressly limited their use to the treatment of cancer pain in opioid-tolerant individuals.  Both Actiq and Fentora are extremely powerful fentanyl-based IR opioids. Neither is approved for or has been shown to be safe or effective for chronic pain. Indeed, the FDA expressly prohibited Cephalon from marketing Actiq for anything but cancer pain, and refused to approve Fentora for the treatment of chronic pain because of the potential harm, including the high risk of "serious and life-threatening adverse events" and abuse – which are greatest in non-cancer patients.  The FDA also issued a Public Health Advisory in 2007 emphasizing that Fentora should only be used for cancer patients who are opioid-tolerant and should not be used for any other conditions, such as migraines, post-operative pain, or pain due to injury.

87.    Despite this, Cephalon conducted and continues to conduct a well-funded campaign to promote Actiq and Fentora for chronic pain and other non-cancer conditions for which it was not approved, appropriate, or safe.  As part of this campaign, Cephalon used CMEs, speaker programs, KOLs, journal supplements, and detailing by its sales representatives to give doctors the false impression that Actiq and Fentora are safe and effective for treating non-cancer

30

pain. For example: (a) Cephalon paid to have a CME it sponsored, *Opioid-Based Management of Persistent and Breakthrough Pain,* published in a supplement of *Pain Medicine News* in 2009. The CME instructed doctors that "clinically, broad classification of pain syndromes as either cancer or noncancer-related has limited utility" and recommended Actiq and Fentora for patients with chronic pain; (b) Cephalon's sales representatives set up hundreds of speaker programs for doctors, including many non-oncologists, which promoted Actiq and Fentora for the treatment of non-cancer pain; and (c) in December 2011, Cephalon widely disseminated a journal supplement entitled "*Special Report: An Integrated Risk Evaluation and Mitigation Strategy for Fentanyl Buccal Tablet (FENTORA) and Oral Transmucosal Fentanyl Citrate (ACTIQ)*" to *Anesthesiology News, Clinical Oncology News,* and *Pain Medicine News* – three publications that are sent to thousands of anesthesiologists and other medical professionals. The Special Report openly promotes Fentora for "multiple causes of pain" – and not just cancer pain.

88.     Cephalon's negligent marketing gave doctors and patients the false impression that Actiq and Fentora were not only safe and effective for treating chronic pain but were also approved by the FDA for such uses.

89.     Purdue unlawfully and unfairly failed to report or address illicit and unlawful prescribing of its drugs, despite knowing about it for years. Purdue's sales representatives have maintained a database since 2002 of doctors suspected of inappropriately prescribing its drugs. Rather than report these doctors to state medical boards or law enforcement authorities (as Purdue is legally obligated to do) or cease marketing to them, Purdue used the list to demonstrate the high rate of diversion of OxyContin – the same OxyContin that Purdue had promoted as less addictive – in order to persuade the FDA to bar the manufacture and sale of generic copies of the drug because the drug was too likely to be abused. In an interview with the *Los Angeles Times,*

31

Case 1:18-cv-01018-EAW    Document 1-3    Filed 09/14/18    Page 39 of 150

Purdue's senior compliance officer acknowledged that in five years of investigating suspicious pharmacies, Purdue failed to act – even where Purdue employees personally witnessed the diversion of its drugs. The same was true of prescribers; despite its knowledge of illegal prescribing, Purdue did not report until years after law enforcement shut down a Los Angeles clinic that prescribed more than 1.1 million OxyContin tablets and that Purdue's district manager described internally as "an organized drug ring." In doing so, Purdue protected its own profits at the expense of public health and safety.

90.     The State of New York's settlement with Purdue specifically cited the company for failing to adequately address suspicious prescribing. Yet, upon information and belief, Purdue continues to profit from the prescriptions of such prolific prescribers.

91.     Like Purdue, Endo has been cited for its failure to set up an effective system for identifying and reporting suspicious prescribing. In its settlement agreement with Endo, the State of New York found that Endo failed to require sales representatives to report signs of abuse, diversion, and inappropriate prescribing; paid bonuses to sales representatives for detailing prescribers who were subsequently arrested or convicted for illegal prescribing; and failed to prevent sales representatives from visiting prescribers whose suspicious conduct had caused them to be placed on a no-call list.

92.     As a part of their negligent marketing scheme, the Pharmaceutical Defendants identified and targeted susceptible prescribers and vulnerable patient populations in New York State. For example, these Defendants focused their negligent marketing on primary care doctors, who were more likely to treat chronic pain patients and prescribe them drugs but were less likely to be educated about treating pain and the risks and benefits of opioids and therefore more likely to accept Defendants' misrepresentations.

4852-5120-1392, v. 1

Case 1:18-cv-01018-EAW   Document 1-3   Filed 09/14/18   Page 40 of 150

93.     The Pharmaceutical Defendants, both individually and collectively, made, promoted, and profited from their misrepresentations about the risks and benefits of opioids for chronic pain even though they knew that their misrepresentations were false and negligent. The history of opioids, as well as research and clinical experience over the last 20 years, established that opioids were highly addictive and responsible for a long list of very serious adverse outcomes. The FDA and other regulators warned these Defendants of this, and these Defendants had access to scientific studies, detailed prescription data, and reports of adverse events, including reports of addiction, hospitalization, and deaths – all of which made clear the harms from long-term opioid use and that patients are suffering from addiction, overdoses, and death in alarming numbers. More recently, the FDA and CDC have issued pronouncements based on the medical evidence that conclusively expose the known falsity of Defendants' misrepresentations, and Endo and Purdue have recently entered agreements prohibiting them from making some of the same misrepresentations described in this Complaint in New York.

94.     Moreover, at all times relevant to this Complaint, the Pharmaceutical Defendants took steps to avoid detection of and to fraudulently conceal their negligent marketing and unlawful, unfair, and fraudulent conduct. For example, the Pharmaceutical Defendants disguised their own role in the negligent marketing of chronic opioid therapy by funding and working through third parties like Front Groups and KOLs. These Defendants purposefully hid behind the assumed credibility of these individuals and organizations and relied on them to vouch for the accuracy and integrity of Defendants' false and negligent statements about the risks and benefits of long-term opioid use for chronic pain.

95.     The Pharmaceutical Defendants also never disclosed their role in shaping, editing, and approving the content of information and materials disseminated by these third parties.

33

These Defendants exerted considerable influence on these promotional and "educational" materials in emails, correspondence, and meetings with KOLs, fake independent groups, and public relations companies that were not, and have not yet become, public. For example, painknowledge.org, which is run by the NIPC, did not disclose Endo's involvement. Other Pharmaceutical Defendants, such as Purdue and Janssen, ran similar websites that masked their own direct role.

96.     Finally, the Pharmaceutical Defendants manipulated their promotional materials and the scientific literature to make it appear that these items were accurate, truthful, and supported by objective evidence when they were not. These Defendants distorted the meaning or import of studies they cited and offered them as evidence for propositions the studies did not support. The lack of support for these Defendants' negligent messages was not apparent to medical professionals who relied upon them in making treatment decisions.

97.     Thus, the Pharmaceutical Defendants successfully concealed from the medical community, municipalities, patients, and health care payers' facts sufficient to arouse suspicion of the claims that the Plaintiffs now assert. Plaintiffs did not know of the existence or scope of Defendants' industry-wide fraud and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

98.     The Pharmaceutical Defendants' misrepresentations deceived doctors and patients about the risks and benefits of long-term opioid use. Studies also reveal that many doctors and patients are not aware of or do not understand these risks and benefits. Indeed, patients often report that they were not warned they might become addicted to opioids prescribed to them. As reported in January 2016, a 2015 survey of more than 1,000 opioid patients found that 4 out of 10 were not told opioids were potentially addictive.

34

99.     The Pharmaceutical Defendants' negligent marketing scheme caused and continues to cause doctors in New York to prescribe opioids for chronic pain conditions such as back pain, headaches, arthritis, and fibromyalgia. Absent these Defendants' negligent marketing scheme, these doctors would not have prescribed as many opioids. These Defendants' negligent marketing scheme also caused and continues to cause patients to purchase and use opioids for their chronic pain believing they are safe and effective. Absent these Defendants' negligent marketing scheme, fewer patients would be using opioids long-term to treat chronic pain, and those patients using opioids would be using less of them.

100.    The Pharmaceutical Defendants' negligent marketing has caused and continues to cause the prescribing and use of opioids to explode. Indeed, this dramatic increase in opioid prescriptions and use corresponds with the dramatic increase in Defendants' spending on their negligent marketing scheme. Defendants' spending on opioid marketing totaled approximately $91 million in 2000. By 2011, that spending had tripled to $288 million.

101.    The escalating number of opioid prescriptions written by doctors who were deceived by the Pharmaceutical Defendants' negligent marketing scheme is the cause of a correspondingly dramatic increase in opioid addiction, overdose, and death throughout the U.S. and New York. In August 2016, the U.S. Surgeon General published an open letter to be sent to physicians nationwide, enlisting their help in combating this "urgent health crisis" and linking that crisis to negligent marketing. He wrote that the push to aggressively treat pain, and the "devastating" results that followed, had "coincided with heavy marketing to doctors . . . [m]any of [whom] were even taught – incorrectly – that opioids are not addictive when prescribed for legitimate pain."

102.    Scientific evidence demonstrates a strong correlation between opioid prescriptions

35

Case 1:18-cv-01018-EAW   Document 1-3   Filed 09/14/18   Page 43 of 150

and opioid abuse. For instance, the CDC Guideline explains that "[o]pioid pain reliever prescribing has quadrupled since 1999 and has increased in parallel with [opioid] overdoses." Patients receiving prescription opioids for chronic pain account for the majority of overdoses. For these reasons, the CDC concluded that efforts to rein in the prescribing of opioids for chronic pain are critical "to reverse the epidemic of opioid drug overdose deaths and prevent opioid-related morbidity."

103.    Contrary to the Pharmaceutical Defendants' misrepresentations, most opioid addiction begins with legitimately *prescribed* opioids, and therefore could have been prevented had Defendants' representations to prescribers been truthful. In 2011, 71% of people who abused prescription opioids got them through friends or relatives, not from pill mills, drug dealers or the internet. Numerous doctors and substance abuse counselors note that many of their patients, who misuse, or abuse opioids started with legitimate prescriptions, confirming the important role that doctors' prescribing habits have played in the opioid epidemic.

104.    Opioid-related cases of NAS are rising at such a rapid pace that cities, counties and health care systems are unable to keep up logistically.

## DISTRIBUTOR DEFENDANTS' WRONGFUL CONDUCT

105.    The supply chain for prescription opioids begins with the manufacture and packaging of the pills. The manufacturers then transfer the pills to distribution companies, including Defendants Cardinal, McKesson, and AmerisourceBergen, which together account for 85-90 % of all revenues from drug distribution in the United States, an estimated $378.4 billion in 2015. The distributors then supply opioids to pharmacies, doctors, and other healthcare providers, which then dispense the drugs to patients.

106.    Manufacturer Defendants and Distributor Defendants share the responsibility for controlling the availability of prescription opioids. Opioid "diversion" occurs whenever the

36

4852-5120-1392, v. 1

supply chain of prescription opioids is broken, and the drugs are transferred from a legitimate channel of distribution or use, to an illegitimate channel of distribution or use. Diversion can occur at any point in the opioid supply chain.

107.    For example, at the wholesale level of distribution, diversion occurs whenever distributors allow opioids to be lost or stolen in transit, or when distributors fill suspicious orders of opioids from buyers, retailers, or prescribers. Suspicious orders include orders of unusually large size, orders that are disproportionately large in comparison to the population of a community served by the pharmacy, orders that deviate from a normal pattern, and/or orders of unusual frequency and duration.

108.    Diversion occurs through the use of stolen or forged prescriptions at pharmacies, or the sale of opioids without prescriptions, including patients seeking prescription opioids under false pretenses.

109.    Opioid diversion occurs in the United States at an alarming rate. In recent years, the number of people who take prescription opioids for non-medical purposes is greater than the number of people who use cocaine, heroin, hallucinogens, and inhalants combined.

110.    Every year, thousands of people in New York misuse and abuse opioid pain relievers that can lead to addiction, neonatal abstinence syndrome, overdose and death.

111.    Within the last 20 years, the abuse of prescription narcotic pain relievers has emerged as a public health crisis in the United States.

112.    The dramatic rise in heroin use in recent years is a direct result of prescription opioid diversion. The strongest risk factor for a heroin use disorder is prescription opioid use. In one national study covering the period 2008 to 2010, 77.4% of the participants reported using prescription opioids before initiating heroin use. Another study revealed that 75% of those who

4852-5120-1392, v. 1

began their opioid abuse in the 2000s started with prescription opioid. The CDC has reported that people who are dependent on prescription opioid painkillers are 40 times more likely to become dependent on heroin.

113. Plaintiffs and the Class have been significantly damaged by the effects of the Distributor Defendants' opioid diversion.

114. Distributor Defendants have a duty to exercise reasonable care under the circumstances. This involves a duty not to create a foreseeable risk of harm to others. Additionally, one who engages in affirmative conduct, and thereafter realizes or should realize that such conduct has created an unreasonable risk of harm to another, is under a duty to exercise reasonable care to prevent the threatened harm.

115. In addition to having common law duties, the Distributor Defendants are governed by the statutory requirements of the Controlled Substances Act ("CSA"), 21 U.S.C. § 801 *et seq.* and its implementing regulations. These requirements were enacted to protect society from the harms of drug diversion. The Distributor Defendants' violations of these requirements show that they failed to meet the relevant standard of conduct that society expects from them. The Distributor Defendants' repeated, unabashed, and prolific violations of these requirements show that they have acted in total reckless disregard.

116. By violating the CSA, the Distributor Defendants are also liable under the law of New York as herein alleged.

117. The CSA creates a legal framework for the distribution and dispensing of controlled substances. Congress passed the CSA partly out of a concern about "the widespread diversion of [controlled substances] out of legitimate channels into the illegal market." H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. at 4566, 4572.

4852-5120-1392, v. 1

Case 1:18-cv-01018-EAW   Document 1-3   Filed 09/14/18   Page 46 of 150

118.    Accordingly, the CSA acts as a system of checks and balances from the manufacturing level through delivery of the pharmaceutical drug to the patient or ultimate user. Every person or entity that manufactures, distributes, or dispenses opioids must obtain a "registration" with the DEA. Registrants at every level of the supply chain must fulfill their obligations under the CSA, otherwise controlled substances move from the legal to the illicit marketplace, and there is enormous potential for harm to the public.

119.    All opioid distributors are required to maintain effective controls against opioid diversion. They are also required to create and use a system to identify and report downstream suspicious orders of controlled substances to law enforcement. Suspicious orders include orders of unusual size, orders deviating substantially from the normal pattern, and orders of unusual frequency. To comply with these requirements, distributors must know their customers, report suspicious orders, conduct due diligence, and terminate orders if there are indications of diversion.

120.    To prevent unauthorized users from obtaining opioids, the CSA creates a distribution monitoring system for controlled substances, including registration and tracking requirements imposed upon anyone authorized to handle controlled substances. The DEA's Automation of Reports and Consolidation Orders System ("ARCOS") is an automated drug reporting system that records and monitors the flow of Schedule II controlled substances from point of manufacture through commercial distribution channels to point of sale. ARCOS accumulates data on distributors'-controlled substances, acquisition transactions, and distribution transactions, which are then summarized into reports used by the DEA to identify any diversion of controlled substances into illicit channels of distribution. Each person or entity that is registered to distribute ARCOS Reportable controlled substances must report acquisition and

39

Case 1:18-cv-01018-EAW   Document 1-3   Filed 09/14/18   Page 47 of 150

distribution transactions to the DEA.

121.    Acquisition and distribution transaction reports must provide data on each acquisition to inventory (identifying whether it is, e.g., by purchase or transfer, return from a customer, or supply by the Federal Government) and each reduction from inventory (identifying whether it is, e.g., by sale or transfer, theft, destruction or seizure by Government agencies) for each ARCOS Reportable controlled substance. 21 U.S.C. § 827(d) (l); 21 C.F.R. §§ 1304.33(e), (d). Inventory that has been lost or stolen must also be reported separately to the DEA within one business day of discovery of such loss or theft.

122.    In addition to filing acquisition/distribution transaction reports, each registrant is required to maintain a complete, accurate, and current record of each substance manufactured, imported, received, sold, delivered, exported, or otherwise disposed of. 21 U.S.C. §§ 827(a)(3), 1304.2l(a), 1304.22(b). It is unlawful for any person to negligently fail to abide by the recordkeeping and reporting requirements.

123.    To maintain registration, distributors must also maintain effective controls against diversion of controlled substances into other than legitimate medical, scientific and industrial channels. When determining if a distributor has provided effective controls, the DEA Administrator refers to the security requirements set forth in §§ 130 1.72-1301.76 as standards for the physical security controls and operating procedures necessary to prevent diversion. 21 CFR § 1301.71.

124.    For years the Distributor Defendants have known of the problems and consequences of opioid diversion in the supply chain and have committed repeated violations of the laws and regulations of the United States as cited above consequently making them liable under New York law.

4852-5120-1392, v. 1

125. To combat the problem of opioid diversion, the DEA has provided guidance to distributors on the requirements of suspicious order reporting in numerous venues, publications, documents, and final agency actions. Since 2006, the DEA has conducted one-on-one briefings with distributors regarding their downstream customer sales, due diligence responsibilities, and legal and regulatory responsibilities (including the responsibility to know their customers and report suspicious orders to the DEA). The DEA provided distributors with data on controlled substance distribution patterns and trends, including data on the volume of orders, frequency of orders, and percentage of controlled vs. non-controlled purchases. The distributors were given case studies, legal findings against other registrants, and ARCOS profiles of their customers whose previous purchases may have reflected suspicious ordering patterns. The DEA emphasized the "red flags" distributors should look for to identify potential diversion.

126. Since 2007, the DEA has hosted no less than five conferences to provide opioid distributors with updated information about diversion trends. The Defendant Distributors attended at least one of these conferences, which allowed for questions and discussions. The DEA has participated in numerous meetings and events with the legacy Healthcare Distribution Management Association (HDMA), now known as the Healthcare Distribution Alliance (HDA), an industry trade association for wholesalers and distributors. DEA representatives have provided guidance to the association concerning suspicious order monitoring, and the association has published guidance documents for its members on suspicious order monitoring, reporting requirements, and the diversion of controlled substances.

127. On September 27, 2006 and December 27, 2007, the DEA Office of Diversion Control sent letters to all registered distributors providing guidance on suspicious order monitoring of controlled substances and the responsibilities and obligations of the registrant to

41

conduct due diligence on controlled substance customers as part of a program to maintain effective controls against diversion.

128.  The September 27, 2006 letter reminded registrants that they were required by law to exercise due diligence to avoid filling orders that could be diverted into the illicit market. The DEA explained that as part of the legal obligation to maintain effective controls against diversion, the distributor was required to exercise due care in confirming the legitimacy of each and every order prior to filling.  It also described circumstances that could be indicative of diversion including ordering excessive quantities of a limited variety of controlled substances while ordering few if any other drugs; disproportionate ratio of ordering-controlled substances versus non-controlled prescription drugs; the ordering of excessive quantities of a limited variety of controlled substances in combination with lifestyle drugs; and ordering the same controlled substance from multiple distributors.  The letter went on to describe what questions should be answered by a customer when attempting to decide if the order is indeed suspicious.

129.  On December 27, 2007, the Office of Diversion Control sent a follow-up letter to DEA registrants providing guidance and reinforcing the legal requirements outlined in the September 2006 correspondence.  The letter reminded registrants that suspicious orders must be reported when discovered and monthly transaction reports of excessive purchases did not meet the regulatory criteria for suspicious order reporting.  The letter also advised registrants that they must perform an independent analysis of a suspicious order prior to the sale to determine if the controlled substances would likely be diverted, and that filing a suspicious order and then completing the sale does not absolve the registrant from legal responsibility.  Finally, the letter directed the registrant community to review a recent DEA action that addressed criteria in determining suspicious orders and their obligation to maintain effective controls against

42

diversion.

130.    The Distributor Defendants' own industry group, the Healthcare Distribution Management Association, published Industry Compliance Guidelines titled "Reporting Suspicious Orders and Preventing Diversion of Controlled Substances," emphasizing the critical role of each member of the supply chain in distributing controlled substances.

131.    These industry guidelines stated: "At the center of a sophisticated supply chain, distributors are uniquely situated to perform due diligence in order to help support the security of controlled substances they deliver to their customers."

132.    Opioid distributors have admitted to the magnitude of the problem and, at least superficially, their legal responsibilities to prevent diversion.   They have made statements assuring the public they are supposedly undertaking a duty to curb the opioid epidemic.

133.    For example, a Cardinal executive claimed that Cardinal uses "advanced analytics" to monitor its supply chain.  He further extolled that Cardinal was being "as effective and efficient as possible in constantly monitoring, identifying, and eliminating any *outside* criminal activity" (emphasis added).

134.    McKesson has publicly stated that it has a "best-in-class controlled substance monitoring program to help identify suspicious orders" and claimed it is "deeply passionate about curbing the opioid epidemic in our Country."

135.    These assurances, on their face, of identifying and eliminating criminal activity and curbing the opioid epidemic create a duty for the Distributor Defendants to take reasonable measures to do just that.

136.    In addition to the obligations imposed by law, through their own words, representations, and actions, the Distributor Defendants have voluntarily undertaken a duty to

43

protect the public at large against diversion from their supply chains, and to curb the opioid epidemic. In this voluntary undertaking, the Distributor Defendants have miserably and negligently failed.

137. The Distributors Defendants have knowingly or negligently allowed diversion. Their wrongful conduct and inaction have resulted in numerous civil fines and other penalties recovered by state and federal agencies- including actions by the DEA related to violations of the Controlled Substances Act.

138. In 2008, Cardinal paid a $34 million penalty to settle allegations about opioid diversion taking place at seven of its warehouses in the United States. In 2012, Cardinal reached an administrative settlement with the DEA relating to opioid diversion between 2009 and 2012 in multiple states. In December 2016, a Department of Justice press release announced a multi-million-dollar settlement with Cardinal for violations of the Controlled Substances Act. In connection with the investigations of Cardinal, the DEA uncovered evidence that Cardinal's own investigator warned Cardinal against selling opioids to certain pharmacies.

139. In May 2008, McKesson entered into a settlement with the DEA on claims that McKesson failed to maintain effective controls against diversion of controlled substances. McKesson allegedly failed to report suspicious orders from rogue Internet pharmacies around the Country, resulting in millions of doses of controlled substances being diverted. McKesson agreed to pay a $13.25 million civil fine. McKesson also was supposed to implement tougher controls regarding opioid diversion and, in this regard, McKesson utterly failed. McKesson's system for detecting "suspicious orders" from pharmacies was so ineffective and dysfunctional that at one of its facilities in Colorado between 2008 and 2013, it filled more than 1.6 million orders, for tens of millions of controlled substances, but it reported just 16 orders as suspicious,

all from a single consumer. In 2015, McKesson was in the middle of allegations concerning its "suspicious order reporting practices for controlled substances." In early 2017, it was reported that McKesson agreed to pay $150 million to the government to settle certain opioid diversion claims that it allowed drug diversion at 12 distribution centers in 11 states.

140. In 2007, AmerisourceBergen lost its license to send controlled substances from a distribution center amid allegations that it was not controlling shipments of prescription opioids to Internet pharmacies. Again in 2012, AmerisourceBergen was implicated for failing to protect against diversion of controlled substances into non-medically necessary channels. It has been reported that the U.S. Department of Justice has subpoenaed AmerisourceBergen for documents in connection with a grand jury proceeding seeking information on the company's "program for controlling and monitoring diversion of controlled substances into channels other than for legitimate medical, scientific and industrial purposes."

141. Relying upon state laws and regulation, various state boards of pharmacy have directly disciplined the wholesale distributors of prescription opioids for failure to prevent diversion, a duty recognized under state laws and regulations.

142. Although distributors have been penalized by law enforcement authorities, these penalties have not changed their conduct. They pay fines as a cost of doing business in an industry that generates billions of dollars in revenue and profit.

143. The Distributor Defendants have the ability and owe the duty to prevent opioid diversion, which presented a known or foreseeable risk of damage to Plaintiffs and the Class.

144. The Distributor Defendants have supplied massive quantities of prescription opioids in New York with the actual or constructive knowledge that the opioids were ultimately being consumed by citizens for non-medical purposes. Many of these shipments should have

45

been stopped or investigated as suspicious orders, but the Distributor Defendants negligently or intentionally failed to do so.

145.    Each Distributor Defendant knew or should have known that the amount of the opioids that it allowed to flow into New York was far in excess of what could be consumed for medically-necessary purposes in the relevant communities (especially given that each Distributor Defendant knew it was not the only opioid distributor servicing those communities).

146.    The Distributor Defendants negligently or intentionally failed to adequately control their supply lines to prevent diversion.  A reasonably-prudent distributor of Schedule II controlled substances would have anticipated the danger of opioid diversion and protected against it by, for example, taking greater care in hiring, training, and supervising employees; providing greater oversight, security, and control of supply channels; looking more closely at the pharmacists and doctors who were purchasing large quantities of commonly-abused opioids in amounts greater than the populations in those areas would warrant; investigating demographic or epidemiological facts concerning the increasing demand for narcotic painkillers in New York; providing information to pharmacies and retailers about opioid diversion; and in general, simply following applicable statutes, regulations, professional standards, and guidance from government agencies and using a little bit of common sense.

147.    Upon information and belief, the Distributor Defendants made little to no effort to visit the pharmacies servicing patients and citizens of New York to perform due diligence inspections to ensure that the controlled substances the Distributors Defendants had furnished were not being diverted to illegal uses.

148.    Upon information and belief, the compensation the Distributor Defendants provided to certain of their employees was affected, in part, by the volume of their sales of

46

opioids to pharmacies and other facilities servicing the patients and citizens of New York, thus improperly creating incentives that contributed to and exacerbated opioid diversion and the resulting epidemic of opioid abuse.

149.    It was reasonably foreseeable to the Distributor Defendants that their conduct in flooding the consumer market of New York with highly-addictive opioids would allow opioids to fall into the hands of children, addicts, criminals, and other unintended users.

150.    It is reasonably foreseeable to the Distributor Defendants that, when unintended users gain access to opioids, tragic preventable injuries will result, including neo-natal addiction and NAS.

151.    The Distributor Defendants knew or should have known that the opioids being diverted from their supply chains would create access to opioids by unauthorized users, which, in turn, perpetuates the cycle of addiction, demand, illegal transactions, economic ruin, and human tragedy.

152.    The Distributor Defendants knew or should have known that a substantial amount of the opioids dispensed to patients and citizens of New York were being dispensed based on invalid or suspicious prescriptions.  It is foreseeable that filling suspicious orders for opioids will cause harm to individual pharmacy customers, third-parties, Plaintiffs and the Class.

153.    The Distributor Defendants were aware of widespread prescription opioid abuse of persons who would become patients in New York, but they nevertheless persisted in a pattern of distributing commonly abused and diverted opioids in geographic areas-and in such quantities, and with such frequency- that they knew or should have known these commonly abused controlled substances were not being prescribed and consumed for legitimate medical purposes.

154.    If any of the Distributor Defendants adhered to effective controls to guard against

47

diversion, the Class would have avoided significant damages.

155.    The Distributor Defendants made substantial profits over the years based on the diversion of opioids affecting New York. Their participation and cooperation in a common enterprise has foreseeably caused damages to Plaintiffs and the Class. The Distributor Defendants knew full well that Plaintiffs and the Class would be unjustly forced to bear these injuries and damages.

156.    The Distributor Defendants' intentional distribution of excessive amounts of prescription opioids to communities showed an intentional or reckless disregard for Plaintiffs and the Class. Their conduct poses a continuing economic threat to the communities that must deal with ongoing needs of children afflicted with NAS.

## CLASS ACTION ALLEGATIONS

157.    Plaintiffs seek to represent the following class of individuals:

*All New York persons under the age of eighteen who were diagnosed with neonatal abstinence syndrome (NAS) and whose birth mother (1) used opioids during gestation and (2) had a medical prescription for opioids before or during the gestation period.*

158.    Additionally, Plaintiffs bring this action on behalf of a subclass of Baby C.E. and all other similarly situated New York minors who have suffered personal injury damages from opioid exposure in utero, defined as follows:

*All New York persons under the age of eighteen who were diagnosed with neonatal abstinence syndrome (NAS) and whose birth mother (1) used opioids during gestation and (2) had a medical prescription for opioids before or during the gestation period, who have suffered personal injury damages from opioid exposure in utero.*

159.    Excluded from the Class are children of the Defendants and their officers,

4852-5120-1392, v. 1

directors, and employees, as well as the Court and its personnel.

160.    Plaintiffs and all others similarly situated are entitled to have this case maintained as a class action pursuant to CPLR Article 9 for (e.g.§ 901 et. Seq.) the following reasons:

161.    The prerequisites for a class action under Article 901 are met.

a.    The class is so numerous that joinder of all persons is impracticable. Although the precise number of children in the Class is currently unknown, Plaintiffs believe that the putative class is in the thousands, if not more.

b.    There are common issues of law and fact, particularly whether Defendants' and their agents' policies and procedures that encouraged the continued use and abuse of opioids despite knowing the dangers caused harm to the Class.

c.    Plaintiffs' claims are typical of the class. Plaintiffs' injuries are typical of the experience of the Class Members, having suffered personal injury and increased health risks necessitating medical monitoring and future medical treatment that are typical of the experience of the Class Members. Plaintiffs' interests are identical to and aligned with those of other Class Members. Plaintiffs and the Class Members have suffered an array of damages all stemming from the common trunk of facts and issues related to exposure to Defendants' manufacture and distribution of opioids.

d.    Plaintiffs will fairly and adequately represent and protect the interests of the class because:

i.    Plaintiffs have retained counsel experienced in the prosecution of class action litigation who will adequately represent the interests of the class;

ii.    Plaintiffs and counsel are aware of no conflicts of interest between

49

Case 1:18-cv-01018-EAW   Document 1-3   Filed 09/14/18   Page 57 of 150

Plaintiffs and absent Class Members or otherwise that cannot be managed through the implementation of available procedures;

iii.     Plaintiffs have, or can acquire, adequate financial resources to assure that the interests of the class will be protected; and

iv.     Plaintiffs are knowledgeable concerning the subject matter of this action and will assist counsel in the prosecution of this litigation.

e.  This Class action procedure is superior to other available methods for the fair and efficient adjudication of the controversy.

162.    Further, any denial of liability and defenses raised by the Defendants would be applicable to all claims presented by all members of the class or can otherwise be managed through available procedures.

163.    Defendants' conduct presents predominant common factual questions. This class is bound together by the common factual questions relating to whether the Defendants' tortious activities led to physicians' over-subscription of opioids and created a diversionary market for opioids thus certification is proper under Article 9. Regardless of whether Plaintiffs and the Class Members are presenting individualized damages such as pain & suffering, they will present common liability proof that is the same for each member of the Class. Across claim categories, Plaintiffs' common proof of Defendants' liability will involve the same cast of characters, events, discovery, documents, fact witnesses, and experts.

164.    The need for proof of Plaintiffs' and Class Members' damages will not cause individual issues to predominate over common questions.

165.    A class action is superior to maintenance of these claims on a claim-by-claim basis when all actions arise out of the same circumstances and course of conduct. A class action

4852-5120-1392, v. 1

allows the Court to process all rightful claims in one proceeding. Class litigation is manageable considering the opportunity to afford reasonable notice of significant phases of the litigation to Class Members and permit distribution of any recovery. The prosecution of separate actions by individual Class Members, or the individual joinder of all Class Members in this action, is impracticable and would create a massive and unnecessary burden on the resources of the courts and could result in inconsistent adjudications, while a single class action can determine, with judicial economy, the rights of each member of the class or subclasses, should that be determined to be appropriate.

166. The conduct of this action as a class action conserves the resources of the parties and the court system, protects the rights of each member of the class, and meets all due process requirements.

167. Certification of the Class with respect to particular common factual and legal issues concerning liability and comparative fault, as well as the necessary and appropriate quantum of punitive damages, or ratio of punitive damages to actual harm, is appropriate under Article 9.

168. The particular common issues of liability, comparative fault, and the quantum of punitive damages or ratio of punitive damages to actual harm, are common to all Class Members no matter what type of harm or injury was suffered by each Class Member.

169. A class action may be maintained under Article 9 because Defendants have acted or refused to act on grounds that apply generally to the Class, thereby making appropriate the entry of equitable and/or injunctive relief, including a medical monitoring protocol and treatment programs, and injunctive relief to prevent recurrence of the conduct in the future.

170. As a result of Defendants' negligent conduct, the Class Members are at increased

51

risk of NAS and developmental issues. Early detection of neonatal exposure and developmental issues through examination and testing, with treatment as necessary, has significant value for Class Members because such detection will help Class Members monitor, minimize and treat the harm therefrom.    Due to neonatal opioid exposure by the Class Members, surveillance, surveillance in the form of periodic medical examinations and treatment is reasonable and necessary, because such surveillance will provide early detection, diagnosis and treatment of NAS and its effects.  As a remedy for the negligent and unconscionable conduct alleged in this Complaint, Defendants should be required to fund a medical monitoring and treatment program designed to identify and combat NAS and its effects on the Class and provide desperately needed neonatal care and treatment programs as NAS affected children develop.

171.    The particular common issues of liability, comparative fault, and the quantum of punitive damages or ratio of punitive damages to actual harm, are common to all Class Members no matter what type of harm or injury was suffered by each Class Member.

### AS AND FOR PLAINTIFFS' FIRST CAUSE OF ACTION - NUISANCE

172.    Plaintiffs reassert the allegations of the foregoing paragraphs as if set forth fully herein.

173.    Defendants are liable for public nuisance.

174.    The nuisance is the over-saturation of opioids in New York for non-medical purposes, as well as the adverse social, economic, and human health outcomes associated with widespread illegal opioid use, including the increasing incidence of NAS.

175.    All Defendants substantially participated in nuisance-causing activities.

176.    Defendants' nuisance-causing activities include selling or facilitating the excessive sale of prescription opioids to the patients and citizens of New York, as well as to

52

unintended users, including newborns and children, pregnant women, and potential mothers.

177.    Defendants' nuisance-causing activities also include failing to implement effective controls and procedures in their supply chains to guard against theft, diversion and misuse of controlled substances, and their failure to adequately design and operate a system to detect, halt and report suspicious orders of controlled substances.

178.    Defendants' activities unreasonably interfere with the rights of Plaintiffs and the Class.

179.    The Defendants' interference with these rights of Plaintiffs and the Class is unreasonable because it:

    a.      Has harmed and will continue to harm the children and public health services of New York;

    b.      Is proscribed by statutes and regulation, including the CSA and the consumer protection statute;

    c.      Is of a continuing nature and it has produced long-lasting effects; and

    d.      Defendants have reason to know their conduct has a significant effect upon Plaintiff and the Class.

180.    The nuisance undermines public health, quality of life, and safety. It has resulted in high rates of addiction, overdoses, dysfunction, and despair within families and entire communities.

181.    The resources of the communities, and of the Plaintiffs and the Class, are insufficient to deal with needs created by the Opioid Crisis, and these limited resources are being unreasonably consumed in efforts to address the Crisis, including efforts to address the overwhelming number of children born with NAS.

4852-5120-1392, v. 1

182.   Defendants' nuisance-causing activities are not outweighed by the utility of Defendants' behavior.  In fact, their behavior is illegal and has no social utility whatsoever. There is no legitimately recognized societal interest in failing to identify, halt, and report suspicious opioid transactions.   There is no legitimate societal interest in Manufacturer Defendants dissemination of false "scientific" facts and advice.

183.   At all times, all Defendants possessed the right and ability to control the nuisance-causing outflow of opioids from pharmacy locations or other points of sale.  Pharmaceutical Defendants flooded the distribution channels and the geographic and demographic area of New York with opioid pills.  Distributor Defendants had the power to shut off the supply of illicit opioids to patients and consumers of New York and, yet, did the opposite by flooding the U.S. (including New York) with opioid pills.

184.   As a direct and proximate result of the nuisance, the communities of Plaintiffs and the Class have born a great burden trying to remedy the harms caused by Defendants' nuisance-causing activity, including, but not limited to, costs of hospital services, counseling, healthcare, and child services.

185.   Plaintiff Baby C.E. and the Class also have suffered unique harms different from the public at large, namely, that they personally suffer NAS. Therefore, Plaintiffs have standing to bring a private action for public nuisance.

186.   Defendants' conduct also constitutes nuisance per se, as Defendants' conduct violated the New York State Controlled Substances Act.

187.   The effects of the nuisance can be abated, and the further occurrence of such harm can be prevented.  All Defendants share in the responsibility for doing so.

188.   Defendants should be required to pay the expenses Plaintiffs and the Class, and

54

FILED: NIAGARA COUNTY CLERK 08/23/2018 11:40 AM
NYSCEF DOC. NO. 1    Case 1:18-cv-01018-EAW    Document 1-3    Filed 09/14/18    Page 62 of 150

INDEX NO. E165792/2018
RECEIVED NYSCEF: 08/23/2018

their communities have incurred or will incur in the future to fully abate the nuisance.

## AS AND FOR PLAINTIFFS' SECOND CAUSE OF ACTION
## NEGLIGENCE AND GROSS NEGLIGENCE

189.    Plaintiffs repeat and reassert the allegations of the foregoing paragraphs as if set forth fully herein.

190.    Defendants owe a non-delegable duty to Plaintiff Baby C.E. and the Class to conform their behavior to the legal standard of reasonable conduct under the circumstances, in the light of the apparent risks.

191.    Defendant's duty to plaintiffs included a duty not to deceive, which imposed an obligation to "establish and operate a system to disclose to the licensee suspicious orders for controlled substances and inform the [Department of Health] of such suspicious orders" in compliance with the 10 NYCRR 80.22.

192.    There is no social value to Defendants' challenged behavior. In fact, Defendants' entire conduct, behavior, actions, misrepresentations, conspiracies, and omissions are against the law.

193.    On the other hand, there is immense social value to the interests threatened by Defendants' behavior, namely the health, safety, and welfare of Baby C.E. and the Class.

194.    Defendants' behavior caused a substantial injury and damage to Baby C.E. and the Class.

195.    Defendants' conduct fell below the reasonable standard of care and was negligent. Their negligent acts include:

    a.    Consciously supplying the market in New York with highly-addictive prescription opioids, including misrepresenting, understating, or obfuscating the highly addictive

propensities of opioid pills;

b.    Using unsafe marketing, labeling, distribution, and dispensing practices, including failing to warn or advise physicians to conduct an addiction family history of each and every potential patient;

c.    Affirmatively enhancing the risk of harm from prescription opioids by failing to act as a last line of defense against diversion;

d.    Failing to properly train or investigate their employees;

e.    Failing to properly review and analyze prescription orders and data for red flags;

f.    Failing to report suspicious orders or refuse to fill them;

g.    Failing to provide effective controls and procedures to detect and/or guard against theft and diversion of controlled substances;

h.    Failing to police the integrity of their supply chains; and

i.    Creating misleading information with the intention of having prescribing physicians rely upon it.

196.    Each Defendant had an ability to control the opioids at a time when it knew or should have known it was passing control of the opioids to an actor further down in the supply chain that was incompetent or acting illegally and should not be entrusted with the opioids.

197.    Each Defendant sold prescription opioids in the supply chain knowing (a) there was a substantial likelihood many of the sales were for non-medical purposes and, (b) opioids are an inherently dangerous product when used for non-medical purposes, and (c) that every patient, before being prescribed even one opioid pill, needed to have a complete family history of addiction to alcohol and drugs, with any such history as a contraindication of any opioid use.

56

198.    Defendants were negligent or reckless in not acquiring and utilizing special knowledge and special skills that relate to the dangerous activity in order to prevent or ameliorate such distinctive and significant dangers.

199.    Controlled substances are dangerous commodities.  Defendants breached their duty to exercise the degree of care, prudence, watchfulness, and vigilance commensurate to the dangers involved in the transaction of their business.

200.    Defendants were also negligent or reckless in failing to guard against foreseeable third-party misconduct, *e.g.*, the foreseeable conduct of: corrupt prescribers, corrupt pharmacists and staff, and/or criminals who buy and sell opioids for non-medical purposes.

201.    Defendants are in a limited class of registrants authorized to legally distribute controlled substances.  This places Defendants in a position of great trust and responsibility vis-a-vis Plaintiffs and the Class.  Defendants owe a special duty to Plaintiffs, Baby C.E. and the Class.  That duty cannot be delegated to another party.

202.    Plaintiffs, Baby C.E. and the Class are without fault, and the injuries to Plaintiffs, Baby C.E. and the Class would not have happened in the ordinary course of events if the Defendants used due care commensurate to the dangers involved in the distribution and dispensing of controlled substances.

203.    The aforementioned conduct of Defendants proximately caused damage to Plaintiffs, Baby C.E. and the Class.

## AS AND FOR PLAINTIFFS' THIRD CAUSE OF ACTION - CIVIL CONSPIRACY

204.    Plaintiffs repeat and reassert the allegations in the foregoing paragraphs as if fully set out herein.

205.    The Pharmaceutical Defendants continuously supplied prescription opioids to the

Distributor Defendants despite having actual or constructive knowledge that said Distributors were habitually breaching their common law duties and violating the CSA. The Distributor Defendants continuously supplied prescription opioids to pharmacies despite having actual or constructive knowledge that said pharmacies were habitually breaching their common law duties and violating the CSA.

206. Without the Distributor Defendants' supply of prescription opioids, pharmacies would not be able to fill and dispense the increasing number of prescription opioids throughout New York.

207. No Defendant in this opioid network would have succeeded in profiting so significantly from the opioid epidemic without the concerted conduct of the other party, and none would have succeeded so significantly without engaging in the wrongful conduct as herein alleged.

208. The Pharmaceutical Defendants likewise benefitted from this distribution conspiracy in that the more pervasive opioid diversion became, the more the Pharmaceutical Defendants profited. Despite access to the same information in the hands of the Distributor Defendants, the Pharmaceutical Defendants ignored the warning signs of opioid diversion.

209. As a result of the concerted actions between and among the Defendants, the Plaintiff and the class have suffered damages.

210. Plaintiffs, Baby C.E. and the Class demand judgment against each Defendant for compensatory damages.

### AS AND FOR PLAINTIFFS' FOURTH CAUSE OF ACTION
### INJUNCTIVE AND EQUITABLE RELIEF FOR
### MEDICAL MONITORING AND CONTINUING TREATMENT

211. Plaintiffs repeat and reassert the allegations in the foregoing paragraphs as if fully

58

set out herein.

212.    By definition, Baby C.E. and the Class were exposed to opioids, a known toxic substance, at a concentration higher than expected for the general population and suffer the physical injury of NAS.

213.    Baby C.E. and the Class face a lifetime of latent, dread medical, physical and emotional conditions proven to be linked to in utero exposure opioids, including but not limited to: brain damage, muscular-skeletal developmental disorders, speech and language disorders, cognitive developmental disorders, psychiatric disorders, emotional development disorders, behavioral disorders and increased risk of addiction.

214.    Plaintiff Baby C.E. and the Class will benefit from medical monitoring for the aforementioned medical and emotional conditions because testing and continued monitoring will bring to light the onset of these medical and emotional conditions so that treatment and intervention may begin at the earliest point possible.

215.    Baby C.E. and the Class will benefit from a medical monitoring program featuring an epidemiological component that collects and analyzes medical monitoring results[7] so that other heretofore unrecognized latent, dread diseases that may be associated with in utero exposure may be identified so that treating professionals may better care for the Class Members and so that medical professionals engaged in the research and development of new treatment will have access to a broader universe of data.

216.    Further, Baby C.E. and the Class will require on-going care for the aforementioned conditions which are known to result from in utero exposure to opioids including but not limited to medical care, psychiatric care, psychological care, physical therapy, cognitive

---

[7] Such epidemiological data will be collected, maintained and analyzed in such a manner as to protect the identity of individual class members.

4852-5120-1392, v. 1

therapy and speech therapy.

217. The harm visited upon Baby C.E. and the Class is irreparable.

218. Money damages will not suffice because it is impossible to predict with any certainty the costs of such monitoring and treatment for each individual class member nor is it possible to predict new treatment and intervention protocol that may be developed as data from medical monitoring of the Class is provided to the medical research community.

219. Further, money damages will not suffice because an award of money damages for future monitoring and treatment would not result in comprehensive programs whereby important information is shared among the medical community so that new treatments, protocols, intervention and test may be developed.

220. Plaintiffs, on behalf of all those similarly situated, seek a Court administered fund replenished from time-to-time by the Defendants to achieve such injunctive and equitable relief as necessary for the continuing benefit of the class.

221. Plaintiffs and the Class also seek injunctive Relief, including enjoining the Defendants and all other persons acting in concert or participation with them from engaging in unfair or deceptive practices in violation of law as described herein, and by temporary, preliminary or permanent injunction force the Defendants and all other persons acting in concert or participation with them to abide by the Controlled Substances Act and New York State Controlled Substances Act, provide the required control measures, and prevent unauthorized users from obtaining opioids.

222. Given the immense wealth of the Defendants, such injunctive and equitable relief presents no undue burden or irreparable damage to the Defendants.

4852-5120-1392, v. 1

## AS AND FOR PLAINTIFFS' FIFTH
## CAUSE OF ACTION PRODUCTS LIABILITY

223.    Plaintiffs repeat and reassert the allegations in the foregoing paragraphs as if fully set out herein.

224.    At all times material to this action, Defendants were engaged in the business of the design, development, manufacture, testing, packaging, promotion, marketing, distribution, labeling, and/or sale of opioid products.

225.    At all times material to this action, Defendants' opioid products were expected to reach, and did reach, consumers in the State of New York and throughout the United States, including Plaintiffs herein, without substantial change in the condition in which they were sold.

226.    Defendants knew that the damage causing characteristics of Defendants' product include its addictive properties on potential mothers and its in utero impacts on their future children.

227.    Defendants knew that prolonged use of opioids leads to decreased effectiveness, requiring increases in doses to achieve the same level of pain relief, markedly increasing the risk of significant side effects and addiction. Defendants conducted studies documenting these risks yet failed to publish the results or warn of the documented risks.

228.    The risks of opioid addiction and the risk to children in utero are grave and Defendants had a duty to warn about these risks.

229.    Providing such warnings would have been easily feasible but would have interfered with Defendants' marketing efforts. Instead, Defendants' engaged in a multimillion dollar marketing and advertising effort promoting falsehoods and minimizing the risk of addiction and withdrawal from long term opioid use.

230.    Defendants knew that opioids are too addictive and to debilitating for long-term

4852-5120-1392, v. 1

use for chronic pain, barring exceptional circumstances. Defendants knew that the only safe uses for their product were end of life care, short term pain relief after surgery, and pain relief related to cancer. Defendants failed to warn New York physicians, potential mothers and pregnant women of the dangers of using their product outside of these areas.

231. Defendants' products were unreasonably dangerous at the time they left the control of Defendants because of inadequate warning.

232. Because of Defendants' knowledge of the risks to mothers and their neonatal children, and their extensive efforts to obscure these risks, Defendants are liable for all resulting damages caused to Plaintiffs and the Class.

233. The opioid product manufactured and/or supplied by Defendants were defective in design in that an alternative design exists that would prevent addiction, NAS and severe and permanent injury to pregnant women and their unborn children; in short, it is feasible for Defendants to design the product in a safer manner.

234. A reasonably prudent manufacturer or seller would not have put Defendants' products on the market had it known of the products' dangerous condition and/or defective design.

235. Defendants designed their product in such a way that it could easily be abused by crushing of pills with the resulting powder ingested by inhalation or injection.

236. Defendants were aware that their products were being abused in this manner on a large scale, making this a reasonably anticipated use.

237. Despite this knowledge, Defendants only recently altered the design of their product to be "enteric," that is, changed it to a form that prevented such crushing and consumption. This change was only made after years of public and legal pressure.

62

238. Further, Defendants promoted their unreasonably dangerous design by actively undercutting the prescription of alternative nonsteroidal anti-inflammatory drugs, pushing the misinformation that such non-opioid drugs were not effective for the treatment of long term pain.

239. The defects of Defendants' opioid products were substantial factors in bringing about the plaintiffs' injuries and damages.

240. Therefore Defendants failed to warn New York physicians, potential mothers and pregnant women of the dangers of using their product outside of these areas. Defendants are liable for the damages caused to the Plaintiffs and the Class by their opioid products' unreasonably dangerous and defective design and inadequate warnings of their opioids' addictive properties.

241. Manufacturing Defendants are strictly liable for defect design and failure to provide an adequate warning regarding the use of their opioid products.

242. Plaintiffs, Baby C.E. and the Class demand judgment against each Defendant for compensatory damages in connection with the foregoing allegations.

## AS AND FOR PLAINTIFFS' SIXTH
## CAUSE OF ACTION PUNITIVE DAMAGES

243. Plaintiffs repeat and reassert each and every allegation set forth in all preceding paragraphs as if fully restated herein.

244. The conduct of Defendants as set forth herein was malicious, oppressive, willful, wanton, reckless, and/or criminally indifferent to civil obligations affecting the rights of others, including Plaintiffs. Plaintiffs and the Class are thus entitled to recover punitive damages against Defendants.

245. Defendants were malicious, oppressive, willful, wanton, reckless, and/or criminally indifferent to civil obligations affecting the rights of others, including Plaintiffs, in

63

their activities and in failing to warn Plaintiffs of dangers well known to Defendants, which acts exhibited a deliberate disregard for the rights and safety of Plaintiffs.

246.    Defendants realized the imminence of danger to Plaintiffs and other members of the public but continued with deliberate disregard and complete indifference and lack of concern for the probable consequences of their acts.

247.    As a direct result of Defendants' deliberate disregard for the rights and safety of others, gross negligence, malicious, oppressive, willful, wanton, reckless, and/or criminally indifferent to civil obligations affecting the rights of others, including Plaintiffs, Plaintiffs suffered the injuries and dangers stated above.

248.    Defendants' acts as described herein exhibited deliberate disregard for the rights and safety of others and were malicious, oppressive, willful, wanton, reckless, and/or criminally indifferent to civil obligations affecting the rights of others, including Plaintiffs.  An award of punitive and exemplary damages is therefore necessary to punish Defendants, and each of them, and to deter any reoccurrence of this intolerable conduct.  Consequently, Plaintiffs are entitled to an award of punitive damages.

249.    The conduct of Defendants as set forth herein was malicious, oppressive, willful, wanton, reckless, and/or criminally indifferent to civil obligations affecting the rights of others, including Plaintiffs.  Plaintiffs and the Class are thus entitled to recover punitive damages against Defendants in an amount sufficient to punish Defendants for their wrongful conduct and to deter Defendants and others from similar wrongful conduct in the future.

250.    Plaintiffs, Baby C.E. and the Class demand judgment against each Defendant for punitive damages.

251.    Plaintiffs seek a trial by jury for all causes of action so triable.

64

252.    Plaintiffs respectfully reject all efforts to transfer this action to the multi-district

litigation pending in United States District Court, Northern District of Ohio, Eastern Division;

MDL No. 2804.   Plaintiffs do not object to transfer to 400,000-2017, *In Re Opioid Litigation*.

New York State obviously has an important interest in the opioid epidemic and opioid litigation

as shown by the institution of the special opioid litigation now pending in Suffolk County.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and Putative Class Representative AM.H., individually and on

behalf of Baby C.E. and all those similarly situated requests that the Court grant the following

relief:

i.    an order awarding compensatory damages in an amount to be determined at trial

in connection with the First Cause of Action;

ii.    an order awarding compensatory damages in an amount to be determined at trial

in connection with the Second Cause of Action;

iii.    an order awarding compensatory damages in an amount to be determined at trial

in connection with the Third Cause of Action;

iv.    an order awarding and ordering injunctive and equitable relief of medical

monitoring and continuing treatment in connection with the Fourth Cause of Action; including

enjoining the Defendants and all other persons acting in concert or participation with them from

engaging in unfair or deceptive practices in violation of law as described herein, and by

temporary, preliminary or permanent injunction force the Defendants and all other persons acting

in concert or participation with them to abide by the Controlled Substances Act, provide the

required control measures, and prevent unauthorized users from obtaining opioids;

v.    an order awarding compensatory damages in an amount to be determined at trial

4852-5120-1392, v. 1

in connection with the Fifth Cause of Action;

      vi.     an order awarding punitive damages in an amount to be determined at trial in connection with the Sixth Cause of Action;

      vii.    an order awarding pre, and post, judgment interest;

      vii.    an order awarding plaintiffs' reasonable attorney fees and costs; and

      viii.   an order awarding plaintiffs and putative class members such other relief this Court deems just and proper.

DATED:     New York NY
            August 21, 2018

                   Respectfully submitted by:

                   */s/ Donald Creadore*
                   THE CREADORE LAW FIRM, P.C.
                   Donald Creadore (NY Reg. No. 2090702)
                   450 Seventh Avenue – 1408
                   New York, NY 10123
                   Telephone: 212-355-7200
                   Fax: 212-583-0412
                   Email: Donald@creadorelawfirm.com

                   */s/ Celeste Brustowicz*
                   COOPER LAW FIRM, LLC
                   Celeste Brustowicz *(pro hac vice)*
                   Barry J. Cooper, Jr. *(pro hac vice)*
                   Stephen H. Wussow *(pro hac vice)*
                   Victor Cobb *(pro hac vice)*
                   1525 Religious Street
                   New Orleans, LA 70130
                   Telephone: 504-399-0009
                   Email: cbrustowicz@sch-llc.com

                   */s/ Kevin W. Thompson*
                   THOMPSON BARNEY LAW FIRM
                   Kevin W. Thompson *(pro hac vice)*
                   David R. Barney, Jr. *(pro hac vice)*
                   2030 Kanawha Boulevard, East

66

Charleston, WV 25311
Telephone: 304-343-4401
Facsimile: 304-343-4405
Email: kwthompsonwv@gmail.com

_/s/ Scott R. Bickford_

MARTZELL, BICKFORD & CENTOLA
Scott R. Bickford (*pro hac vice)*
Lawrence J. Centola, III (*pro hac vice)*
338 Lafayette Street
New Orleans, Louisiana 70130
Telephone: 504-581-9065

4852-5120-1392, v. 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NIAGARA
----------------------------------------------------------------X
A.M.H., INDIVIDUALLY AND IN HER CAPACITY
AS LEGAL CUSTODIAN OF BABY C.E., ON
BEHALF OF THEMSELVES AND ALL OTHERS
SIMILIARLY SITUATED,

        Plaintiff(s),

     -against-

PURDUE PHARMA, L.P., et al.

        Defendant(s).
----------------------------------------------------------------X
STATE OF NEW YORK)
              S.S.:
COUNTY OF ALBANY )

Index No. E165792/2018

AFFIDAVIT OF SERVICE

       JEFFREY TEITEL, being duly sworn, deposes and says that he is over the age of eighteen years,
is an agent of, METRO ATTORNEY SERVICE INC., and is not a party to this action.

       That on the 27th day of August, 2018, at approximately 12:20 PM, deponent served a true copy of
the Summons, Class Action Complaint and Notice of Electronic Filing upon MCKESSON CORPORATION
c/o Corporation Service Company at 80 State Street, Albany, New York, by personally delivering and leaving
the same with Kathy Krieger Jewell, Clerk, who informed deponent that she is an agent authorized by
appointment to receive service at that address.

       Kathy Krieger Jewell is a white female, approximately 60 years of age, stands approximately 5
feet 7 inches tall, weighs approximately 145 pounds with black and gray hair.



JEFFREY TEITEL

Sworn to before me this
27th day of August, 2018


NOTARY PUBLIC

HILARY TEITEL
Notary Public, State of New York
Qualified in Albany County
No. 01TE5049179
Commission Expires Sept. 11, 20 21

Metro Attorney Service Inc. 305 Broadway 9th Floor New York, New York 10007 212.822.1421 NYC DCA#1320502

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NIAGARA
-------------------------------------------------------------X
A.M.H., INDIVIDUALLY AND IN HER CAPACITY
AS LEGAL CUSTODIAN OF BABY C.E., ON
BEHALF OF THEMSELVES AND ALL OTHERS
SIMILARLY SITUATED,

        Plaintiff(s),                                    Index No. E165792/2018

   -against-                                            AFFIDAVIT OF SERVICE

PURDUE PHARMA, L.P., et al.

        Defendant(s).
-------------------------------------------------------------X
STATE OF NEW YORK)
            S.S.:
COUNTY OF ALBANY )

      JEFFREY TEITEL, being duly sworn, deposes and says that he is over the age of eighteen years,

is an agent of, METRO ATTORNEY SERVICE INC., and is not a party to this action.

      That on the 27th day of August, 2018, at approximately 12:20 PM, deponent served a true copy of

the Summons, Class Action Complaint and Notice of Electronic Filing upon Ortho-Mcneil-Janssen

Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals, Inc. c/o Corporation Service Company at 80 State Street,

Albany, New York, by personally delivering and leaving the same with Kathy Krieger Jewell, Clerk, who

informed deponent that she is an agent authorized by appointment to receive service at that address.

      Kathy Krieger Jewell is a white female, approximately 60 years of age, stands approximately 5

feet 7 inches tall, weighs approximately 145 pounds with black and gray hair.


_____
JEFFREY TEITEL

Sworn to before me this
27th day of August, 2018


_____
NOTARY PUBLIC

                HILARY TEITEL
          Notary Public, State of New York
           Qualified in Albany County
             No. 01TE5049179
        Commission Expires Sept. 11, 20 21

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NIAGARA
------------------------------------------------------------X
A.M.H., INDIVIDUALLY AND IN HER CAPACITY
AS LEGAL CUSTODIAN OF BABY C.E., ON
BEHALF OF THEMSELVES AND ALL OTHERS
SIMILIARLY SITUATED,

         Plaintiff(s),

    -against-

PURDUE PHARMA, L.P., et al,

        Defendant(s).
------------------------------------------------------------X
STATE OF NEW YORK )
            S.S.:
COUNTY OF ALBANY )

Index No. E165792/2018

AFFIDAVIT OF SERVICE

    JEFFREY TEITEL, being duly sworn, deposes and says that he is over the age of eighteen years, is an agent of METRO ATTORNEY SERVICE INC., and is not a party to this action.

    That on the 27th day of August, 2018, at approximately 12:20 PM, deponent served a true copy of the Summons, Class Action Complaint and Notice of Electronic Filing upon Purdue Pharma, Inc. c/o Corporation Service Company at 80 State Street, Albany, New York, by personally delivering and leaving the same with Kathy Krieger Jewell, Clerk, who informed deponent that she is an agent authorized by appointment to receive service at that address.

    Kathy Krieger Jewell is a white female, approximately 60 years of age, stands approximately 5 feet 7 inches tall, weighs approximately 145 pounds with black and gray hair.


_____
JEFFREY TEITEL

Sworn to before me this
27th day of August, 2018


_____
NOTARY PUBLIC

HILARY TEITEL
Notary Public, State of New York
Qualified in Albany County
No. 01TE5049179
Commission Expires Sept. 11, 20_2_1

Metro Attorney Service Inc. 305 Broadway 9th Floor New York, New York 10007 212.822.1421 NYC DCA#1320502

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NIAGARA
------------------------------------------------------------------X
A.M.H., INDIVIDUALLY AND IN HER CAPACITY
AS LEGAL CUSTODIAN OF BABY C.E., ON
BEHALF OF THEMSELVES AND ALL OTHERS
SIMILIARLY SITUATED,

        Plaintiff(s),                                   Index No. E165792/2018

    -against-                                            AFFIDAVIT OF SERVICE

PURDUE PHARMA, L.P., et al,

        Defendant(s).
------------------------------------------------------------------X
STATE OF NEW YORK)
               S.S.:
COUNTY OF ALBANY )

        JEFFREY TEITEL, being duly sworn, deposes and says that he is over the age of eighteen years,

is an agent of, METRO ATTORNEY SERVICE INC., and is not a party to this action.

        That on the 27th day of August, 2018, at approximately 12:20 PM, deponent served a true copy of

the Summons, Class Action Complaint and Notice of Electronic Filing upon Purdue Pharma, L.P. c/o

Corporation Service Company at 80 State Street, Albany, New York, by personally delivering and leaving the

same with Kathy Krieger Jewell, Clerk, who informed deponent that she is an agent authorized by appointment

to receive service at that address.

        Kathy Krieger Jewell is a white female, approximately 60 years of age, stands approximately 5

feet 7 inches tall, weighs approximately 145 pounds with black and gray hair.


JEFFREY TEITEL

Sworn to before me this
27th day of August, 2018


NOTARY PUBLIC

HILARY TEITEL
Notary Public, State of New York
Qualified in Albany County
No. 01TE5040179
Commission Expires Sept. 11, 2021

Metro Attorney Service Inc. 305 Broadway 9th Floor New York, New York 10007 212.822.1421 NYC DCA#1320502

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NIAGARA
--------------------------------------------------------------X
A.M.H., INDIVIDUALLY AND IN HER CAPACITY
AS LEGAL CUSTODIAN OF BABY C.E., ON
BEHALF OF THEMSELVES AND ALL OTHERS
SIMILARLY SITUATED,

        Plaintiff(s),                         Index No. E165792/2018

   -against-                              AFFIDAVIT OF SERVICE

PURDUE PHARMA, L.P., et al,

        Defendant(s).
--------------------------------------------------------------X
STATE OF NEW YORK )
                   S.S.:
COUNTY OF ALBANY )

       JEFFREY TEITEL, being duly sworn, deposes and says that he is over the age of eighteen years, is an agent of, METRO ATTORNEY SERVICE INC., and is not a party to this action.

       That on the 27th day of August, 2018, at approximately 12:20 PM, deponent served a true copy of the Summons, Class Action Complaint and Notice of Electronic Filing upon The Purdue Frederick Company, Inc. c/o Corporation Service Company at 80 State Street, Albany, New York, by personally delivering and leaving the same with Kathy Krieger Jewell, Clerk, who informed deponent that she is an agent authorized by appointment to receive service at that address.

       Kathy Krieger Jewell is a white female, approximately 60 years of age, stands approximately 5 feet 7 inches tall, weighs approximately 145 pounds with black and gray hair.


_____
JEFFREY TEITEL

Sworn to before me this
27th day of August, 2018


_____
NOTARY PUBLIC

                HILARY TEITEL
          Notary Public, State of New York
            Qualified in Albany County
              No. 01TE6049179
          Commission Expires Sept. 11, 20__

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NIAGARA
-------------------------------------------------------------X
A.M.H., INDIVIDUALLY AND IN HER CAPACITY
AS LEGAL CUSTODIAN OF BABY C.E., ON
BEHALF OF THEMSELVES AND ALL OTHERS
SIMILIARLY SITUATED,

        Plaintiff(s),                    Index No. E165792/2018

    -against-                           AFFIDAVIT OF SERVICE

PURDUE PHARMA, L.P., et al,

        Defendant(s).
-------------------------------------------------------------X
STATE OF NEW YORK   )
                    S.S.:
COUNTY OF NEW YORK)

        RICARDO DELPRATT, being duly sworn, deposes and says that he is over the age of eighteen

years, is employed by the attorney service, METRO ATTORNEY SERVICE INC., and is not a party to this

action.

        That on the 27th day of August, 2018, at approximately 1:08 PM, deponent served a true copy of

the Summons, Class Action Complaint and Notice of Electronic Filing upon Endo Health Solutions, Inc. c/o CT

Corporation Systems at 111 Eighth Avenue, New York, New York, by personally delivering and leaving the

same with Nora Dindyal, Process Specialist, who informed deponent that she is an agent authorized by

appointment to receive service at that address.

        Nora Dindyal is an Indian female, approximately 54 years of age, stands approximately 5 feet 6

inches tall, and weighs approximately 160 pounds with black hair and glasses.


_____
RICARDO DELPRATT #2067114

Sworn to before me this
28th day of August, 2018

                              EVAN COHAN
                   NOTARY PUBLIC & ATTORNEY AT LAW
                      NO. 02CO4998577
                QUALIFIED IN ROCKLAND COUNTY
           CERTIFICATE FILED IN NEW YORK COUNTY
            COMMISSION EXPIRES JUNE 29, 2022

_____
NOTARY PUBLIC

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NIAGARA
-------------------------------------------------------------X
A.M.H., INDIVIDUALLY AND IN HER CAPACITY
AS LEGAL CUSTODIAN OF BABY C.E., ON
BEHALF OF THEMSELVES AND ALL OTHERS
SIMILIARLY SITUATED,

        Plaintiff(s),                         Index No. E165792/2018

   -against-                             AFFIDAVIT OF SERVICE

PURDUE PHARMA, L.P., et al,

        Defendant(s).
-------------------------------------------------------------X
STATE OF NEW YORK  )
                 S.S.:
COUNTY OF NEW YORK)

        RICARDO DELPRATT, being duly sworn, deposes and says that he is over the age of eighteen
years, is employed by the attorney service, METRO ATTORNEY SERVICE INC., and is not a party to this
action.

        That on the 27th day of August, 2018, at approximately 1:08 PM, deponent served a true copy of
the Summons, Class Action Complaint and Notice of Electronic Filing upon Johnson & Johnson c/o CT
Corporation Systems at 111 Eighth Avenue, New York, New York, by personally delivering and leaving the
same with Nora Dindyal, Process Specialist, who informed deponent that she is an agent authorized by
appointment to receive service at that address.

        Nora Dindyal is an Indian female, approximately 54 years of age, stands approximately 5 feet 6
inches tall, and weighs approximately 160 pounds with black hair and glasses.


RICARDO DELPRATT #2067114

Sworn to before me this
28th day of August, 2018


NOTARY PUBLIC

                    EVAN COHAN
           NOTARY PUBLIC & ATTORNEY AT LAW
                NO. 02CO4998577
           QUALIFIED IN ROCKLAND COUNTY
         CERTIFICATE FILED IN NEW YORK COUNTY
         COMMISSION EXPIRES JUNE 29, 2022

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NIAGARA
-------------------------------------------------------------------X
A.M.H., INDIVIDUALLY AND IN HER CAPACITY
AS LEGAL CUSTODIAN OF BABY C.E., ON
BEHALF OF THEMSELVES AND ALL OTHERS
SIMILIARLY SITUATED,

        Plaintiff(s),                       Index No. E165792/2018

  -against-                         AFFIDAVIT OF SERVICE

PURDUE PHARMA, L.P., et al,

        Defendant(s).
-------------------------------------------------------------------X
STATE OF NEW YORK  )
                  S.S.:
COUNTY OF NEW YORK)

      RICARDO DELPRATT, being duly sworn, deposes and says that he is over the age of eighteen years, is employed by the attorney service, METRO ATTORNEY SERVICE INC., and is not a party to this action.

      That on the 27th day of August, 2018, at approximately 1:08 PM, deponent served a true copy of the Summons, Class Action Complaint and Notice of Electronic Filing upon Endo Pharmaceuticals, Inc. c/o CT Corporation Systems at 111 Eighth Avenue, New York, New York, by personally delivering and leaving the same with Nora Dindyal, Process Specialist, who informed deponent that she is an agent authorized by appointment to receive service at that address.

      Nora Dindyal is an Indian female, approximately 54 years of age, stands approximately 5 feet 6 inches tall, and weighs approximately 160 pounds with black hair and glasses.

_____
RICARDO DELPRATT #2067114

Sworn to before me this
28th day of August, 2018

_____
NOTARY PUBLIC

EVAN COHAN
NOTARY PUBLIC & ATTORNEY AT LAW
NO. 02CO4998577
QUALIFIED IN ROCKLAND COUNTY
CERTIFICATE FILED IN NEW YORK COUNTY
COMMISSION EXPIRES JUNE 28, 2022

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NIAGARA
------------------------------------------------------------X
A.M.H., INDIVIDUALLY AND IN HER CAPACITY
AS LEGAL CUSTODIAN OF BABY C.E., ON
BEHALF OF THEMSELVES AND ALL OTHERS
SIMILIARLY SITUATED,

               Plaintiff(s),

     -against-

PURDUE PHARMA, L.P., et al,

               Defendant(s).
------------------------------------------------------------X

Index No. E165792/2018

AFFIDAVIT OF SERVICE

STATE OF NEW YORK  )
                S.S.:
COUNTY OF NEW YORK)

     RICARDO DELPRATT, being duly sworn, deposes and says that he is over the age of eighteen years, is employed by the attorney service, METRO ATTORNEY SERVICE INC., and is not a party to this action.

     That on the 27th day of August, 2018, at approximately 1:08 PM, deponent served a true copy of the Summons, Class Action Complaint and Notice of Electronic Filing upon Cardinal Health, Inc. c/o CT Corporation Systems at 111 Eighth Avenue, New York, New York, by personally delivering and leaving the same with Nora Dindyal, Process Specialist, who informed deponent that she is an agent authorized by appointment to receive service at that address.

     Nora Dindyal is an Indian female, approximately 54 years of age, stands approximately 5 feet 6 inches tall, and weighs approximately 160 pounds with black hair and glasses.

RICARDO DELPRATT #2067114

Sworn to before me this
28th day of August, 2018

NOTARY PUBLIC

EVAN COHAN
NOTARY PUBLIC & ATTORNEY AT LAW
NO. 02CO4998577
QUALIFIED IN ROCKLAND COUNTY
CERTIFICATE FILED IN NEW YORK COUNTY
COMMISSION EXPIRES JUNE 28, 2022

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NIAGARA
-----------------------------------------------------------X
A.M.H, INDIVIDUALLY AND IN HER CAPACITY
AS LEGAL CUSTODIAN OF BABY C.E., ON
BEHALF OF THEMSELVES AND ALL OTHERS
SIMILIARLY SITUATED,

        Plaintiff(s),

     -against-

PURDUE PHARMA, L.P., et al,

       Defendant(s).
-----------------------------------------------------------X

Index No. E165792/2018

**AFFIDAVIT OF SERVICE**

STATE OF NEW YORK  )
             S.S.:
COUNTY OF NEW YORK)

      RICARDO DELPRATT, being duly sworn, deposes and says that he is over the age of eighteen years, is employed by the attorney service, METRO ATTORNEY SERVICE INC., and is not a party to this action.

      That on the 27th day of August, 2018, at approximately 1:08 PM, deponent served a true copy of the Summons, Class Action Complaint and Notice of Electronic Filing upon Amerisourcebergen Corporation c/o CT Corporation Systems at 111 Eighth Avenue, New York, New York, by personally delivering and leaving the same with Nora Dindyal, Process Specialist, who informed deponent that she is an agent authorized by appointment to receive service at that address.

      Nora Dindyal is an Indian female, approximately 54 years of age, stands approximately 5 feet 6 inches tall, and weighs approximately 160 pounds with black hair and glasses.


_____
RICARDO DELPRATT #2067114

Sworn to before me this
28th day of August, 2018


_____
NOTARY PUBLIC

**EVAN COHAN
NOTARY PUBLIC & ATTORNEY AT LAW
NO. 02CO4998577
QUALIFIED IN ROCKLAND COUNTY
CERTIFICATE FILED IN NEW YORK COUNTY
COMMISSION EXPIRES JUNE 29, 2022**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NIAGARA
------------------------------------------------------------X
A.M.H., INDIVIDUALLY AND IN HER CAPACITY
AS LEGAL CUSTODIAN OF BABY C.E., ON
BEHALF OF THEMSELVES AND ALL OTHERS
SIMILIARLY SITUATED,

        Plaintiff(s),                      Index No. E165792/2018

   -against-                        AFFIDAVIT OF SERVICE

PURDUE PHARMA, L.P., et al,

        Defendant(s).
------------------------------------------------------------X
STATE OF NEW YORK   )
                       S.S.:
COUNTY OF NEW YORK)

        DOMINIC DELLAPORTE, being duly sworn, deposes and says that he is over the age of eighteen

years, is employed by the attorney service, METRO ATTORNEY SERVICE INC., and is not a party to this

action.

        That on the 27th day of August, 2018, at approximately 2:39 PM, deponent served a true copy of

the Summons, Class Action Complaint and Notice of Electronic Filing upon Actavis Pharma, Inc. f/k/a Watson

Pharma, Inc. c/o Corporate Creations Network Inc. at 15 North Mill Street, Nyack, New York, by personally

delivering and leaving the same with Joanne "Doe", Manager, who refused to provide her last name, who

informed deponent that she is an agent authorized by appointment to receive service at that address.

        Joanne "Doe" is a white female, approximately 70 years of age, stands approximately 4 feet 11

inches tall, weighs approximately 130 pounds with brown hair and glasses.

DOMINIC DELLAPORTE #1320496

Sworn to before me this
28th day of August, 2018

EVAN COHAN
NOTARY PUBLIC & ATTORNEY AT LAW
NO. 02CO4898577
QUALIFIED IN ROCKLAND COUNTY
CERTIFICATE FILED IN NEW YORK COUNTY
COMMISSION EXPIRES JUNE 29, 2022

NOTARY PUBLIC

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NIAGARA
-------------------------------------------------------------X
A.M.H., INDIVIDUALLY AND IN HER CAPACITY
AS LEGAL CUSTODIAN OF BABY C.E., ON
BEHALF OF THEMSELVES AND ALL OTHERS
SIMILIARLY SITUATED,

        Plaintiff(s),                Index No. E165792/2018

   -against-                    AFFIDAVIT OF SERVICE

PURDUE PHARMA, L.P., et al,

        Defendant(s).
-------------------------------------------------------------X
STATE OF NEW YORK  )
              S.S.:
COUNTY OF NEW YORK)

        DOMINIC DELLAPORTE, being duly sworn, deposes and says that he is over the age of eighteen

years, is employed by the attorney service, METRO ATTORNEY SERVICE INC., and is not a party to this

action.

        That on the 27th day of August, 2018, at approximately 2:39 PM, deponent served a true copy of

the Summons, Class Action Complaint and Notice of Electronic Filing upon Cephalon, Inc. c/o Corporate

Creations Network Inc. at 15 North Mill Street, Nyack, New York, by personally delivering and leaving the

same with Joanne "Doe", Manager, who refused to provide her last name, who informed deponent that she is an

agent authorized by appointment to receive service at that address.

        Joanne "Doe" is a white female, approximately 70 years of age, stands approximately 4 feet 11

inches tall, weighs approximately 130 pounds with brown hair and glasses.


DOMINIC DELLAPORTE #1320496

Sworn to before me this
28th day of August, 2018


NOTARY PUBLIC

EVAN COHAN
NOTARY PUBLIC & ATTORNEY AT LAW
NO. 02CO4998577
QUALIFIED IN ROCKLAND COUNTY
CERTIFICATE FILED IN NEW YORK COUNTY
COMMISSION EXPIRES JUNE 29, 2022

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NIAGARA
----------------------------------------------------X
A.M.H., INDIVIDUALLY AND IN HER CAPACITY
AS LEGAL CUSTODIAN OF BABY C.E., ON
BEHALF OF THEMSELVES AND ALL OTHERS
SIMILIARLY SITUATED,

        Plaintiff(s),                      Index No. E165792/2018

    -against-                        **AFFIDAVIT OF SERVICE**

PURDUE PHARMA, L.P., et al,

        Defendant(s).
----------------------------------------------------X
STATE OF NEW YORK  )
               S.S.:
COUNTY OF NEW YORK)

        DOMINIC DELLAPORTE, being duly sworn, deposes and says that he is over the age of eighteen years, is employed by the attorney service, METRO ATTORNEY SERVICE INC., and is not a party to this action.

        That on the 27th day of August, 2018, at approximately 2:39 PM, deponent served a true copy of the Summons, Class Action Complaint and Notice of Electronic Filing upon Teva Pharmaceuticals USA, Inc. c/o Corporate Creations Network Inc. at 15 North Mill Street, Nyack, New York, by personally delivering and leaving the same with Joanne "Doe", Manager, who refused to provide her last name, who informed deponent that she is an agent authorized by appointment to receive service at that address.

        Joanne "Doe" is a white female, approximately 70 years of age, stands approximately 4 feet 11 inches tall, weighs approximately 130 pounds with brown hair and glasses.


DOMINIC DELLAPORTE #1320496

Sworn to before me this
28th day of August, 2018

                                      EVAN COHAN
                     NOTARY PUBLIC & ATTORNEY AT LAW
                        NO. 02CO4898577
                  QUALIFIED IN ROCKLAND COUNTY
             CERTIFICATE FILED IN NEW YORK COUNTY
NOTARY PUBLIC           COMMISSION EXPIRES JUNE 29, 2022

INDEX NO. E165792/2018

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NIAGARA

----------------------------------------------------------------X

A.M.H., INDIVIDUALLY AND IN HER CAPACITY
AS LEGAL CUSTODIAN OF BABY C.E., ON
BEHALF OF THEMSELVES AND ALL OTHERS
SIMILIARLY SITUATED,

        Plaintiff(s),

        -against-

PURDUE PHARMA, L.P., et al,

        Defendant(s).

----------------------------------------------------------------X

Index No. E165792/2018

AFFIDAVIT OF SERVICE

STATE OF PENNSYLVANIA  )
                       S.S.:
COUNTY OF MONTGOMERY)

        MARC JONES, being duly sworn, deposes and says that he is over the age of eighteen years, is an agent of METRO ATTORNEY SERVICE INC., and is not a party to this action.

        That on the 28th day of August, 2018, at approximately 12:45 PM, deponent served a true copy of the Summons, Class Action Complaint and Notice of Electronic Filing upon Janssen Pharmaceutica Inc. n/k/a Janssen Pharmaceuticals, Inc. c/o CT Corporation System at 600 North 2nd Street, Suite 401, Harrisburg, Pennsylvania, by personally delivering and leaving the same Stefoni Murphy, Intake Specialist, who informed deponent that she is an agent authorized by appointment to receive service at that address.

        Stefoni Murphy is a white female, approximately 25 years of age, stands approximately 5 feet 7 inches tall, weighs approximately 120 pounds with long black hair and glasses.

MARC JONES

Sworn to before me this
28th day of August, 2018

NOTARY PUBLIC

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Michele M. Harris, Notary Public
Lansdale Boro
Montgomery County
My Commission Expires 08-16-2020

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NIAGARA
------------------------------------------------------------------X
A.M.H., INDIVIDUALLY AND IN HER CAPACITY
AS LEGAL CUSTODIAN OF BABY C.E., ON
BEHALF OF THEMSELVES AND ALL OTHERS
SIMILIARLY SITUATED,

        Plaintiff(s),                            Index No. E165792/2018

    -against-                              AFFIDAVIT OF SERVICE

PURDUE PHARMA, L.P., et al,

        Defendant(s).
------------------------------------------------------------------X
STATE OF PENNSYLVANIA  )
                        S.S.:
COUNTY OF MONTGOMERY)

        MARC JONES, being duly sworn, deposes and says that he is over the age of eighteen years, is an

agent of METRO ATTORNEY SERVICE INC., and is not a party to this action.

        That on the 28th day of August, 2018, at approximately 12:45 PM, deponent served a true copy of

the Summons, Class Action Complaint and Notice of Electronic Filing upon Janssen Pharmaceuticals Inc. c/o

CT Corporation System at 600 North 2nd Street, Suite 401, Harrisburg, Pennsylvania, by personally delivering

and leaving the same with Stefoni Murphy, Intake Specialist, who informed deponent that she is an agent

authorized by appointment to receive service at that address.

        Stefoni Murphy is a white female, approximately 25 years of age, stands approximately 5 feet 7

inches tall, weighs approximately 120 pounds with long black hair and glasses.


_____
MARC JONES

Sworn to before me this
28th day of August, 2018


_____
NOTARY PUBLIC

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Michele M. Harris, Notary Public
Lansdale Boro
Montgomery County
My Commission Expires 08-10-2020

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NIAGARA
------------------------------------------------------------X
A.M.H., INDIVIDUALLY AND IN HER CAPACITY
AS LEGAL CUSTODIAN OF BABY C.E., ON
BEHALF OF THEMSELVES AND ALL OTHERS
SIMILIARLY SITUATED,

         Plaintiff(s),

    -against-

PURDUE PHARMA, L.P., et al,

        Defendant(s).
------------------------------------------------------------X

Index No. E165792/2018

AFFIDAVIT OF SERVICE

STATE OF PENNSYLVANIA  )
                      S.S.:
COUNTY OF MONTGOMERY)

        CHARLES A. HARRIS, III, being duly sworn, deposes and says that he is over the age of

eighteen years, is an agent of METRO ATTORNEY SERVICE INC., and is not a party to this action.

        That on the 28th day of August, 2018, at approximately 12:10 PM, deponent served a true copy of

the Summons, Class Action Complaint and Notice of Electronic Filing upon Actavis, LLC at 425 Privet Road,

Horsham, Pennsylvania, by personally delivering and leaving the same with Barbara Scoli, Paralegal, who

informed deponent that she is an agent authorized by appointment to receive service at that address.

        Barbara Scoli is a white female, approximately 50 years of age, stands approximately 5 feet 7

inches tall, weighs approximately 200 pounds with brown hair.


_____
CHARLES A. HARRIS, III

Sworn to before me this
28th day of August, 2018


_____
NOTARY PUBLIC

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Michele M. Harris, Notary Public
Lansdale Boro
Montgomery County
My Commission Expires 98-10-2020

Metro Attorney Service Inc. 305 Broadway 9th Floor New York, New York 10007 212.822.1421 NYC DCA#1320502

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NIAGARA
---------------------------------------------------------------X
A.M.H., INDIVIDUALLY AND IN HER CAPACITY
AS LEGAL CUSTODIAN OF BABY C.E., ON
BEHALF OF THEMSELVES AND ALL OTHERS
SIMILIARLY SITUATED,

        Plaintiff(s),                       Index No. E165792/2018

    -against-                            AFFIDAVIT OF SERVICE

PURDUE PHARMA, L.P., et al,

        Defendant(s).
---------------------------------------------------------------X
STATE OF PENNSYLVANIA  )
                      S.S.:
COUNTY OF MONTGOMERY)

      CHARLES A. HARRIS, III, being duly sworn, deposes and says that he is over the age of

eighteen years, is an agent of METRO ATTORNEY SERVICE INC., and is not a party to this action.

      That on the 28th day of August, 2018, at approximately 12:10 PM, deponent served a true copy of

the Summons, Class Action Complaint and Notice of Electronic Filing upon Watson Laboratories, Inc. at 425

Privet Road, Horsham, Pennsylvania, by personally delivering and leaving the same with Barbara Scoli,

Paralegal, who informed deponent that she is an agent authorized by appointment to receive service at that

address.

      Barbara Scoli is a white female, approximately 50 years of age, stands approximately 5 feet 7

inches tall, weighs approximately 200 pounds with brown hair.

 

_____
CHARLES A. HARRIS, III

Sworn to before me this
28th day of August, 2018

_____
NOTARY PUBLIC

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Michela M. Harris, Notary Public
Lansdale Boro
Montgomery County
My Commission Expires 08-10-2020

Metro Attorney Service Inc. 305 Broadway 9th Floor New York, New York 10007 212.822.1421 NYC DCA#1320502

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NIAGARA
-------------------------------------------------------------------X
A.M.H., INDIVIDUALLY AND IN HER CAPACITY
AS LEGAL CUSTODIAN OF BABY C.E., ON
BEHALF OF THEMSELVES AND ALL OTHERS
SIMILIARLY SITUATED,

        Plaintiff(s),                    Index No. E165792/2018

   -against-                        AFFIDAVIT OF SERVICE

PURDUE PHARMA, L.P., et al,

        Defendant(s).
-------------------------------------------------------------------X
STATE OF ARIZONA    )
                       S.S.:
COUNTY OF MARICOPA   )

        CORY SHIELDS, being duly sworn, deposes and says that he is over the age of eighteen years, is

an agent of METRO ATTORNEY SERVICE INC., and is not a party to this action.

        That on the 30th day of August, 2018, at approximately 2:55 PM, deponent served a true copy of

the Summons, Class Action Complaint and Notice of Electronic Filing upon INSYS at 1333 S Spectrum Blvd

#100, Chandler, Arizona, by personally delivering and leaving the same with Robert Schwimmer, Assistant

General Counsel, who informed deponent that he is an agent authorized by appointment to receive service at

that address.

        Robert Schwimmer is a white male, approximately 35 years of age, stands approximately 6 feet 0

inches tall, weighs approximately 185 pounds with black hair.


CORY SHIELDS #8670

Sworn to before me this
4th day of September, 2018


NOTARY PUBLIC

CRAIG PODGURSKI JR
Notary Public - Arizona
Maricopa County
My Comm. Expires Dec 15, 2020

# REQUEST FOR JUDICIAL INTERVENTION
UCS-840 (7/2012)

**Supreme** _____ COURT, COUNTY OF ____ **Niagara**

Index No: ___**E165792/2018**___   Date Index Issued: ___**09/07/2018**___

| For Court Clerk Use Only: |
| --- |
| IAS Entry Date |
| |
| Judge Assigned |
| |
| RJI Date |
| |

**CAPTION:** Enter the complete case caption. Do not use et al or et ano. If more space is required, attach a caption rider sheet.

A.M.H., INDIVIDUALLY AND IN HER CAPACITY AS LEGAL CUSTODIAN OF BABY C.E., ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED

Plaintiff(s)/Petitioner(s)

-against-

PURDUE PHARMA LP.; PURDUE PHARMA, INC.; THE PURDUE FREDERICK COMPANY, INC.; MCKESSON CORPORATION; CARDINAL HEALTH, INC.; AMERISOURCEBERGEN CORPORATION; TEVA PHARMACEUTICAL INDUSTRIES, LTD.; TEVA PHARMACEUTICALS USA, INC.; CEPHALON, INC.; JOHNSON & JOHNSON; JANSSEN PHARMACEUTICALS, INC.; ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; JANSSEN PHARMACEUTICA INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; INSYS THERAPEUTICS, INC.; ENDO HEALTH SOLUTIONS INC.; ENDO PHARMACEUTICALS, INC.; ALLERGAN PLC f/k/a ACTAVIS PLC; WATSON PHARMACEUTICALS, INC. n/k/a ACTAVIS, INC.; WATSON LABORATORIES, INC.; ACTAVIS LLC; and ACTAVIS PHARMA, INC. f/k/a WATSON PHARMA, INC.

Defendant(s)/Respondent(s)

## NATURE OF ACTION OR PROCEEDING: Check ONE box only and specify where indicated.

**MATRIMONIAL**
- ◯ Contested
  **NOTE:** For all Matrimonial actions where the parties have children under the age of 18, complete and attach the MATRIMONIAL RJI Addendum. For Uncontested Matrimonial actions, use RJI form UD-13.

**TORTS**
- ◯ Asbestos
- ◯ Breast Implant
- ◯ Environmental: _____
  (specify)
- ◯ Medical, Dental, or Podiatric Malpractice
- ◯ Motor Vehicle
- ⦿ Products Liability: Opioid
  (specify)
- ◯ Other Negligence: _____
  (specify)
- ◯ Other Professional Malpractice: _____
  (specify)
- ◯ Other Tort: _____
  (specify)

**OTHER MATTERS**
- ◯ Certificate of Incorporation/Dissolution  [see NOTE under Commercial]
- ◯ Emergency Medical Treatment
- ◯ Habeas Corpus
- ◯ Local Court Appeal
- ◯ Mechanic's Lien
- ◯ Name Change
- ◯ Pistol Permit Revocation Hearing
- ◯ Sale or Finance of Religious/Not-for-Profit Property
- ◯ Other: _____
  (specify)

**COMMERCIAL**
- ◯ Business Entity (including corporations, partnerships, LLCs, etc.)
- ◯ Contract
- ◯ Insurance (where insurer is a party, except arbitration)
- ◯ UCC (including sales, negotiable instruments)
- ◯ Other Commercial: _____
  (specify)

  **NOTE:** For Commercial Division assignment requests [22 NYCRR § 202.70(d)], complete and attach the COMMERCIAL DIV RJI Addendum.

**REAL PROPERTY:** How many properties does the application include? ____
- ◯ Condemnation
- ◯ Mortgage Foreclosure (specify):   ◯ Residential   ◯ Commercial
  Property Address: _____
  Street Address          City          State          Zip
  **NOTE:** For Mortgage Foreclosure actions involving a one- to four-family, owner-occupied, residential property, or an owner-occupied condominium, complete and attach the FORECLOSURE RJI Addendum.
- ◯ Tax Certiorari - Section: ____ Block: ____ Lot: ____
- ◯ Tax Foreclosure
- ◯ Other Real Property: _____
  (specify)

**SPECIAL PROCEEDINGS**
- ◯ CPLR Article 75 (Arbitration)  [see NOTE under Commercial]
- ◯ CPLR Article 78 (Body or Officer)
- ◯ Election Law
- ◯ MHL Article 9.60 (Kendra's Law)
- ◯ MHL Article 10 (Sex Offender Confinement-Initial)
- ◯ MHL Article 10 (Sex Offender Confinement-Review)
- ◯ MHL Article 81 (Guardianship)
- ◯ Other Mental Hygiene: _____
  (specify)
- ◯ Other Special Proceeding: _____
  (specify)

## STATUS OF ACTION OR PROCEEDING: Answer YES or NO for EVERY question AND enter additional information where indicated.

| | YES | NO | |
| --- | --- | --- | --- |
| Has a summons and complaint or summons w/notice been filed? | ⦿ | ◯ | If yes, date filed: 08/23/2018 |
| Has a summons and complaint or summons w/notice been served? | ⦿ | ◯ | If yes, date served: 08/27/2018 |
| Is this action/proceeding being filed post-judgment? | ◯ | ⦿ | If yes, judgment date: _____ |

## NATURE OF JUDICIAL INTERVENTION: Check ONE box only AND enter additional information where indicated.

- ○ Infant's Compromise
- ○ Note of Issue and/or Certificate of Readiness
- ○ Notice of Medical, Dental, or Podiatric Malpractice   Date Issue Joined: _____
- ○ Notice of Motion   Relief Sought: _____   Return Date: _____
- ○ Notice of Petition   Relief Sought: _____   Return Date: _____
- ○ Order to Show Cause   Relief Sought: _____   Return Date: _____
- ○ Other Ex Parte Application   Relief Sought: _____
- ○ Poor Person Application
- ○ Request for Preliminary Conference
- ○ Residential Mortgage Foreclosure Settlement Conference
- ○ Writ of Habeas Corpus
- ● Other (specify): Admission Pro Hac Vice

## RELATED CASES: List any related actions. For Matrimonial actions, include any related criminal and/or Family Court cases. If additional space is required, complete and attach the RJI Addendum. If none, leave blank.

| Case Title | Index/Case No. | Court | Judge (if assigned) | Relationship to Instant Case |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

## PARTIES: For parties without an attorney, check "Un-Rep" box AND enter party address, phone number and e-mail address in space provided. If additional space is required, complete and attach the RJI Addendum.

| Un-Rep | Parties: List parties in caption order and indicate party role(s) (e.g. defendant; 3rd-party plaintiff). | Attorneys and/or Unrepresented Litigants: Provide attorney name, firm name, business address, phone number and e-mail address of all attorneys that have appeared in the case. For unrepresented litigants, provide address, phone number and e-mail address. | Issue Joined (Y/N): | Insurance Carrier(s): |
|---|---|---|---|---|
| ☐ | A.M.H. Last Name / First Name Primary Role: / Secondary Role (if any): | Creadore Last Name    Donald First Name / The Creadore Law Firm, P.C. Firm Name / 450 Seventh Avenue, 1408 Street Address    New York City    New York State    Zip / +1 (212) 355-7200 Phone    +1 (212) 683-0412 Fax    donald@creadorelawfirm.com e-mail | ○YES ○NO |  |
| ☐ | C.E. Last Name / First Name Primary Role: / Secondary Role (if any): | Creadore Last Name    Donald First Name / The Creadore Law Firm, P.C. Firm Name / 450 Seventh Avenue, 1408 Street Address    New York City    New York State    Zip / +1 (212) 355-7200 Phone    +1 (212) 683-0412 Fax    donald@creadorelawfirm.com e-mail | ○YES ○NO |  |
| ☒ | Actavis Pharma, Inc. fka Watson Pharma Last Name / First Name Primary Role: / Secondary Role (if any): | Last Name    First Name / Firm Name / 1090 Horsham Road Street Address    North Wales City    Pennsylvania State    19454-1505 Zip / +1 (847) 377-5508 Phone    Fax    e-mail | ○YES ●NO |  |
| ☒ | AmerisourceBergen Corporation Last Name / First Name Primary Role: / Secondary Role (if any): | Last Name    First Name / Firm Name / 1300 Morris Drive Street Address    Chesterbrook City    Pennsylvania State    19087-5594 Zip / +1 (610) 727-7000 Phone    Fax    e-mail | ○YES ●NO |  |

I AFFIRM UNDER THE PENALTY OF PERJURY THAT, TO MY KNOWLEDGE, OTHER THAN AS NOTED ABOVE, THERE ARE AND HAVE BEEN NO RELATED ACTIONS OR PROCEEDINGS, NOR HAS A REQUEST FOR JUDICIAL INTERVENTION PREVIOUSLY BEEN FILED IN THIS ACTION OR PROCEEDING.

Dated: 09/07/2018

_2 090 702_
**ATTORNEY REGISTRATION NUMBER**

_Donald Creadore_
**SIGNATURE**
**PRINT OR TYPE NAME**

[Print Form]

FILED: NIAGARA COUNTY CLERK 09/10/2018 02:13 PM

NYSCEF DOC. NO. 4

INDEX NO. E165792/2018

Case 1:18-cv-01018-EAW   Document 1-3   Filed 09/14/18   Page 95 of 150   RECEIVED NYSCEF: 09/10/2018

Print Form

UCS-840A (7/2012)

## Request for Judicial Intervention Addendum

**Supreme** _____ **COURT, COUNTY OF** _____ **Niagara** _____ **Index No:** **E165792/2018**

For use when additional space is needed to provide party or related case information.

**PARTIES:** For parties without an attorney, check "Un-Rep" box AND enter party address, phone number and e-mail address in "Attorneys" space.

| Un-Rep | Parties: List parties in caption order and indicate party role(s) (e.g. defendant; 3rd-party plaintiff). | Attorneys and/or Unrepresented Litigants: Provide attorney name, firm name, business address, phone number and e-mail address of all attorneys that have appeared in the case. For unrepresented litigants, provide address, phone number and e-mail address. | Issue Joined (Y/N): | Insurance Carrier(s): |
|---|---|---|---|---|
| ☒ | Cardinal Health, Inc. — Last Name / First Name / Primary Role: / Secondary Role (if any): | Last Name / First Name / Firm Name / 7000 Cardinal Place — Street Address / Dublin — City / Ohio — State / 43017-1091 — Zip / +1 (614) 757-5000 — Phone / Fax / e-mail | ○YES ●NO | |
| ☒ | Cephalon, Inc. — Last Name / First Name / Primary Role: / Secondary Role (if any): | Last Name / First Name / Firm Name / 1090 Horsham Road — Street Address / North Wales — City / Pennsylvania — State / 19454-1505 — Zip / +1 (763) 315-4178 — Phone / Fax / e-mail | ○YES ●NO | |
| ☒ | Endo Pharmaceuticals, Inc. — Last Name / First Name / Primary Role: / Secondary Role (if any): | Last Name / First Name / Firm Name / 1400 Atwater Drive — Street Address / Malvern — City / Pennsylvania — State / 19355-8701 — Zip / +1 (484) 216-0000 — Phone / Fax / e-mail | ○YES ●NO | |
| ☒ | Johnson & Johnson — Last Name / First Name / Primary Role: / Secondary Role (if any): | Last Name / First Name / Firm Name / 1 Johnson & Johnson Plaza — Street Address / New Brunswick — City / New Jersey — State / 08933-0001 — Zip / +1 (732) 524-0400 — Phone / Fax / e-mail | ○YES ●NO | |
| ☒ | McKesson Corporation — Last Name / First Name / Primary Role: / Secondary Role (if any): | Last Name / First Name / Firm Name / 1 Post Street — Street Address / San Francisco — City / California — State / 94104-5203 — Zip / +1 (415) 983-8300 — Phone / Fax / e-mail | ○YES ●NO | |
| ☒ | Ortho-McNeil-Janssen Pharmaceuticals — Last Name / First Name / Primary Role: / Secondary Role (if any): | Last Name / First Name / Firm Name / 1221 River Park Circle, E — Street Address / Mukwonago — City / Wisconsin — State / 53149-1096 — Zip / +1 (262) 363-2689 — Phone / Fax / e-mail | ○YES ●NO | |

**RELATED CASES:** List any related actions. For Matrimonial actions, include any related criminal and/or Family Court cases.

| Case Title | Index/Case No. | Court | Judge (if assigned) | Relationship to Instant Case |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

## Request for Judicial Intervention Addendum

Print Form

UCS-840A (7/2012)

**Supreme** _____ COURT, COUNTY OF _____ **Niagara** _____    Index No: ___ **E165792/2018** ___

For use when additional space is needed to provide party or related case information.

**PARTIES:** For parties without an attorney, check 'Un-Rep' box AND enter party address, phone number and e-mail address in 'Attorneys' space.

| Un-Rep | Parties: List parties in caption order and indicate party role(s) (e.g. defendant; 3rd-party plaintiff). | Attorneys and/or Unrepresented Litigants: Provide attorney name, firm name, business address, phone number and e-mail address of all attorneys that have appeared in the case. For unrepresented litigants, provide address, phone number and e-mail address. | Issue Joined (Y/N): | Insurance Carrier(s): |
|---|---|---|---|---|
| ☒ | Endo Health Solutions (Last Name) / First Name / Primary Role / Secondary Role (if any): | Last Name / First Name / Firm Name / 1400 Atwater Drive (Street Address) / Malvern (City) / Pennsylvania (State) / 19355-6701 (Zip) / +1 (484) 216-0000 (Phone) / Fax / e-mail | ○YES ◉NO | |
| ☒ | Janssen Pharmaceuticals, Inc. (Last Name) / First Name / Primary Role / Secondary Role (if any): | Last Name / First Name / Firm Name / 1125 Trenton Harbourton Road (Street Address) / Titusville (City) / New Jersey (State) / 08560 (Zip) / +1 (609) 730-3100 (Phone) / Fax / e-mail | ○YES ◉NO | |
| ☒ | Janssen Pharmaceutica Inc nka Janssen (Last Name) / First Name / Primary Role / Secondary Role (if any): | Last Name / First Name / Firm Name / 1125 Trenton Harbourton Road (Street Address) / Titusville (City) / New Jersey (State) / 08560 (Zip) / Phone / Fax / e-mail | ○YES ◉NO | |
| ☒ | Teva Pharmaceutical Industries, Ltd. (Last Name) / First Name / Primary Role / Secondary Role (if any): | Last Name / First Name / Firm Name / 5 Basel St. Post Office Box 3190 (Street Address) / Petah Tikva, Israel (City) / State / Zip / Phone / Fax / e-mail | ○YES ◉NO | Mail code: 4951033 Israel phone no. 97239267267 |
| ☒ | Watson Laboratories, Inc. (Last Name) / First Name / Primary Role / Secondary Role (if any): | Last Name / First Name / Firm Name / 1090 Horsham Road (Street Address) / North Wales (City) / Pennsylvania (State) / 19454 (Zip) / +1 (909) 493-5050 (Phone) / Fax / e-mail | ○YES ◉NO | |
| ☒ | nsys (Last Name) / First Name / Primary Role / Secondary Role (if any): | Last Name / First Name / Firm Name / 1333 Spectrum Beoulvard #100 (Street Address) / Chandler (City) / Arizona (State) / 85286 (Zip) / Phone / Fax / e-mail | ○YES ◉NO | |

**RELATED CASES:** List any related actions. For Matrimonial actions, include any related criminal and/or Family Court cases.

| Case Title | Index/Case No. | Court | Judge (if assigned) | Relationship to Instant Case |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

Print Form

UCS-840A (7/2012)

## Request for Judicial Intervention Addendum

Supreme _____ COURT, COUNTY OF _____ **Niagara** _____  Index No: ____ **E165792/2018**

For use when additional space is needed to provide party or related case information.

**PARTIES:** For parties without an attorney, check "Un-Rep" box AND enter party address, phone number and e-mail address in "Attorneys" space.

| Un-Rep | Parties: List parties in caption order and indicate party role(s) (e.g. defendant; 3rd-party plaintiff). | Attorneys and/or Unrepresented Litigants: Provide attorney name, firm name, business address, phone number and e-mail address of all attorneys that have appeared in the case. For unrepresented litigants, provide address, phone number and e-mail address. | Issue Joined (Y/N): | Insurance Carrier(s): |
|---|---|---|---|---|
| ☒ | Purdue Pharma, Inc. Last Name / First Name / Primary Role: / Secondary Role (if any): | Last Name / First Name / Firm Name / 201 Tressor Blvd., Floor One Street Address / Stamford City / Connecticut State / 06901 3431 Zip / +1 (203) 588-8000 Phone / Fax / e-mail | ○YES ●NO | |
| ☒ | Purdue Pharma, L.P. Last Name / First Name / Primary Role: / Secondary Role (if any): | Last Name / First Name / Firm Name / 201 Tressor Blvd., Floor One Street Address / Stamford City / Connecticut State / 06901 3431 Zip / +1 (203) 588-8000 Phone / Fax / e-mail | ○YES ●NO | |
| ☒ | Teva Pharmaceuticals USA, Inc. Last Name / First Name / Primary Role: / Secondary Role (if any): | Last Name / First Name / Firm Name / 140 Hopper Avenue Street Address / Walkwick City / New Jersey State / 07463 Zip / +1 (201) 857-5015 Phone / Fax / e-mail | ○YES ●NO | |
| ☒ | The Purdue Frederick Company, Inc. Last Name / First Name / Primary Role: / Secondary Role (if any): | Last Name / First Name / Firm Name / 80 State Street Street Address / Albany City / New York State / 12207 Zip / Phone / Fax / e-mail | ○YES ●NO | |
| ☒ | Actavis, LLC Last Name / First Name / Primary Role: / Secondary Role (if any): | Last Name / First Name / Firm Name / 400 Interpace Parkway, Morris Corporate Cent➕Parsippany Street Address / City / New Jersey State / 70541120 Zip / +1 (302) 351-3367 Phone / Fax / e-mail | ○YES ●NO | |
| ☒ | Allergan PLC fka Actavis PLC Last Name / First Name / Primary Role: / Secondary Role (if any): | Last Name / First Name / Firm Name / 400 Interpace Parkway, Morris Corporate Cent➕Parsippany Street Address / City / New Jersey State / 7054 Zip / Phone / Fax / e-mail | ○YES ●NO | |

**RELATED CASES:** List any related actions. For Matrimonial actions, include any related criminal and/or Family Court cases.

| Case Title | Index/Case No. | Court | Judge (if assigned) | Relationship to Instant Case |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

SUPREME COURT FOR THE STATE OF NEW YORK
NIAGARA COUNTY
---------------------------------------------------------------X
A.M.H., INDIVIDUALLY AND                          INDEX NO.: E165792/2018
IN HER CAPACITY AS LEGAL CUSTODIAN
OF BABY C.E., ON BEHALF OF THEMSELVES
AND ALL OTHERS SIMILARLY SITUATED,

       Plaintiffs,

v.

PURDUE PHARMA L.P.;
PURDUE PHARMA, INC.;
THE PURDUE FREDERICK COMPANY, INC.;
MCKESSON CORPORATION;                             **NOTICE OF MOTION**
CARDINAL HEALTH, INC.;
AMERISOURCEBERGEN CORPORATION;                    **ECF FILED**
TEVA PHARMACEUTICAL INDUSTRIES, LTD.;
TEVA PHARMACEUTICALS USA, INC.;
CEPHALON, INC.;
JOHNSON & JOHNSON;
JANSSEN PHARMACEUTICALS, INC.;
ORTHO-MCNEIL-JANSSEN
PHARMACEUTICALS, INC. n/k/a
JANSSEN PHARMACEUTICALS, INC.;
JANSSEN PHARMACEUTICA INC. n/k/a
JANSSEN PHARMACEUTICALS, INC.;
INSYS THERAPEUTICS, INC.;
ENDO HEALTH SOLUTIONS INC.;
ENDO PHARMACEUTICALS, INC.;
ALLERGAN PLC f/k/a ACTAVIS PLC;
WATSON PHARMACEUTICALS, INC.
n/k/a ACTAVIS, INC.;
WATSON LABORATORIES, INC.;
ACTAVIS LLC; and
ACTAVIS PHARMA, INC. f/k/a
WATSON PHARMA, INC.,

       Defendants.

---------------------------------------------------------------X

**PLEASE TAKE NOTICE** that, upon the annexed affirmation of Donald Creadore, Esq., dated September 5, 2018, and upon the Affidavit of Celeste Brustowicz, Esq., with exhibit, sworn to September 5, 2018, and upon the Affidavit of Stephen H. Wussow, Esq., with exhibit, sworn to September 5, 2018, and upon the Affidavit of Scott Bickford, Esq., with exhibits, sworn to September 5, 2018, and upon the Affidavit of Kevin Thompson, Esq., with exhibits, sworn to September 5, 2018, and upon the Affidavit of David R. Barney, Jr., Esq., with exhibits, sworn to September 6, 2018, and upon the papers, pleadings and all proceedings heretofore filed herein, Plaintiffs, by and through the undersigned attorneys, will move before this court, located at Niagara County Courthouse, located at 775 Third Street, Niagara Falls, New York, on October 2, 2018, or as soon after as counsel be heard, for an order of admission of Celeste Brustowicz, Esq., Stephen H. Wussow, Esq., Kevin Thompson, David R. Barney, Jr., Esq., and Scott Bickford, Esq., *pro hac vice* pursuant to 22 N.Y.C.R.R. 520.11 *et seq.*, and any and all other state and local rules of practice that may be applicable, in addition to awarding Plaintiffs such other and further relief as the court may deem just and proper..

Dated: New York, New York
September 5, 2018

_____/s/ Donald Creadore_____
THE CREADORE LAW FIRM, P.C.
Attorneys for Plaintiffs
450 Seventh Avenue -- Suite 1408
New York, New York 10123
(212) 355-7200

SERVICE LIST ATTACHED:

# PHV SERVICE LIST E165972/2018

1. **ACTAVIS PHARMA, INC. f/k/a WATSON PHARMA, INC.**
   1090 HORSHAM RD
   NORTH WALES, PA 19454-1505

2. **AMERISOURCEBERGEN CORPORATION**
   1300 MORRIS DR
   CHESTERBROOK, PA, 19087-5594

3. **CEPHALON, INC.**
   1090 HORSHAM RD
   NORTH WALES, PA, 19454-1505

4. **ENDO PHARMACEUTICALS, INC.**
   1400 ATWATER DR
   MALVERN, PA, 19355-8701

5. **JOHNSON & JOHNSON**
   1 JOHNSON AND JOHNSON PLZ
   NEW BRUNSWICK, NJ, 08933-0001

6. **MCKESSON CORPORATION**
   1 POST ST
   SAN FRANCISCO, CA, 94104-5203

7. **ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC**
   1125 TRENTON HARBOURTON RD
   TITUSVILLE, NJ, 08560

8. **PURDUE PHARMA, INC.**
   201 TRESSER BLVD FL 1
   STAMFORD, CT, 06901

9. **PURDUE PHARMA, L.P.**
   201 TRESSER BLVD
   STAMFORD, CT, 06901-3431

10. **THE FREDERICK PURDUE COMPANY, INC.**
    1 STAMFORD FORUM
    STAMFORD, CT, 06901

11. **TEVA PHARMACEUTICALS USA, INC.**
    140 HOPPER AVE
    WALDWICK, NJ, 07463

12. **ACTAVIS, LLC**
   400 INTERPACE PKWY
   PARSIPPANY, NJ, 07054-1120

13. **ENDO HEALTH SOLUTIONS, INC.**
   1400 ATWATER DR
   MALVERN, PA, 19355-8701

14. **INSYS**
   1333 S Spectrum Blvd #100
   Chandler, AZ 85286

15. **INSYS RX**
   410 S BENSON LN
   CHANDLER, AZ, 85224

16. **JANSSEN PHARMACEUTICALS INC.**
   1125 TRENTON HARBOURTON RD
   TITUSVILLE, NJ, 08560

17. **JANSSEN PHARMACEUTICA INC**
   1125 TRENTON HARBOURTON RD
   TITUSVILLE, NJ, 08560-1499

18. **WATSON LABORATORIES, INC.**
   1090 HORSHAM RD
   NORTH WALES, PA, 19454

Case 1:18-cv-01018-EAW    Document 1-3    Filed 09/14/18    Page 102 of 150

**SUPREME COURT FOR THE STATE OF NEW YORK**
**NIAGARA COUNTY**

----------------------------------------------------------------------X

**A.M.H., INDIVIDUALLY AND**                    INDEX NO.: E165792/2018
**IN HER CAPACITY AS LEGAL CUSTODIAN**
**OF BABY C.E., ON BEHALF OF THEMSELVES**
**AND ALL OTHERS SIMILARLY SITUATED,**

       **Plaintiffs,**

**v.**
                             **AFFIRMATION OF**
**PURDUE PHARMA L.P.;**                          **DONALD CREADORE**
**PURDUE PHARMA, INC.;**                         **IN SUPPORT OF**
**THE PURDUE FREDERICK COMPANY, INC.;**          **APPLICATION FOR**
**MCKESSON CORPORATION;**                        **ADMISSION _PRO HAC VICE_**

**CARDINAL HEALTH, INC.;**
**AMERISOURCEBERGEN CORPORATION;**               **ECF FILED**
**TEVA PHARMACEUTICAL INDUSTRIES, LTD.;**
**TEVA PHARMACEUTICALS USA, INC.;**
**CEPHALON, INC.;**
**JOHNSON & JOHNSON;**
**JANSSEN PHARMACEUTICALS, INC.;**
**ORTHO-MCNEIL-JANSSEN**
**PHARMACEUTICALS, INC. n/k/a**
**JANSSEN PHARMACEUTICALS, INC.;**
**JANSSEN PHARMACEUTICA INC. n/k/a**
**JANSSEN PHARMACEUTICALS, INC.;**
**INSYS THERAPEUTICS, INC.;**
**ENDO HEALTH SOLUTIONS INC.;**
**ENDO PHARMACEUTICALS, INC.;**
**ALLERGAN PLC f/k/a ACTAVIS PLC;**
**WATSON PHARMACEUTICALS, INC.**
**n/k/a ACTAVIS, INC.;**
**WATSON LABORATORIES, INC.;**
**ACTAVIS LLC; and**
**ACTAVIS PHARMA, INC. f/k/a**
**WATSON PHARMA, INC.,**

       **Defendants.**

_____X

**Donald Creadore**, an attorney duly admitted to practice in the courts of the State of New York and not a party to this action, hereby affirms the following to be true under the penalties of perjury pursuant to CPLR § 2106:

1. I am a partner of The Creadore Law Firm, P.C., attorneys for Plaintiffs in the above-captioned action. I have personal knowledge of the facts described herein.

2. I am a member in good standing of the New York Bar, pursuant to 22 N.Y.C.R.R. §§ 520.11 and 670.6(e); I was admitted in 1986.

3. I respectfully submit this affirmation in support of Plaintiffs motion (the "Motion") for an Order , pursuant to 22 N.Y.C.R.R. §§ 520.11 and 602.2(a), admitting Celeste Brustowicz, Stephen Wussow, David R. Barney, Jr., Kevin Thompson, and Scott Bickford as counsel *pro hac vice* to appear and participate in this action on behalf of Plaintiffs, together with The Creadore Law Firm, P.C.

4. As demonstrated by their respective Certificates of Good Standing attached to their accompanying affidavits, Ms. Brustowicz, Mr. Barney, Mr. Wussow, Mr. Thompson, and Mr. Bickford are all active members in good standing before the Louisiana State Bar and, in the case or Mr. Bickford, he is also a member in good standing before the Colorado State Bar and Texas State Bar, and in the case of Kevin Thompson he is also a member in good standing before the West Virginia Bar.

5. If this motion is granted, Celeste Brustowicz, Stephen Wussow, David R. Barney, Jr., Kevin Thompson and Scott Bickford will be working together with The Creadore Law Firm, P.C., and The Creadore Law Firm, P.C. will remain attorney of record.

6.  Celeste Brustowicz, Stephen Wussow, Kevin Thompson, David R. Barney, Jr., and Scott Bickford possess substantial and meaningful knowledge and experience in this type of lawsuit, such that their participation will promote an effective and efficient presentation in the proceedings before this Court.  The interests of the clients and of the judicial economy support their admission *pro hac vice.*

7.  Each of the supporting affidavits states that she or he: (1) is familiar and will comply with the standards of professional conduct imposed upon members of the New York bar, including the rules of conduct governing the conduct of attorneys and the Rules of Professional Conduct; (2) agrees to be subject to the jurisdiction of the courts of New York with respect to any acts occurring in the course of her or his participation in this matter; and (3) will notify this Court immediately of any matter affecting her or his standing with the Louisiana State Bar and, in the case of Mr. Bickford his standing before the Colorado State Bar and Texas State and, in the case of Kevin Thompson his standing before the West Virginia Bar as well.

8.  Accompanying this affirmation is a proposed order admitting Ms. Brustowicz, Mr. Wussow, Mr. Barney, Mr. Thompson and Mr. Bickford *pro hac vice.*

[THIS SPACE LEFT BLANK INTENTIONALLY]

W H E R E F O R E, it is respectfully requested that for the reasons set forth herein, Plaintiffs' Motion for an Order, pursuant to 22 N.Y.C.R.R. §§ 520.11, admitting Celeste Brustowicz, Stephen Wussow, David R. Barney, Jr., Kevin Thompson, and Scott Bickford *pro hac vice* to represent Plaintiffs in the above action be granted in its entirety.

Dated:  New York, New York
        September 5, 2018

                                _____*/s/ Donald Creadore*_____
                                THE CREADORE LAW FIRM, P.C.
                                Attorneys for Plaintiffs
                                450 Seventh Avenue – Suite 1408
                                New York, New York 10123
                                (212) 355-7200

SUPREME COURT FOR THE STATE OF NEW YORK
NIAGARA COUNTY
------------------------------------------------------------------X
A.M.H., INDIVIDUALLY AND        INDEX NO.: E165792/2018
IN HER CAPACITY AS LEGAL CUSTODIAN
OF BABY C.E., ON BEHALF OF THEMSELVES     ECF- FILED
AND ALL OTHERS SIMILARLY SITUATED,

        Plaintiffs,

v.

PURDUE PHARMA L.P.;
PURDUE PHARMA, INC.;
THE PURDUE FREDERICK COMPANY, INC.;    **AFFIDAVIT OF**
MCKESSON CORPORATION;                 **CELESTE BRUSTOWICZ**
CARDINAL HEALTH, INC.;                **IN SUPPORT OF MOTION**
AMERISOURCEBERGEN CORPORATION;       **FOR ADMISSION**
TEVA PHARMACEUTICAL INDUSTRIES, LTD.;   *PRO HAC VICE*
TEVA PHARMACEUTICALS USA, INC.;
CEPHALON, INC.;
JOHNSON & JOHNSON;
JANSSEN PHARMACEUTICALS, INC.;
ORTHO-MCNEIL-JANSSEN
PHARMACEUTICALS, INC. n/k/a
JANSSEN PHARMACEUTICALS, INC.;
JANSSEN PHARMACEUTICA INC. n/k/a
JANSSEN PHARMACEUTICALS, INC.;
INSYS THERAPEUTICS, INC.;
ENDO HEALTH SOLUTIONS INC.;
ENDO PHARMACEUTICALS, INC.;
ALLERGAN PLC f/k/a ACTAVIS PLC;
WATSON PHARMACEUTICALS, INC.
n/k/a ACTAVIS, INC.;
WATSON LABORATORIES, INC.;
ACTAVIS LLC; and
ACTAVIS PHARMA, INC. f/k/a
WATSON PHARMA, INC.,

        Defendants.
_____X

STATE OF LOUISIANA     )
                                   )

ORLEANS PARISH       )

Celeste Brustowicz, being duly sworn, hereby deposes and says as follows:

1. I am a partner with Cooper Law Firm, L.L.C., located at Cooper Law Firm, LLC, 1525

   Religious Street, New Orleans, LA 70103; 504.399.0009;

   cbrustowicz@sch-llc.com

2. I submit this affidavit pursuant to 22 N.Y.C.R.R. §520.11 and § 670.6 in support of my

   application for an Order granting motion for admission *pro hac vice* to appear and

   participate in the above captioned action for and on behalf of Plaintiffs.

3. As shown in the Certificate(s) of Good Standing, annexed hereto, I am a member in

   good standing of the Bar of the State(s) of Louisiana, Mississippi and California.

4. There are no pending disciplinary proceedings against me in any State or Federal

   Court.

5. I have not been convicted of a felony.

6. I have not been censured, suspended, disbarred or denied admission or readmission by

   any court.

7. I am familiar with and will comply with the standards of professional conduct imposed

   upon members of the New York bar, including the rules of court governing the conduct

   of attorneys and the Rules of Professional Conduct.

8. I agree to be subject to the jurisdiction of the courts of New York with respect to any

acts occurring during the course of my participation in this action.

9. Wherefore your affiant respectfully submits that she be permitted to appear as counsel

and advocate *pro hac vice* in the above-captioned action for and on behalf of Plaintiffs.

CELESTE BRUSTOWICZ

SWORN TO BEFORE ME THIS
5th DAY OF SEPTEMBER 2018

NOTARY PUBLIC

Stephen H. Wussow, Notary Public
and Attorney at Law (LSBA No.35391)
365 Canal Street, Suite 2850
New Orleans, Louisiana 70130
Parish of Orleans, State of Louisiana
My Commission is for Life.

TO:     SERVICE LIST ATTACHED:

## Louisiana State Bar Association

The Louisiana State Bar Association hereby certifies that_____

Ms. Celeste  Brustowicz
_____

1525 Religious St

whose address is_____

New Orleans, LA 70130
_____

is a member in good standing of the Louisiana State Bar Association as of this date, and that

said person was duly admitted to practice in the courts of the State of Louisiana on the

_____11th_____day of ____October_____1985_____.

Given over my hand and the Seal of the Louisiana State Bar Association, this_____24th

day of____August_____2018_____.

_____

*Executive Director*
*Louisiana State Bar Association*

SUPREME COURT FOR THE STATE OF NEW YORK
NIAGARA COUNTY

-----------------------------------------------------------------X

A.M.H., INDIVIDUALLY AND                      INDEX NO.: E165792/2018
IN HER CAPACITY AS LEGAL CUSTODIAN
OF BABY C.E., ON BEHALF OF THEMSELVES         ECF- FILED
AND ALL OTHERS SIMILARLY SITUATED,

        Plaintiffs,

v.

PURDUE PHARMA L.P.;
PURDUE PHARMA, INC.;
THE PURDUE FREDERICK COMPANY, INC.;           **AFFIDAVIT OF**
MCKESSON CORPORATION;                         **STEPHEN WUSSOW**
CARDINAL HEALTH, INC.;                        **IN SUPPORT OF MOTION**
AMERISOURCEBERGEN CORPORATION;                **FOR ADMISSION**
TEVA PHARMACEUTICAL INDUSTRIES, LTD.;         *PRO HAC VICE*
TEVA PHARMACEUTICALS USA, INC.;
CEPHALON, INC.;
JOHNSON & JOHNSON;
JANSSEN PHARMACEUTICALS, INC.;
ORTHO-MCNEIL-JANSSEN
PHARMACEUTICALS, INC. n/k/a
JANSSEN PHARMACEUTICALS, INC.;
JANSSEN PHARMACEUTICA INC. n/k/a
JANSSEN PHARMACEUTICALS, INC.;
INSYS THERAPEUTICS, INC.;
ENDO HEALTH SOLUTIONS INC.;
ENDO PHARMACEUTICALS, INC.;
ALLERGAN PLC f/k/a ACTAVIS PLC;
WATSON PHARMACEUTICALS, INC.
n/k/a ACTAVIS, INC.;
WATSON LABORATORIES, INC.;
ACTAVIS LLC; and
ACTAVIS PHARMA, INC. f/k/a
WATSON PHARMA, INC.,

        Defendants.

_____X

STATE OF LOUISIANA       )
                         )
ORLEANS PARISH           )

Stephen Wussow, being duly sworn, hereby deposes and says as follows:

1. I am an associate attorney with Cooper Law Firm, L.L.C., located at Cooper Law Firm,
   LLC, 1525 Religious Street, New Orleans, LA 70103; 504.399.0009;
   stephen.wussow@sch-llc.com

2. I submit this affidavit pursuant to 22 N.Y.C.R.R. §520.11 and § 670.6 in support of my
   application for an Order granting motion for admission *pro hac vice* to appear and
   participate in the above captioned action for and on behalf of Plaintiffs.

3. As shown in the Certificate of Good Standing, annexed hereto, I am a member in good
   standing of the Bar of the State of Louisiana.

4. There are no pending disciplinary proceedings against me in any State or Federal
   Court.

5. I have not been convicted of a felony.

6. I have not been censured, suspended, disbarred or denied admission or readmission by
   any court.

7. I am familiar with and will comply with the standards of professional conduct imposed
   upon members of the New York bar, including the rules of court governing the conduct
   of attorneys and the Rules of Professional Conduct.

8. I agree to be subject to the jurisdiction of the courts of New York with respect to any acts occurring during the course of my participation in this action.

9. Wherefore your affiant respectfully submits that she be permitted to appear as counsel and advocate *pro hac vice* in the above-captioned action for and on behalf of Plaintiffs.

STEPHEN WUSSOW

SWORN TO BEFORE ME THIS
5ᵗʰ DAY OF SEPTEMBER 2018

_____
NOTARY PUBLIC

CELESTE BRUSTOWICZ
BAR ROLL #16835
STATE OF LOUISIANA
PARISH OF ORLEANS
My Commission is for Life

TO:    SERVICE LIST ATTACHED:

# Louisiana State Bar Association

The Louisiana State Bar Association hereby certifies that_____

Mr. Stephen Helmuth Wussow

1525 Religious St

whose address is_____

New Orleans, LA 70130

is a member in good standing of the Louisiana State Bar Association as of this date, and that

said person was duly admitted to practice in the courts of the State of Louisiana on the

_____24th_____ day of ___October_____, __2013___ .

Given over my hand and the Seal of the Louisiana State Bar Association, this____7th____

day of___September_____, __2018___ .

Executive Director
Louisiana State Bar Association

**SUPREME COURT FOR THE STATE OF NEW YORK**
**NIAGARA COUNTY**
--------------------------------------------------------------X
**A.M.H., INDIVIDUALLY AND**                     INDEX NO.: E165792/2018
**IN HER CAPACITY AS LEGAL CUSTODIAN**
**OF BABY C.E., ON BEHALF OF THEMSELVES**        **ECF- FILED**
**AND ALL OTHERS SIMILARLY SITUATED,**

       **Plaintiffs,**

**v.**

**PURDUE PHARMA L.P.;**
**PURDUE PHARMA, INC.;**
**THE PURDUE FREDERICK COMPANY, INC.;**    **AFFIDAVIT OF**
**MCKESSON CORPORATION;**                   **SCOTT R. BICKFORD**
**CARDINAL HEALTH, INC.;**                  **IN SUPPORT OF MOTION**
**AMERISOURCEBERGEN CORPORATION;**          **FOR ADMISSION**
**TEVA PHARMACEUTICAL INDUSTRIES, LTD.;**   *PRO HAC VICE*
**TEVA PHARMACEUTICALS USA, INC.;**
**CEPHALON, INC.;**
**JOHNSON & JOHNSON;**
**JANSSEN PHARMACEUTICALS, INC.;**
**ORTHO-MCNEIL-JANSSEN**
**PHARMACEUTICALS, INC. n/k/a**
**JANSSEN PHARMACEUTICALS, INC.;**
**JANSSEN PHARMACEUTICA INC. n/k/a**
**JANSSEN PHARMACEUTICALS, INC.;**
**INSYS THERAPEUTICS, INC.;**
**ENDO HEALTH SOLUTIONS INC.;**
**ENDO PHARMACEUTICALS, INC.;**
**ALLERGAN PLC f/k/a ACTAVIS PLC;**
**WATSON PHARMACEUTICALS, INC.**
**n/k/a ACTAVIS, INC.;**
**WATSON LABORATORIES, INC.;**
**ACTAVIS LLC; and**
**ACTAVIS PHARMA, INC. f/k/a**
**WATSON PHARMA, INC.,**

       **Defendants.**
_____X

STATE OF LOUISIANA

PARISH OF ORLEANS

Scott R. Bickford, being duly sworn, hereby deposes and says:

     1.    I am a partner with the law firm Martzell, Bickford & Centola APC located at 338 Lafayette Street, New Orleans, Louisiana 70130. I am admitted to practice law before the courts of Louisiana, Texas and Colorado. I submit this affidavit pursuant to 22 N.Y.C.R.R. Sec. 520.11 & 670.6 in support of my application for an Order granting me admission *pro hac vice* to appear and participate in this action on behalf of plaintiffs.

     2.    I am a member in good standing of the State Bars of Louisiana, Texas and Colorado (Exhibit A). I have never been disciplined by any court, and no disciplinary proceedings are pending against me (Exhibit B). I certify that I received my J.D. from Tulane University Law School on May 16, 1982 (Exhibit C).

     3.    I am familiar with and will comply with the standards of professional conduct imposed upon members of the New York bar, including the rules of court governing the conduct of attorneys and the Rules of Professional Conduct.

     4.    I agree to be subject to the jurisdiction of the courts of New York with respect to any acts occurring during the course of my participation in this matter.

5.    Wherefore your affiant respectfully submits that he be permitted to appear as counsel and advocate *pro hac vice* in the above-captioned action for and on behalf of Plaintiffs.

_____
SCOTT R. BICKFORD

Dated: SEPTEMBER 5, 2018

SWORN TO AND SUBSCRIBED
BEFORE ME THIS 5TH DAY
OF SEPTEMBER, 2018.

_____
NOTARY PUBLIC

SPENCER R. DOODY
LSBA # 27795
NOTARY PUBLIC
MY COMMISSION IS ISSUED FOR LIFE.

United States of America

State of Louisiana

# Supreme Court of the State of Louisiana

_____

I, JOHN TARLTON OLIVIER, Clerk of the Supreme Court of the State of Louisiana,

do hereby certify that

### *SCOTT R. BICKFORD ESQ., #1165*

was duly admitted and licensed to practice as an attorney and counselor at law in this Court and

the several courts of the State of Louisiana, on the 18th Day of April, 1983 A.D.; and is currently

in good standing, and sufficiently qualified to perform the duties of an attorney and counselor at

law.

IN WITNESS WHEREOF, I hereunto sign

my name and affix the seal of this Court, at

the City of New Orleans, this the 22nd Day

of August, 2018, A.D.

**Clerk of Court**
**Supreme Court of Louisiana**

**EXHIBIT**

A

# STATE BAR OF TEXAS



*Office of the Chief Disciplinary Counsel*

August 22, 2018

Re: Mr. Scott R. Bickford, State Bar Number 02295200

To Whom It May Concern:

This is to certify that Mr. Scott R. Bickford was licensed to practice law in Texas on December 14, 1990, and is an active member in good standing with the State Bar of Texas. "Good standing" means that the attorney is current on payment of Bar dues; has met Minimum Continuing Legal Education requirements; and is not presently under either administrative or disciplinary suspension from the practice of law.

This certification expires 30 days from the date, unless sooner revoked or rendered invalid by operation of rule or law.

Sincerely,

Linda A. Acevedo
Chief Disciplinary Counsel
LA/web



P.O. BOX 12487, CAPITOL STATION, AUSTIN, TEXAS 78711-2487, 512.427.1350; FAX: 512.427.4167



# SUPREME COURT

## State of Colorado,

STATE OF COLORADO, ss:

I, _Cheryl Stevens_ Clerk of the Supreme Court of the State of Colorado, do hereby certify that

### SCOTT R BICKFORD

has been duly licensed and admitted to practice as an

## ATTORNEY AND COUNSELOR AT LAW

within this State; and that his/her name appears upon the Roll of Attorneys and Counselors at Law in my office of date the _____ 26th _____

day of _____ May _____ A. D. 1992 ___ and that at the date hereof

the said _____ SCOTT R BICKFORD _____

is in good standing at this Bar.



IN WITNESS WHEREOF, I have hereunto subscribed my name and affixed the Seal of said Supreme Court, at Denver, in said State, this

____ 23rd ____ day of ____ August ____ A. D. ____ 2018

### Cheryl Stevens

_Clerk_

By _Arielle M. Reid_



## LOUISIANA ATTORNEY DISCIPLINARY BOARD

## OFFICE OF THE DISCIPLINARY COUNSEL

**4000 S. Sherwood Forest Blvd., Suite 607**
**Baton Rouge, Louisiana  70816**

**PH (225) 293-3900 • 1-800-326-8022 • FAX (225) 293-3300**

August 24, 2018

To Whom It May Concern:

## <u>STATEMENT OF DISCIPLINE</u>

This is to certify that there is not now pending, nor any record of any public or private disciplinary action or disciplinary proceeding against:

**Scott R. Bickford**
**Louisiana State Bar Roll No. 01165**
**Date of Admission:  4/18/1983**

on file with the Office of the Disciplinary Counsel.  Current status reflects that attorney is in good standing and eligible to practice law in the State of Louisiana.

CHARLES B. PLATTSMIER
Chief Disciplinary Counsel

CBP/kmw

**EXHIBIT**

tabbies®

B

# STATE BAR OF TEXAS



*Office of the Chief Disciplinary Counsel*

August 22, 2018

Re: Mr. Scott R. Bickford, State Bar Number 02295200

To Whom It May Concern:

This is to certify that Mr. Scott R. Bickford was licensed to practice law in Texas on December 14, 1990, and is an active member in good standing with the State Bar of Texas. "Good standing" means that the attorney is current on payment of Bar dues; has met Minimum Continuing Legal Education requirements; and is not presently under either administrative or disciplinary suspension from the practice of law.

This certification expires 30 days from the date, unless sooner revoked or rendered invalid by operation of rule or law.

Sincerely,

Linda A. Acevedo
Chief Disciplinary Counsel
LA/web



P.O. BOX 12487, CAPITOL STATION, AUSTIN, TEXAS 78711-2487, 512.427.1350; FAX: 512.427.4167

**COLORADO SUPREME COURT**
**ATTORNEY REGULATION COUNSEL**

Attorney Regulation Counsel
Jessica E. Yates

Chief Deputy Regulation Counsel
Margaret B. Funk

Deputy Regulation Counsel
April M. McMurrey

Deputy Regulation Counsel
Dawn M. McKnight

Gregory G. Sapakoff
Deputy Regulation Counsel



Attorneys' Fund for Client Protection
Unauthorized Practice of Law

Assistant Regulation Counsel
Jill Perry Fernandez
Kim E. Ikeler
Erin Robson Kristofco
Bryon M. Large
J.P. Moore
Geanne R. Moroye
Alan C. Obye
Lisa E. Pearce
Matt Ratterman
Catherine Shea
Jacob Vos
Rhonda White-Mitchell
E. James Wilder

Professional Development Counsel
Jonathan P. White

August 31, 2018

To Whom It May Concern:

THIS CERTIFIES that SCOTT R. BICKFORD, registration number 21496, registered address 338 Lafayette St., New Orleans, LA 70130, was admitted to the practice of law in the State of Colorado May 26, 1992, and has not had, as of this date, an order of private reprimand, public censure, suspension, or disbarment for professional misconduct. At this time there are no pending matters against Mr. Bickford.



_Kevin Hanks_

KEVIN HANKS
Office Manager

1300 Broadway, Suite 500 ● Denver, Colorado 80203 ● (303) 457-5800 ● Toll free (877) 888-1370 ●Website ● www.coloradosupremecourt.com

## LOUISIANA ATTORNEY DISCIPLINARY BOARD

## OFFICE OF THE DISCIPLINARY COUNSEL

**4000 S. Sherwood Forest Blvd., Suite 607**
**Baton Rouge, Louisiana 70816**

**PH (225) 293-3900 • 1-800-326-8022 • FAX (225) 293-3300**

August 24, 2018

To Whom It May Concern:

## <u>STATEMENT OF DISCIPLINE</u>

This is to certify that there is not now pending, nor any record of any public or private disciplinary action or disciplinary proceeding against:

**Scott R. Bickford**
**Louisiana State Bar Roll No. 01165**
**Date of Admission: 4/18/1983**

on file with the Office of the Disciplinary Counsel. Current status reflects that attorney is in good standing and eligible to practice law in the State of Louisiana.

CHARLES B. PLATTSMIER
Chief Disciplinary Counsel

CBP/kmw



# STATE BAR OF TEXAS



*Office of the Chief Disciplinary Counsel*

August 22, 2018

Re: Mr. Scott R. Bickford, State Bar Number 02295200

To Whom It May Concern:

This is to certify that Mr. Scott R. Bickford was licensed to practice law in Texas on December 14, 1990, and is an active member in good standing with the State Bar of Texas. "Good standing" means that the attorney is current on payment of Bar dues; has met Minimum Continuing Legal Education requirements; and is not presently under either administrative or disciplinary suspension from the practice of law.

This certification expires 30 days from the date, unless sooner revoked or rendered invalid by operation of rule or law.

Sincerely,

Linda A. Acevedo
Chief Disciplinary Counsel
LA/web



P.O. BOX 12487, CAPITOL STATION, AUSTIN, TEXAS 78711-2487, 512.427.1350; FAX: 512.427.4167

**COLORADO SUPREME COURT**
**ATTORNEY REGULATION COUNSEL**

Attorney Regulation Counsel
Jessica E. Yates

Chief Deputy Regulation Counsel
Margaret B. Funk

Deputy Regulation Counsel
April M. McMurrey

Deputy Regulation Counsel
Dawn M. McKnight

Gregory G. Sapakoff
Deputy Regulation Counsel



Attorneys' Fund for Client Protection
Unauthorized Practice of Law

Assistant Regulation Counsel
Jill Perry Fernandez
Kim E. Ikeler
Erin Robson Kristofco
Bryon M. Large
J.P. Moore
Geanne R. Moroye
Alan C. Obye
Lisa E. Pearce
Matt Ratterman
Catherine Shea
Jacob Vos
Rhonda White-Mitchell
E. James Wilder

Professional Development Counsel
Jonathan P. White

August 31, 2018

To Whom It May Concern:

THIS CERTIFIES that SCOTT R. BICKFORD, registration number 21496, registered address 338 Lafayette St., New Orleans, LA 70130, was admitted to the practice of law in the State of Colorado May 26, 1992, and has not had, as of this date, an order of private reprimand, public censure, suspension, or disbarment for professional misconduct. At this time there are no pending matters against Mr. Bickford.



_Kevin Hanks_

KEVIN HANKS
Office Manager

1300 Broadway, Suite 500 • Denver, Colorado 80203 • (303) 457-5800 • Toll free (877) 888-1370 • Website • www.coloradosupremecourt.com



Tulane
University

LAW SCHOOL

Colleen Timmons
*Assistant Dean of Academic Services*

August 22, 2018

Supreme Court of the
State of New York

To Whom It May Concern:

This is to certify that Scott R. Bickford graduated in good academic standing and received
the Juris Doctor degree from Tulane University School of Law on May 16, 1982.

Sincerely,



Colleen Timmons
Assistant Dean of Academic Services

CT/cr

SEAL:



John Giffen Weinmann Hall, 6329 Freret St., New Orleans, LA 70118–6248  *tel* 504.865.5935  *fax* 504.862.8373
ctimmons@tulane.edu  law.tulane.edu

# SUPREME COURT FOR THE STATE OF NEW YORK
## NIAGARA COUNTY

-----------------------------------------------------------------------X

A.M.H., INDIVIDUALLY AND                  INDEX NO.: E165792/2018
IN HER CAPACITY AS LEGAL CUSTODIAN
OF BABY C.E., ON BEHALF OF THEMSELVES          ECF- FILED
AND ALL OTHERS SIMILARLY SITUATED,

      Plaintiffs,

v.

PURDUE PHARMA L.P.;
PURDUE PHARMA, INC.;
THE PURDUE FREDERICK COMPANY, INC.;      **AFFIDAVIT OF**
MCKESSON CORPORATION;                     **DAVID R. BARNEY, JR.,**
CARDINAL HEALTH, INC.;                    **IN SUPPORT OF MOTION**
AMERISOURCEBERGEN CORPORATION;            **FOR ADMISSION**
TEVA PHARMACEUTICAL INDUSTRIES, LTD.;  *PRO HAC VICE*
TEVA PHARMACEUTICALS USA, INC.;
CEPHALON, INC.;
JOHNSON & JOHNSON;
JANSSEN PHARMACEUTICALS, INC.;
ORTHO-MCNEIL-JANSSEN
PHARMACEUTICALS, INC. n/k/a
JANSSEN PHARMACEUTICALS, INC.;
JANSSEN PHARMACEUTICA INC. n/k/a
JANSSEN PHARMACEUTICALS, INC.;
INSYS THERAPEUTICS, INC.;
ENDO HEALTH SOLUTIONS INC.;
ENDO PHARMACEUTICALS, INC.;
ALLERGAN PLC f/k/a ACTAVIS PLC;
WATSON PHARMACEUTICALS, INC.
n/k/a ACTAVIS, INC.;
WATSON LABORATORIES, INC.;
ACTAVIS LLC; and
ACTAVIS PHARMA, INC. f/k/a
WATSON PHARMA, INC.,

      Defendants.

_____X

STATE OF WEST VIRGINIA    )
                          )
COUNTY OF KANAWHA         )

David R. Barney, Jr., being duly sworn, hereby deposes and says as follows:

1.    I am a partner with Thompson Barney, which is located at 2030 Kanawha Boulevard, East; Charleston, West Virginia 25311-2204; Telephone: (304) 343-4401; email: drbarneywv@gmail.com.

2.    I submit this affidavit pursuant to 22 N.Y.C.R.R. §520.11 and §670.6 in support of my application for an Order granting motion for admission *pro hac vice* to appear and participate in the above captioned action for and on behalf of Plaintiffs.

3.    As shown in the Certificate of Good Standing, annexed hereto, I am a member in good standing of the Bar of the State of West Virginia.

4.    There are no pending disciplinary proceedings against me in any State or Federal Court.

5.    I have not been convicted of a felony.

6.    I have not been censured, suspended, disbarred or denied admission or readmission by any court.

7.    I am familiar with and will comply with the standards of professional conduct imposed upon members of the New York bar, including the rules of court governing the conduct of attorneys and the Rules of Professional Conduct.

8.    I agree to be subject to the jurisdiction of the courts of New York with respect to any acts occurring during the course of my participation in this action.

9.    Wherefore your affiant respectfully submits that he be permitted to appear as counsel and advocate *pro hac vice* in the above-captioned action for and on behalf of Plaintiffs.

_____

DAVID R. BARNEY, JR.

SWORN TO BEFORE ME THIS
6th DAY OF SEPTEMBER 2018

_____
NOTARY PUBLIC

My commission expires Feb. 22, 2023

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
TYLER COLLINS
215 Morris Drive, Montgomery, WV 25136
My Commission Expires Feb. 22, 2023

TO:     SERVICE LIST ATTACHED:

# THE WEST VIRGINIA STATE BAR

## Certificate of Good Standing

**David R. Barney Jr. - WVSB ID# 7958**

This is to certify that, according to the records of the West Virginia State Bar, David R. Barney Jr., of Charleston, WV, was admitted to practice law by the West Virginia Supreme Court of Appeals on September 29, 1999, and was registered as a member of The West Virginia State Bar in September, 1999.

It is further certified that the said David R. Barney Jr., according to our membership records, is currently an Active member in good standing with The West Virginia State Bar.

Given over my hand and seal of The West Virginia State Bar this day, September 6, 2018.



Anita R. Casey, Esquire
Executive Director
The West Virginia State Bar

SUPREME COURT FOR THE STATE OF NEW YORK
NIAGARA COUNTY

-------------------------------------------------------------------X

A.M.H., INDIVIDUALLY AND                    INDEX NO.: E165792/2018
IN HER CAPACITY AS LEGAL CUSTODIAN
OF BABY C.E., ON BEHALF OF THEMSELVES       ECF- FILED
AND ALL OTHERS SIMILARLY SITUATED,

       Plaintiffs,

v.

PURDUE PHARMA L.P.;
PURDUE PHARMA, INC.;
THE PURDUE FREDERICK COMPANY, INC.;         AFFIDAVIT OF
MCKESSON CORPORATION;                       KEVIN THOMPSON
CARDINAL HEALTH, INC.;                      IN SUPPORT OF MOTION
AMERISOURCEBERGEN CORPORATION;              FOR ADMISSION
TEVA PHARMACEUTICAL INDUSTRIES, LTD.;       *PRO HAC VICE*
TEVA PHARMACEUTICALS USA, INC.;
CEPHALON, INC.;
JOHNSON & JOHNSON;
JANSSEN PHARMACEUTICALS, INC.;
ORTHO-MCNEIL-JANSSEN
PHARMACEUTICALS, INC. n/k/a
JANSSEN PHARMACEUTICALS, INC.;
JANSSEN PHARMACEUTICA INC. n/k/a
JANSSEN PHARMACEUTICALS, INC.;
INSYS THERAPEUTICS, INC.;
ENDO HEALTH SOLUTIONS INC.;
ENDO PHARMACEUTICALS, INC.;
ALLERGAN PLC f/k/a ACTAVIS PLC;
WATSON PHARMACEUTICALS, INC.
n/k/a ACTAVIS, INC.;
WATSON LABORATORIES, INC.;
ACTAVIS LLC; and
ACTAVIS PHARMA, INC. f/k/a
WATSON PHARMA, INC.,

       Defendants.

_____X


STATE OF LOUISIANA          )
                            )
ORLEANS PARISH              )

Kevin Thompson, being duly sworn, hereby deposes and says as follows:

1. I am a partner with Thompson Barney Law Firm, located at Thompson Barney, 2030

    Kanawha Blvd. East, Charleston, WV 25311; (304)343-4401;

    kwthompsonwv@gmail.com

2. I submit this affidavit pursuant to 22 N.Y.C.R.R. §520.11 and § 670.6 in support of my

    application for an Order granting motion for admission *pro hac vice* to appear and

    participate in the above captioned action for and on behalf of Plaintiffs.

3. As shown in the Certificate of Good Standing, annexed hereto, I am a member in good

    standing of the Bar of the State of West Virginia.

4. There are no pending disciplinary proceedings against me in any State or Federal Court.

5. I have not been convicted of a felony.

6. I have not been censured, suspended, disbarred or denied admission or readmission by

    any court.

7. I am familiar with and will comply with the standards of professional conduct imposed

    upon members of the New York bar, including the rules of court governing the conduct

    of attorneys and the Rules of Professional Conduct.

8. I agree to be subject to the jurisdiction of the courts of New York with respect to any acts

    occurring during the course of my participation in this action.

9. Wherefore your affiant respectfully submits that he be permitted to appear as counsel and

advocate *pro hac vice* in the above-captioned action for and on behalf of Plaintiffs.

KEVIN THOMPSON

SWORN TO BEFORE ME THIS
DAY OF SEPTEMBER 2018

NOTARY PUBLIC

Stephen H. Wussow, Notary Public
and Attorney at Law (LSBA No.35391)
365 Canal Street, Suite 2850
New Orleans, Louisiana 70130
Parish of Orleans, State of Louisiana
My Commission is for Life.



# THE WEST VIRGINIA STATE BAR

## Certificate of Good Standing

### Kevin W. Thompson – WVSB ID# 5062

This is to certify that, according to the records of the West Virginia State Bar, Kevin W. Thompson, of Charleston, WV, was admitted to practice law by the West Virginia Supreme Court of Appeals on November 1, 1988, and was registered as a member of The West Virginia State Bar in November, 1988.

It is further certified that the said Kevin W. Thompson, according to our membership records, is currently an Active member in good standing with The West Virginia State Bar.

Given over my hand and seal of The West Virginia State Bar this day, September 6, 2018.

Anita R. Casey, Esquire
Executive Director
The West Virginia State Bar

SUPREME COURT FOR THE STATE OF NEW YORK
NIAGARA COUNTY
------------------------------------------------------------------X

A.M.H., INDIVIDUALLY AND                    INDEX NO.: E165792/2018
IN HER CAPACITY AS LEGAL CUSTODIAN
OF BABY C.E., ON BEHALF OF THEMSELVES       ECF- FILED
AND ALL OTHERS SIMILARLY SITUATED,

                Plaintiffs,               PROPOSED
                                            ORDER OF ADMISSIONS
                                            *PRO HAC VICE*

v.

PURDUE PHARMA L.P.;
PURDUE PHARMA, INC.;
THE PURDUE FREDERICK COMPANY, INC.;
MCKESSON CORPORATION;
CARDINAL HEALTH, INC.;
AMERISOURCEBERGEN CORPORATION;
TEVA PHARMACEUTICAL INDUSTRIES, LTD.;
TEVA PHARMACEUTICALS USA, INC.;
CEPHALON, INC.;
JOHNSON & JOHNSON;
JANSSEN PHARMACEUTICALS, INC.;
ORTHO-MCNEIL-JANSSEN
PHARMACEUTICALS, INC. n/k/a
JANSSEN PHARMACEUTICALS, INC.;
JANSSEN PHARMACEUTICA INC. n/k/a
JANSSEN PHARMACEUTICALS, INC.;
INSYS THERAPEUTICS, INC.;
ENDO HEALTH SOLUTIONS INC.;
ENDO PHARMACEUTICALS, INC.;
ALLERGAN PLC f/k/a ACTAVIS PLC;
WATSON PHARMACEUTICALS, INC.
n/k/a ACTAVIS, INC.;
WATSON LABORATORIES, INC.;
ACTAVIS LLC; and
ACTAVIS PHARMA, INC. f/k/a
WATSON PHARMA, INC.,

              Defendants.

_____X

THIS MATTER, having been presented to this Honorable Court by Donald Creadore of The Creadore Law Firm, P.C., attorney for Plaintiffs, upon motion for an Order pursuant to 22 N.Y.C.R.R. § 520.11, granting *pro hac vice* admission to Celeste Brustowicz, Stephen H. Wussow, Kevin Thompson, David Barney, Jr., and Scott Bickford, in the above-captioned matter, and in support of said application thereof the affirmation of Donald Creadore of The Creadore Law Firm, P.C., a member of the Bar of the State of New York and attorney of record herein for Plaintiffs, together with affidavits and supporting exhibits by each of the forenamed individuals seeking admission, each dated September 5, 2018 or, in the case of David Barney, Jr., dated September 6, 2018,  and a Certificate of Good Standing from the jurisdiction(s) in which each applicant was admitted to the practice of law, and the Court having reviewed the foregoing submissions and due deliberations having been had, it is therefore,

ORDERED, that the motion is GRANTED and Celeste Brustowicz, David Barney, Jr., Stephen Wussow, Scott Bickford and Kevin Thompson, are permitted to appear and to participate in this action on behalf of the Plaintiffs; and it is further

ORDERED that they shall at all times be associated herein with counsel who is a member in good standing of the Bar of the State of New York and is attorney of record for the party in question and all pleadings, briefs and other papers filed with the Court shall be served upon the attorney of record, who shall be held responsible for such papers and for the conduct of this action; and it is further

ORDERED that, pursuant to § 520.11 of the Rules of the Court of Appeals, the attorneys hereby admitted *pro hac vice* shall abide by the standards of professional conduct imposed upon members of the New York Bar, including the Rules of the Courts governing the conduct of attorneys and the Disciplinary Rules of the Code of Professional Responsibility; and it is further

ORDERED that Celeste Brustowicz, Kevin Thompson, Stephen Wussow David Barney, Jr. and Mr. Bickford shall be subject to the jurisdiction of the courts of the State of New York with respect to any acts occurring during the course of their participation in this matter; and it is further

ORDERED that said counsel shall notify the court immediately of any matter or event in this or any other jurisdiction which affects their standing as a member of the Bar.

Dated: New York, New York

ENTER:

_____

Case 1:18-cv-01018-EAW   Document 1-3   Filed 09/14/18   Page 140 of 150

SUPREME COURT FOR THE STATE OF NEW YORK
NIAGARA COUNTY

-------------------------------------------------------------------X

A.M.H., INDIVIDUALLY AND                          INDEX NO.: E165792/2018
IN HER CAPACITY AS LEGAL CUSTODIAN
OF BABY C.E., ON BEHALF OF THEMSELVES
AND ALL OTHERS SIMILARLY SITUATED,

        Plaintiffs,

v.

PURDUE PHARMA L.P.;
PURDUE PHARMA, INC.;
THE PURDUE FREDERICK COMPANY, INC.;          **AMENDED**
MCKESSON CORPORATION;                         **NOTICE OF MOTION**
CARDINAL HEALTH, INC.;
AMERISOURCEBERGEN CORPORATION;                **ECF FILED**
TEVA PHARMACEUTICAL INDUSTRIES, LTD.;
TEVA PHARMACEUTICALS USA, INC.;
CEPHALON, INC.;
JOHNSON & JOHNSON;
JANSSEN PHARMACEUTICALS, INC.;
ORTHO-MCNEIL-JANSSEN
PHARMACEUTICALS, INC. n/k/a
JANSSEN PHARMACEUTICALS, INC.;
JANSSEN PHARMACEUTICA INC. n/k/a
JANSSEN PHARMACEUTICALS, INC.;
INSYS THERAPEUTICS, INC.;
ENDO HEALTH SOLUTIONS INC.;
ENDO PHARMACEUTICALS, INC.;
ALLERGAN PLC f/k/a ACTAVIS PLC;
WATSON PHARMACEUTICALS, INC.
n/k/a ACTAVIS, INC.;
WATSON LABORATORIES, INC.;
ACTAVIS LLC; and
ACTAVIS PHARMA, INC. f/k/a
WATSON PHARMA, INC.,

        Defendants.

-------------------------------------------------------------------X

**PLEASE TAKE NOTICE** that, upon the annexed affirmation of Donald Creadore, Esq.,

dated September 5, 2018, and upon the Affidavit of Celeste Brustowicz, Esq., with

exhibit, sworn to September 5, 2018, and upon the Affidavit of Stephen H. Wussow,

Esq., with exhibit, sworn to September 5, 2018, and upon the Affidavit of Scott Bickford,

Esq., with exhibits, sworn to September 5, 2018, and upon the Affidavit of Kevin

Thompson, Esq., with exhibits, sworn to September 5, 2018, and upon the Affidavit of

David R. Barney, Jr., Esq., with exhibits, sworn to September 6, 2018, and upon the

papers, pleadings and all proceedings heretofore filed herein, Plaintiffs, by and through

the undersigned attorneys, will move before this court, located at Niagara County

Courthouse, located at 775 Third Street, Niagara Falls, New York, on October 4, 2018, or

as soon after as counsel be heard, for an order of admission of Celeste Brustowicz, Esq.,

Stephen H. Wussow, Esq., Kevin Thompson, David R. Barney, Jr., Esq., and Scott

Bickford, Esq., *pro hac vice* pursuant to 22 N.Y.C.R.R. 520.11 *et seq.*, and any and all

other state and local rules of practice that may be applicable, in addition to awarding

Plaintiffs such other and further relief as the court may deem just and proper.

In accordance with CPLR § 2214, opposition papers, if any, shall be served upon

plaintiff's counsel at least seven (7) days prior to the return date.

Dated: New York, New York
    September 12, 2018

                    _____/s/ Donald Creadore_____
                    THE CREADORE LAW FIRM, P.C.
                    Attorneys for Plaintiffs
                    450 Seventh Avenue – Suite 1408
                    New York, New York 10123
                    (212) 355-7200

Case 1:18-cv-01018-EAW   Document 1-3   Filed 09/14/18   Page 142 of 150

SERVICE LIST ATTACHED:

## PHV SERVICE LIST E165792/2018
## AMENDED NOTICE

1. **ACTAVIS PHARMA, INC.**
   1090 HORSHAM RD
   NORTH WALES, PA 19454-1505

2. **AMERISOURCEBERGEN CORPORATION**
   1300 MORRIS DR
   CHESTERBROOK, PA, 19087-5594

3. **CARDINAL HEALTH, INC**
   7000 CARDINAL PL
   DUBLIN, OH, 43017-1091

4. **CEPHALON, INC.**
   1090 HORSHAM RD
   NORTH WALES, PA, 19454-1505

5. **ENDO PHARMACEUTICALS, INC.**
   1400 ATWATER DR
   MALVERN, PA, 19355-8701

6. **JOHNSON & JOHNSON**
   1 JOHNSON AND JOHNSON PLZ
   NEW BRUNSWICK, NJ, 08933-0001

7. **MCKESSON CORPORATION**
   1 POST ST
   SAN FRANCISCO, CA, 94104-5203

8. **ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC.**
   1125 TRENTON HARBOURTON RD
   TITUSVILLE, NJ, 08560

9. **PURDUE PHARMA, INC.**
   201 TRESSER BLVD FL 1
   STAMFORD, CT, 06901

10. **PURDUE PHARMA, L.P.**
    201 TRESSER BLVD
    STAMFORD, CT, 06901-3431

11. **FREDERICK PERDUE COMPANY, INC.**
    1 STAMFORD FORUM
    STAMFORD, CT. 06901

FILED: NIAGARA COUNTY CLERK 09/12/2018 08:28 AM
NYSCEF DOC. NO. 19    Case 1:18-cv-01018-EAW    Document 1-3    Filed 09/14/18    Page 144 of 150

INDEX NO. E165792/2018
RECEIVED NYSCEF: 09/12/2018

**12. TEVA PHARMACEUTICALS USA, INC.**
140 HOPPER AVE
WALDWICK, NJ, 07463

**13. ACTAVIS, LLC**
400 INTERPACE PKWY
PARSIPPANY, NJ, 07054-1120

**14. ENDO HEALTH SOLUTIONS, INC.**
1400 ATWATER DR
MALVERN, PA, 19355-8701

**15. INSYS**
1333 S Spectrum Blvd #100
Chandler, AZ 85286

**16. INSYS RX**
410 S BENSON LN
CHANDLER, AZ, 85224

**17. JANSSEN PHARMACEUTICALS INC.**
1125 TRENTON HARBOURTON RD
TITUSVILLE, NJ, 08560

**18. JANSSEN PHARMACEUTICA INC**
1125 TRENTON HARBOURTON RD
TITUSVILLE, NJ, 08560-1499

**19. WATSON LABORATORIES, INC.**
1090 HORSHAM RD
NORTH WALES, PA, 19454

SUPREME COURT FOR THE STATE OF NEW YORK
NIAGARA COUNTY
---------------------------------------------------------------X

A.M.H., INDIVIDUALLY AND                      INDEX NO.: E165792/2018
IN HER CAPACITY AS LEGAL CUSTODIAN
OF BABY C.E., ON BEHALF OF THEMSELVES          ECF- FILED
AND ALL OTHERS SIMILARLY SITUATED,
                                              AFFIRMATION OF SERVICE
          Plaintiffs,

     v.

PURDUE PHARMA L.P.;
PURDUE PHARMA, INC.;
THE PURDUE FREDERICK COMPANY, INC.;
MCKESSON CORPORATION;
CARDINAL HEALTH, INC.;
AMERISOURCEBERGEN CORPORATION;
TEVA PHARMACEUTICAL INDUSTRIES, LTD.;
TEVA PHARMACEUTICALS USA, INC.;
CEPHALON, INC.;
JOHNSON & JOHNSON;
JANSSEN PHARMACEUTICALS, INC.;
ORTHO-MCNEIL-JANSSEN
PHARMACEUTICALS, INC. n/k/a
JANSSEN PHARMACEUTICALS, INC.;
JANSSEN PHARMACEUTICA INC. n/k/a
JANSSEN PHARMACEUTICALS, INC.;
INSYS THERAPEUTICS, INC.;
ENDO HEALTH SOLUTIONS INC.;
ENDO PHARMACEUTICALS, INC.;
ALLERGAN PLC f/k/a ACTAVIS PLC;
WATSON PHARMACEUTICALS, INC.
n/k/a ACTAVIS, INC.;
WATSON LABORATORIES, INC.;
ACTAVIS LLC; and
ACTAVIS PHARMA, INC. f/k/a
WATSON PHARMA, INC.,

          Defendants.
---------------------------------------------------------------X

## AFFIRMATION OF SERVICE BY REGULAR MAIL

STATE OF NEW YORK  )
                   :  ss.:
COUNTY OF NEW YORK  )

     Donald E. Creadore, an attorney duly licensed to practice before the Courts of the State of New York, says:

     I am not a party to the action, am over 18 years of age and reside in New York, New York.

     On September 12th, 2018, I served a true copy of the AMENDED NOTICE OF MOTION by mailing the same in a sealed envelope, with postage prepaid thereon, in a post-office or official depository of the United States Postal Service within the State of New York, addressed to the last known address of the addressee(s) as indicated below:

1. **ACTAVIS PHARMA, INC.**
   1090 HORSHAM RD
   NORTH WALES, PA 19454-1505

2. **AMERISOURCEBERGEN CORPORATION**
   1300 MORRIS DR
   CHESTERBROOK, PA, 19087-5594

3. **CEPHALON, INC.**
   1090 HORSHAM RD
   NORTH WALES, PA, 19454-1505

4. **ENDO PHARMACEUTICALS, INC.**
   1400 ATWATER DR
   MALVERN, PA, 19355-8701

5. **JOHNSON & JOHNSON**
   1 JOHNSON AND JOHNSON PLZ
   NEW BRUNSWICK, NJ, 08933-0001

6. **MCKESSON CORPORATION**
   1 POST ST
   SAN FRANCISCO, CA, 94104-5203

7. **ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC**
   1125 TRENTON HARBOURTON RD
   TITUSVILLE, NJ, 08560

FILED: NIAGARA COUNTY CLERK 09/12/2018 08:28 AM
NYSCEF, DOC. NO. 20
Case 1:18-cv-01018-EAW    Document 1-3    Filed 09/14/18    Page 147 of 150

INDEX NO. E165792/2018
RECEIVED NYSCEF: 09/12/2018

8. **PURDUE PHARMA, INC.**
   201 TRESSER BLVD FL 1
   STAMFORD, CT, 06901

9. **PURDUE PHARMA, L.P.**
   201 TRESSER BLVD
   STAMFORD, CT, 06901-3431

10. **THE FREDERICK PURDUE COMPANY, INC.**
    1 STAMFORD FORUM
    STAMFORD, CT, 06901

11. **TEVA PHARMACEUTICALS USA, INC.**
    140 HOPPER AVE
    WALDWICK, NJ, 07463

12. **ACTAVIS, LLC**
    400 INTERPACE PKWY
    PARSIPPANY, NJ, 07054-1120

13. **ENDO HEALTH SOLUTIONS, INC.**
    1400 ATWATER DR
    MALVERN, PA, 19355-8701

14. **INSYS**
    1333 S Spectrum Blvd #100
    Chandler, AZ 85286

15. **INSYS RX**
    410 S BENSON LN
    CHANDLER, AZ, 85224

16. **JANSSEN PHARMACEUTICALS INC.**
    1125 TRENTON HARBOURTON RD
    TITUSVILLE, NJ, 08560

17. **JANSSEN PHARMACEUTICA INC**
    1125 TRENTON HARBOURTON RD
    TITUSVILLE, NJ, 08560-1499

18. **WATSON LABORATORIES, INC.**
    1090 HORSHAM RD
    NORTH WALES, PA, 19454

19. **CARDINAL HEALTH, INC**
    7000 CARDINAL PL
    DUBLIN, OH, 43017-1091

DATED:     NEW YORK, NY
           SEPTEMBER 12, 2018


                              ___/s/ Donald Creadore_____
                              DONALD E. CREADORE

**SUPREME COURT FOR THE STATE OF NEW YORK**
**NIAGARA COUNTY**
----------------------------------------------------------**X**

**A.M.H., INDIVIDUALLY AND**                    INDEX NO.: E165792/2018
**IN HER CAPACITY AS LEGAL CUSTODIAN**
**OF BABY C.E., ON BEHALF OF THEMSELVES**       **ECF- FILED**
**AND ALL OTHERS SIMILARLY SITUATED,**
                                                **AFFIRMATION OF SERVICE**
                    **Plaintiffs,**

        **v.**

**PURDUE PHARMA L.P.;**
**PURDUE PHARMA, INC.;**
**THE PURDUE FREDERICK COMPANY, INC.;**
**MCKESSON CORPORATION;**
**CARDINAL HEALTH, INC.;**
**AMERISOURCEBERGEN CORPORATION;**
**TEVA PHARMACEUTICAL INDUSTRIES, LTD.;**
**TEVA PHARMACEUTICALS USA, INC.;**
**CEPHALON, INC.;**
**JOHNSON & JOHNSON;**
**JANSSEN PHARMACEUTICALS, INC.;**
**ORTHO-MCNEIL-JANSSEN**
**PHARMACEUTICALS, INC. n/k/a**
**JANSSEN PHARMACEUTICALS, INC.;**
**JANSSEN PHARMACEUTICA INC. n/k/a**
**JANSSEN PHARMACEUTICALS, INC.;**
**INSYS THERAPEUTICS, INC.;**
**ENDO HEALTH SOLUTIONS INC.;**
**ENDO PHARMACEUTICALS, INC.;**
**ALLERGAN PLC f/k/a ACTAVIS PLC;**
**WATSON PHARMACEUTICALS, INC.**
**n/k/a ACTAVIS, INC.;**
**WATSON LABORATORIES, INC.;**
**ACTAVIS LLC; and**
**ACTAVIS PHARMA, INC. f/k/a**
**WATSON PHARMA, INC.,**

        **Defendants.**

_____**X**

## AFFIRMATION OF SERVICE BY REGULAR MAIL

STATE OF NEW YORK    )
                :      ss.:
COUNTY OF NEW YORK  )

        Donald E. Creadore, an attorney duly licensed to practice before the Courts of the State of New York, says:

        I am not a party to the action, am over 18 years of age and reside in New York, New York.

        On September 12th, 2018, I served a true copy of the NOTICE OF MOTION and SUPPORTING PAPERS and PROPOSED ORDER by mailing the same in a sealed envelope, with postage prepaid thereon, in a post-office or official depository of the United States Postal Service within the State of New York, addressed to the last known address of the addressee(s) as indicated below:

      **CARDINAL HEALTH, INC**
      7000 CARDINAL PL
      DUBLIN, OH, 43017-1091


DATED:     NEW YORK, NY
             SEPTEMBER 12, 2018



                       ___/s/ Donald Creadore_____
                       DONALD E. CREADORE